## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

GRIFFITTS & CODER CUSTOM
CHOPPING, LLC, et al.,

                    Plaintiffs,

v.                                            Case No. 18-2300-DDC-KGG

CNH INDUSTRIAL AMERICA, LLC,

                    Defendants.


## PLAINTIFFS' RESPONSE TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT


COME NOW Plaintiffs Griffitts & Coder Custom Chopping, LLC ("Custom Chopping"), Bradley A. Griffitts, and Timothy L. Coder (collectively, "Plaintiffs") by and through counsel, Diane L. Bellquist and Anne M. Kindling of Joseph, Hollander & Craft, LLC, and offer this response to Defendant CNH Industrial America, LLC's ("Defendant" or "CNH") Motion for Summary Judgment.

Plaintiffs jointly acquired five brand-new, CNH-manufactured tractors. Plaintiffs wanted brand-new, reliable tractors with an integrated GPS with autoguidance and Power Take Off (PTO). Plaintiffs also wanted tractors covered by a warranty so that they were assured of a speedy repair in the event one of their new tractors suffered from an unanticipated defect in workmanship or materials. Plaintiffs instead received tractors with a defective GPS that failed to function

1

properly for the majority of their lease term—in the case of two tractors, being repaired only in the final days before Plaintiffs returned the tractors at the conclusion of the three-year lease. These brand new tractors also suffered numerous mechanical defects necessitating multiple warranty repairs to each tractor, leaving Plaintiffs unable to make full use of the five tractors for which they contracted. Plaintiffs filed this action in an attempt to recover the value they paid but never received from the five tractors.

## DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS

1.      Custom Chopping is a Kansas limited liability company that was formed in approximately 2012. Exhibit A, Coder Depo. at 26:21-25; see also Pretrial Order, Dkt. #50, p. 2, ¶ 2(a)(1).

**RESPONSE:** Uncontroverted.

2.      The only two members of Custom Chopping are Brad Griffitts and Tim Coder.  Exhibit A, Coder Depo. at 203:18-22; Exhibit B, Griffitts Depo. at 17:4-7.

**RESPONSE:** Uncontroverted.

3.      Farm Services is a Kansas limited liability company that was formed in 2015.  Exhibit A, Coder Depo. at 29:24-30:6.

**RESPONSE:** Uncontroverted.

4.      The only two members of Farm Services are Brad Griffitts and Tim Coder.  Exhibit A, Coder Depo. at 203:23-25; Exhibit B, Griffitts Depo. at 17:8-13.

**RESPONSE:** Uncontroverted.

5.      Brad Griffitts and Tim Coder are not related to each other. Exhibit B, Griffitts Depo. at 11:21-22.

**RESPONSE:** Uncontroverted.

6.      Neither Brad Griffitts nor Tim Coder own or operate a farming operation, whether as an individual, sole proprietorship, or with other family members, but Custom Chopping owns 335 acres of ground near Muleshoe, Texas where Custom Chopping raises crops, including wheat and corn, for sale. Exhibit A, Coder Depo. at 29:16-31:12, 32:25-33:10; Exhibit B, Griffitts Depo. at 11:5-6, 22:20-24:11.

**RESPONSE:** Uncontroverted.

7.      Custom Chopping performs three primary services: (a) custom silage harvesting, which involves swathing, chopping, hauling, piling, and packing a particular crop; (b) custom swathing and hauling of straw; and (c) occasional trucking for other custom cutters and farmers. Exhibit A, Coder Depo. at 35:18-45:16, 58:19-59:15, and 158:15-21.

**RESPONSE:** Uncontroverted.

8.      The only service performed by Farm Services is manure spreading. Exhibit A, Coder Depo. at 30:7-10, 46:14-47:1, 48:17-24, 50:20-51:12, 97:11-98:2, and 158:15-21; Exhibit B, Griffitts Depo. at 30:5-11.

**RESPONSE:** Uncontroverted.

9.      Custom Chopping's season for custom silage harvesting runs from March to November. Exhibit A, Coder Depo. at 36:17-24.

3

**RESPONSE:**  Uncontroverted.

10.     Farm Services' season for manure spreading runs from September to April.  Exhibit A, Coder Depo. at 50:20-25.

**RESPONSE:**  Uncontroverted.

11.     Custom Chopping's season for straw swathing is in the middle of the summer.  Exhibit A, Coder Depo. at 44:19-24.

**RESPONSE:**  Uncontroverted.

12.     Farm Services last spread manure in December 2018 or January 2019 and is in the process of liquidating and closing the business because manure spreading is no longer lucrative due to increased competition charging lower rates. Exhibit A, Coder Depo. 53:14-55:17, 74:12- 20, and 190:21-191:4.

**RESPONSE:**  Uncontroverted, but irrelevant.

13.     From January to May 2016, Custom Chopping entered into leases for five New Holland tractors from Farm Credit Leasing which were sold by Agri-Center. Exhibit A, Coder Depo. 120:9-125:12.

**RESPONSE:**  Uncontroverted but incomplete and misleading.  See Plaintiff's Additional Statement of Uncontroverted Facts, ¶¶ 55-59.

14.     A Commercial Equipment Lease Agreement ("Lease Agreement") with Farm Credit Leasing was entered into for the lease of each of the five Tractors:

> a.     2016 New Holland T8.380 Auto Command Tractor, Serial
>
>        Number ZFRE05239, dated January 28, 2016;

    b.    2016 New Holland T8.380 Auto Command Tractor, Serial Number ZFRE06025, dated January 28, 2016;

    c.    2015 New Holland T8.435 Auto Command Tractor, Serial Number ZFRE02091, dated March 21, 2016;

    d.    2016 New Holland T8.380 Powershift Tractor, Serial Number ZGRE02009, dated April 29, 2016; and

    e.    2016 New Holland T8.380 Powershift Tractor, Serial Number ZGRE02010, dated April 29, 2016.

Exhibit A, Coder Depo. 120:9-125:12; Exhibit D, Depo. Ex. #23; Exhibit E, Depo. Ex. #24; Exhibit F, Depo. Ex. #25; Exhibit G, Depo. Ex. #26; Exhibit H, Depo. Ex. #27.

**RESPONSE:**  Uncontroverted but incomplete and misleading.  See Plaintiff's Additional Statement of Uncontroverted Facts, ¶¶ 55-59.

15. Each Lease Agreement above was between Farm Credit Leasing as "Lessor" and "Griffitts & Coder Custom Shopping *[sic]* LLC, Timothy L Coder, Bradley Allen Griffitts ('Lessee') a(n) Kansas LLC" as "Lessee."  Exhibit A, Coder Depo. 120:9-125:12; Exhibit D, Depo. Ex. #23; Exhibit E, Depo. Ex. #24; Exhibit F, Depo. Ex. #25; Exhibit G, Depo. Ex. #26; Exhibit H, Depo. Ex. #27.

**RESPONSE:**  Controverted in part.  Uncontroverted in that page 1 of each Lease Agreement includes typing stating: "Lessee:  GRIFFITTS & CODER CUSTOM CHOPPING LLC, TIMOTHY L. CODER, BRADLEY ALLEN GRIFFITTS ("LESSEE") a(n) KANSAS LLC."  Controverted in that page 4 of each Lease Agreement plainly identifies Custom Chopping as a Lessee, Timothy L. Coder as an

5

individual Lessee, and Bradley Allen Griffitts as an individual Lessee and, further, plainly indicates where Coder and Griffitts each signed twice in their corporate capacity and each signed twice in their individual capacity.  See Plaintiff's Additional Statement of Uncontroverted Facts, ¶¶ 56-59; Dkt. #52-4; Dkt. #52-5; Dkt. #52-6; Dkt. #52-6; and Dkt. #52-8.

16.    Paragraph 6 of each Lease Agreement states:

- Use, Maintenance and Return of Equipment; Subletting and Assignment Prohibited. Lessee agrees that the Equipment will only be used in the Lessee's trade or business for legal business and commercial purposes. Without Lessor's prior written consent, Lessee shall not (a) sublet the Equipment, (b) assign, transfer or otherwise dispose of this Lease, any Equipment or any interest therein, or create or suffer any levy, lien or encumbrances thereon other than any lien or encumbrances created by Lessor, or (c) remove the Equipment from the Equipment Location specified above. The Equipment will be operated by competent and qualified personnel only and in accordance with applicable operating instructions, laws, government regulations and applicable insurance policies….

Exhibit A, Coder Depo. 120:9-125:12; Exhibit D, Depo. Ex. #23; Exhibit E, Depo. Ex. #24; Exhibit F, Depo. Ex. #25; Exhibit G, Depo. Ex. #26; Exhibit H, Depo. Ex. #27.

**RESPONSE:**  Uncontroverted.

17.    Paragraph 9 of each Lease Agreement states:

6

- Warranties. Lessee agrees that it has selected the Equipment and Vendor based upon its own judgment and disclaims any reliance upon any statements or representations made by Lessor.  LESSEE ACKNOWLEDGES THAT: LESSOR IS NOT THE MANUFACTURER OF THE EQUIPMENT NOR THE MANUFACTURER'S AGENT NOR A DEALER THEREIN; THE EQUIPMENT IS OF THE SIZE, DESIGN, CAPACITY, DESCRIPTION, AND MANUFACTURE SELECTED BY LESSEE; LESSEE IS SATISFIED THAT THE EQUIPMENT IS SUITABLE AND FIT FOR ITS PURPOSES; LESSOR HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY EITHER EXPRESS OR IMPLIED AND HAS NOT WARRANTED THE MERCHANTABILITY OF THE EQUIPMENT OR ITS FITNESS FOR ANY PARTICULAR PURPOSE; AND LESSEE LEASES THE EQUIPMENT AND TAKES SUCH "AS IS" AND WITH ALL FAULTS.  Lessor hereby assigns to Lessee, for the duration hereof, all warranties received by Lessor with respect to the Equipment to the extent assignable and Lessor shall have no obligation whatsoever to make any claim on such warranty.

Exhibit A, Coder Depo. 120:9-125:12; Exhibit D, Depo. Ex. #23; Exhibit E, Depo. Ex. #24; Exhibit F, Depo. Ex. #25; Exhibit G, Depo. Ex. #26; Exhibit H, Depo. Ex. #27.

**RESPONSE:** Uncontroverted.

7

18.    At no time from January to May 2016 did Tim Coder or Brad Griffitts ever communicate with Farm Credit Leasing regarding the Tractors or the Lease Agreements, as all such communication with Farm Credit Leasing went through Lee File of Agri-Center.  Exhibit A, Coder Depo. 106:23-107:7, 116:11-117:12, 125:13-23, 134:21-135:1; see Exhibit C, Lee File Affidavit at ¶ 13.

**RESPONSE:**  Uncontroverted.

19.    Neither Tim Coder nor Brad Griffitts ever requested that they be identified as additional lessees in the Lease Agreements, as Lee File at Agri-Center advised them that Farm Credit Leasing required them to be named as additional lessees because the lease was with Custom Chopping, not an individual.  Exhibit A, Coder Depo. 145:11-146:14; Exhibit C, Lee File Affidavit at ¶¶ 18-19 and 21.

**RESPONSE:**  Uncontroverted that neither Coder nor Griffitts requested that they be identified as additional lessees in the Lease Agreements; the remaining portions of paragraph 19 are controverted as the sources cited do not establish that Mr. File advised Coder or Griffitts of the particular reason why they had to be additional lessees.

20.    Custom Chopping has always intended to return the Tractors at the end of the lease term, not to pay the "End of Term Amount" under the Lease Agreements to purchase the Tractors from Farm Credit at the end of the least term.  Exhibit A, Coder Depo. 100:5-101:11.

**RESPONSE:** Uncontroverted; however, the Lease Agreements do allow in paragraph 2 for the purchase or a renewed lease at the conclusion of the original lease term. Dkt .#52-4; Dkt. #52-5; Dkt. #52-6; Dkt. #52-6; Dkt. #52-8; Dkt. #52-9.

21.     Lee File at Agri-Center emailed Brad Griffitts and Tim Coder each unsigned Lease Agreement, which Brad Griffitts and Tim Coder reviewed, signed, and emailed back to Mr. File without making any revisions to any Lease Agreement. Exhibit A, Coder Depo. 131:2- 134:20 and 135:7-23; Exhibit C, Lee File Affidavit at ¶¶ 22-24.

**RESPONSE:** Uncontroverted.

22.     Agri-Center's two Bills of Sale documenting the transactions involving the Tractors identified "Griffitts & Coder Custom Chopping LLC" as "Buyer" and "Brad Griffitts & Tim Coder" as "Co-Buyer."  Exhibit A, Coder Depo. 109:2-110:23 and 117:22-118:14; Exhibit I, Depo. Ex. #22; Exhibit C, Lee File Affidavit at ¶¶ 16-17.

**RESPONSE:** Uncontroverted.

23.     Neither Tim Coder nor Brad Griffitts ever requested that they be identified as "Co-Buyer" in the Bills of Sale, as Lee File at Agri-Center advised them that Farm Credit Leasing required them to be named as "Co-Buyer" because the leases of the Tractors were with Custom Chopping, not an individual.  Exhibit A, Coder Depo. 146:15-147:4; Exhibit C, Lee File Affidavit at ¶¶ 18-19.

**RESPONSE:** Uncontroverted that neither Coder nor Griffitts requested that they be identified as additional buyers in the Lease Agreements; the remaining

9

portions of paragraph 23 are controverted as the sources cited do not establish that Mr. File advised Coder or Griffitts of the particular reason why they had to be additional buyers.

24.     Farm Services was not identified as a "Buyer" or "Co-Buyer" on the Bills of Sale or as a "Lessee" in the Lease Agreements because it did not have an established credit rating like Custom Chopping. Exhibit A, Coder Depo. 147:5-22.

**RESPONSE:**  Uncontroverted, but not material.

25.     Lee File of Agri-Center believed that Farm Credit Leasing required the individual business owners (in this case, Brad Griffitts and Tim Coder) to be identified on sale documents as co-buyers and lease documents as additional lessees when the equipment at issue was leased to an entity as opposed to an individual, such that the business owners essentially act as guarantors for the sale and lease if the entity cannot make the payments. Exhibit C, Lee File Affidavit at ¶¶ 18 and 21.

**RESPONSE:**     Uncontroverted that Mr. File's Affidavit so states, but controverted in that Mr. File's thought process or opinion as to whether Coder and Griffitts were "essentially . . . guarantors" contradicts the documents themselves which designate Coder and Griffitts as "co-buyers" and "lessees" and do not designate them as "guarantors."  See Dkt .#52-4; Dkt. #52-5; Dkt. #52-6; Dkt. #52-6; Dkt. #52-8; Dkt. #52-9.  Further, Mr. File's opinion purports to give a legal conclusion and give an opinion on a factual question and therefore invades the province of the judge and jury.

26.    Agri-Center considers its "customer" with respect to the sale and lease of the Tractors to be Custom Chopping, not Brad Griffitts or Tim Coder individually. Exhibit C, Lee File Affidavit at ¶ 20.

**RESPONSE:**    Uncontroverted that Mr. File's Affidavit so states, but controverted in that the purchase agreements state otherwise.  See Dkt. #52-9.

27.    All payments under the Lease Agreements were made by Custom Chopping, not by Brad Griffitts and/or Tim Coder individually.   Exhibit A, Coder Depo. 145:5-10, 159:3-7.

**RESPONSE:**  Uncontroverted.

28.    Plaintiffs allege that as part of the agreement to lease the Tractors through a sale from Agri-Center, Plaintiffs required, and Lee File of Agri-Center agreed, to provide an extended warranty to match the warranty provided by Fendt, a CNH competitor.  Exhibit A, Coder Depo. at 107:8-108:20, 112:25-113:20, 114:8-116:2, and 183:4-184:17.

**RESPONSE:**  Uncontroverted.

29.    Plaintiffs claim that this purported extended warranty was for the life of each lease, and that Agri-Center agreed to (1) perform all fluid and filter changes on the Tractors; (2) perform all mechanical repairs on the Tractors; and (3) provide a loaner tractor to Plaintiffs if one of Plaintiffs' Tractors went down and could not be repaired within 24 hours.   Exhibit A, Coder Depo. at 107:8-108:20, 113:21-114:7, 119:7-120:6, and 127:8-128:23.

**RESPONSE:**  Uncontroverted

11

30.    Plaintiffs acknowledge that the only writing that references this purported additional warranty is the two Agri-Center Bills of Sale, which mention an extended warranty with Agri-Center performing all fluid changes during the extended warranty term, as the purported extended warranty was "all agreed to verbally." Exhibit A, Coder Depo. at 110:5- 111:23; Exhibit I, Coder Depo. Ex. 22.

**RESPONSE:** Uncontroverted.

31.    Plaintiffs also acknowledge that they never had any discussions or email exchanges with CNH about the purported extended warranty and that they did not enter into a written agreement with CNH about the purported extended warranty. Exhibit A, Coder Depo. At 113:5-20 and 118:15-119:6.

**RESPONSE:** Uncontroverted.

32.    Plaintiffs also have no knowledge of whether Farm Credit Leasing was ever advised of the purported extended warranty. Exhibit A, Coder Depo. at 135:24-136:2.

**RESPONSE:** Uncontroverted.

33.    A separate New Holland Warranty and Limitation of Liability Agreement ("WLL") was signed by Brad Griffitts, identifying the "Purchaser Name" as "Griffitts & Coder Custom Chopping LLC," for each of the five Tractors as follows:

    a.    2016 New Holland T8.380 Auto Command Tractor, Serial Number ZFRE05239, signed February 5, 2016;

    b.    2016 New Holland T8.380 Auto Command Tractor, Serial Number ZFRE06025, signed February 5, 2016;

12

    c.    2015 New Holland T8.435 Auto Command Tractor, Serial Number ZFRE02091, signed March 24, 2016;

    d.    2016 New Holland T8.380 Powershift Tractor, Serial Number ZGRE02009, signed May 3, 2016; and

    e.    2016 New Holland T8.380 Powershift Tractor, Serial Number ZGRE02010, signed May 3, 2016.

Exhibit A, Coder Depo. 151:24-156:13; Exhibit J, Depo. Ex. #33; Exhibit K, Depo. Ex. #34; Exhibit L, Depo. Ex. #35; Exhibit M, Depo. Ex. #36; Exhibit N, Depo. Ex. #37; Exhibit B, Griffitts Depo. 27:23-28:24; Exhibit C, Lee File Affidavit at ¶ 25.

    **RESPONSE:** Uncontroverted.

34.    Each WLL contained the following excerpts:

- The NHAG Warranty is a limited warranty that is provided to the initial retail purchaser in return for consideration paid as part of the purchase price of the product. The selling dealer must review the warranty coverage with the initial retail purchaser and obtain signature on this document.
- The warranty described here is from CNH Industrial America LLC . . . referred to in this agreement as "NHAG".
- For the products listed below, the Warranty Period for all coverage begins at the time that any person, dealer or agent first places the unit into service. At the latest, a unit is considered to be placed into service when purchased or delivered to an initial retail purchaser.
  - PRODUCT:…All Agricultural Tractors except Compact Tractors … 24 Months/2000 Hours

- If a defect in material or workmanship is found in a unit and reported during the Warranty Period, NHAG will pay parts and labor costs to repair the defect if the services are performed by an authorized NHAG dealer at the dealer's location.
- NHAG PROVIDES NO WARRANTY, EXPRESS OR IMPLIED, FOR A COMPONENT OR OTHER ITEM THAT IS

SEPARATELY WARRANTED TO THE PURCHASER BY ITS MANUFACTURER

...

- The NHAG Warranty is limited to the written terms in this document..

  ...

- EXCLUSIVE REMEDY: THE REMEDY OF REPAIRING A DEFECT IN MATERIALS OR WORKMANSHIP AT A NHAG DEALERSHIP UNDER THE TERMS OF THIS WARRANTY IS THE PURCHASER'S EXCLUSIVE REMEDY AND IS IN LIEU OF ANY OTHER REMEDY OTHERWISE AVAILABLE.

- THIS DOCUMENT CONTAINS THE ENTIRE NHAG WARRANTY. NHAG MAKES NO OTHER REPRESENTATIONS OR WARRANTIES, EXPRESSED OR IMPLIED, AND SPECIFICALLY EXCLUDES THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR PARTICULAR PURPOSE.* NHAG WILL NOT BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES RESULTING FROM A BREACH OF THE WRITTEN WARRANTY OR ANY IMPLIED WARRANTY IMPOSED BY LAW.*

- The NHAG warranty remains in effect during the Warranty Period if the owner performs the required maintenance at the recommended intervals outlined in the product operator's manual and the unit is operated within its rated capacity.

- What's Not Covered: . . .
  - Repairs arising from storage deterioration, failure to maintain the equipment, negligence, alteration, improper use of the equipment, collision or other accident, vandalism, or other casualty, or operation beyond rated capacity or specification.
  - Repairs arising from abuse or neglect, including but not limited to: operation without adequate coolant or lubricants, adjustments to the fuel system outside equipment specifications, over-speeding, improper storage, starting, warm-up, or shutdown practices, incorrect fuel or contaminated fuel, oil or other fluids. . . .
  - Economic loss including lost profits, crop loss, equipment rental, or other expense. . . .

Exhibit A, Coder Depo. 151:24-156:13; Exhibit J, Depo. Ex. #33; Exhibit K, Depo. Ex. #34; Exhibit L, Depo. Ex. #35; Exhibit M, Depo. Ex. #36; Exhibit N, Depo. Ex. #37; Exhibit B, Griffitts Depo. 27:23-28:24.

**RESPONSE:** Controverted for the reason that the document must be read as a whole, and the excerpts cited by Defendant are incomplete. Notably, the WLL also states immediately above the purported disclaimer: ". . . you may also have other rights, which vary, from region to region." Dkt. #52-10; Dkt. #52-11; Dkt. #52-12; Dkt. #52-13; and Dkt. #52-14.

35.     Lee File from Agri-Center reviewed the WLL with Brad Griffitts in early February 2016 before Brad Griffitts signed the first two WLLs. Exhibit C, Lee File Affidavit at ¶ 26.

**RESPONSE:** Controverted. Griffitts denies any such review of the WLL. Exhibit B, Griffitts Affidavit, ¶ 14. See also Plaintiff's Additional Statement of Uncontroverted Facts, ¶ 63.

36.     All payments for all other non-lease expenses for the Tractors were paid by Custom Chopping, not by Brad Griffitts and/or Tim Coder individually. Exhibit A, Coder Depo. 159:8-13.

**RESPONSE:** Uncontroverted.

37.     All payments for work in which the Tractors were used were paid to Custom Chopping or Farm Services, not to Brad Griffitts and/or Tim Coder individually. Exhibit A, Coder Depo. 159:14-20.

**RESPONSE:** Uncontroverted.

15

38.     Any contracts (which were all oral) for work in which the Tractors were used were made with Custom Chopping or Farm Services, not with Brad Griffitts and/or Tim Coder individually.  Exhibit A, Coder Depo. 159:21-160:5.

**RESPONSE:**  Uncontroverted.

39.     Custom Chopping included the lease expenses for the Tractors in its tax returns, but neither Brad Griffitts nor Tim Coder claimed any amounts related to the Tractors in their individual tax returns.  Exhibit A, Coder Depo. 160:6-24.

**RESPONSE:**  Uncontroverted.

40.     Farm Services never made any documented payments to Custom Chopping for use of the Tractors and Farm Services had no contracts or other agreements with Custom Chopping.  Exhibit A, Coder Depo. 147:23-148:2, 204:1-4.

**RESPONSE:**  Uncontroverted.

41.     Custom Chopping executed Agricultural Exemption Certificates with the Kansas Department of Revenue for each of the five Tractors which identified the "Purchaser" as "Griffitts and Coder Custom Chopping LLC".  Exhibit A, Coder Depo. at 156:15-157:13; Exhibit O, Depo. Ex. #38.

**RESPONSE:**  Uncontroverted.

42.     The Tractors have only been used for (a) spreading manure for Farm Services; (b) swathing and hauling silage and equipment for Custom Chopping; and (c) mowing and maintenance of (i) the house near Muleshoe, Texas that is owned by Custom Chopping and used as its Texas office and as lodging for Brad Griffitts, Tim Coder, and other employees during the season and (ii) the camp site near Muleshoe,

16

Texas that Custom Chopping rents from a local dairy to store equipment and as lodging for other employees during the season.  Exhibit A, Coder Depo. 138:11-145:4.

**RESPONSE:**  Uncontroverted.

43.    Plaintiffs' claims in this case relate to alleged GPS and mechanical issues with the Tractors.  Exhibit A, Coder Depo. at 205:3-7.

**RESPONSE:**  Uncontroverted that Coder so testified; controverted to the extent this oversimplifies the legal claims that have been made in this matter.  See generally Dkt. #1-1, Petition; Dkt. #50, Pretrial Order.

44.    Plaintiffs claim that when a Tractor was used to spread manure in a circular center pivot pattern using their manure spreading implement, the GPS on the Tractor would "crash" and lose the programmed line after approximately two to three hours of use and require the Tractor to be turned off and back on to allow the GPS receiver to reconnect in order to find the programmed line again.  Exhibit A, Coder Depo. at 163:6-164:3; Exhibit B, Griffitts Depo. At 31:1-7 and 42:5-45:2.

**RESPONSE:**  Uncontroverted but misleading.  See Plaintiff's Additional Statement of Uncontroverted Facts, ¶¶ 74-78.

45.    Plaintiffs acknowledge that when a Tractor was used for swathing in a circular center pivot pattern, the GPS "crash" occurred sporadically and much less frequently than during manure spreading, where sometimes it would "crash" two or three times in a day and some days not at all.  Exhibit A, Coder Depo. at 65:3-19, 67:4-7, and 163:6-164:3.

17

**RESPONSE:**   Uncontroverted but misleading.   See Plaintiff's Additional Statement of Uncontroverted Facts, ¶¶ 74-78.

46.   A permanent software fix for the GPS issue identified by Custom Chopping was installed on the Tractors sometime between January 29, 2019 and February 2, 2019.  Exhibit P, Eric Lind Affidavit, ¶ 10.

**RESPONSE:**  Uncontroverted.

47.   The permanent software fix successfully resolved the GPS issues previously reported by Custom Chopping.  Exhibit P, Eric Lind Affidavit, ¶ 11.

**RESPONSE:**  Uncontroverted.

48.   Custom Chopping has not reported any further GPS issues with any of the Tractors since the permanent software fix was installed on their tractors.  Exhibit P, Eric Lind Affidavit, ¶ 12; Exhibit B, Griffitts Depo. at 55:17-22.

**RESPONSE:**  Uncontroverted.

49.   Custom Chopping also reported various mechanical issues with the Tractors.  Exhibit P, Eric Lind Affidavit, ¶ 13.

**RESPONSE:**   Uncontroverted but incomplete.   See Plaintiff's Additional Statement of Uncontroverted Facts, ¶¶ 87-91, 97.

50.   There are no existing mechanical issues with any of the Tractors, as all such prior alleged mechanical issues with the Tractors were successfully repaired by a CNH authorized dealer.  Exhibit P, Eric Lind Affidavit, ¶ 13.

**RESPONSE:**   Uncontroverted at this particular point in time, but see Plaintiff's Additional Statement of Uncontroverted Facts, ¶¶ 97.

51.     In this case, all three Plaintiffs assert claims against CNH for breach of express warranty and breach of the implied warranty of merchantability, and Brad Griffitts and Tim Coder individually assert two claims against CNH under the KCPA for alleged unconscionable and deceptive acts and practices.  Dkt. #1-1; Dkt. #50, pp. 10-12, ¶ 4(a).

**RESPONSE:**  Uncontroverted.

52.     Plaintiffs' deadline under the Scheduling Order to identify and disclose any expert witnesses under Fed. R. Civ. P. 26(a)(2) was January 2, 2019, but to date, Plaintiffs have not identified any expert witness in this case. Dkt. #16, p. 3, ¶ (2)(c); see generally Docket.

**RESPONSE:**  Uncontroverted.

53.     Plaintiffs request damages against CNH for (1) the total of the lease payments for the Tractors of $791,140.27; (2) civil penalties under the KCPA in the amount of $100,000 ($10,000 per Tractor for each individual Plaintiff); and (3) attorney's fees under the KCPA. Dkt. #50, pp. 14-15, ¶ 5.

**RESPONSE:**  Uncontroverted.

54.     Plaintiffs have not alleged in this case that CNH failed to pay, or Plaintiffs were required to pay, for parts or labor costs for defects in the Tractors to be repaired by a CNH authorized dealer.  See generally Dkt. #1-1; Dkt. #50.

**RESPONSE:**  Uncontroverted.

## PLAINTIFFS' ADDITIONAL STATEMENT OF UNCONTROVERTED FACTS

55. Tim Coder and Brad Griffitts were individual co-buyers, along with Custom Chopping, of the five CNH tractors. Four were purchased pursuant to a sales document dated January 23, 2016 (ZFRE06025, ZFRE05239, ZFRE02009, and ZFRE02010), and one was purchased pursuant to a sales document dated March 21, 2016 (ZFRE02091). Dkt. #52-9.

56. Through subsequent commercial transactions with Farm Credit Leasing Services Corporation a/k/a AgDirect ("AgDirect"), Coder and Griffitts became individual co-lessees, along with Custom Chopping, on the five tractors. The last page of each Lease Agreement plainly identifies Custom Chopping as a Lessee, Timothy L. Coder as an individual Lessee, and Bradley Allen Griffitts as an individual Lessee and, further, plainly indicates where Coder and Griffitts each signed twice in their corporate capacity and each signed twice in their individual capacity with the designation "Lessee". Dkt. #52-4, page 5; Dkt. #52-5, page 5; Dkt. #52-6, page 5; Dkt. #52-7, page 5; Dkt. #52-8, page 5.

57. Delivery of ZFRE06025 and ZFRE05239 was acknowledged on February 3, 2016. Delivery of ZFRE02091 was acknowledged on March 22, 2016. Delivery of ZFRE02009 and ZFRE02010 was acknowledged on May 3, 2016. Dkt. #52-4, page 5; Dkt. #52-5, page 5; Dkt. #52-6, page 5; Dkt. #52-7, page 5; Dkt. #52-8, page 5.

58. Each Lease Agreement was signed four times by Coder and four times by Griffitts. As to accepting the lease agreement, it was signed once in their respective capacity as officers of Custom Chopping (identifying Coder as "Vice President" and Griffitts as "President") and once in their respective individual

capacity (identifying each signature with the title "Individual"). As to acknowledging delivery, it was again signed once in their respective capacity as officers of Custom Chopping (identifying Coder as "Vice President" and Griffitts as "President") and once in their respective individual capacity (identifying each signature with the title "Individual"). Each Lease Agreement clearly distinguishes which signatures are as representatives of Lessee Custom Chopping and which signatures are in their Lessee individual capacity. Dkt. #52-4, page 5; Dkt. #52-5, page 5; Dkt. #52-6, page 5; Dkt. #52-7, page 5; Dkt. #52-8, page 5.

59.     Coder and Griffitts both understood that they were joint owners, co-buyers, and co-lessees on the five CNH tractors, along with each other and Custom Chopping, so they had an equal ownership in the tractors and were equally responsible for payment, regardless of who actually made the payment. Exhibit A, Coder Affidavit, ¶ 14; Exhibit B, Griffitts Affidavit, ¶ 15.

60.     The concept of adding Farm Services as a co-buyer or lessee was never even brought up. Dkt. #52-1, Coder Depo., 147:16-22.

61.     The Lease Agreements in paragraph 6 authorize any lessee to use the tractors in the lessee's "trade or business for legal business and commercial purposes." Dkt. #52-4; Dkt. #52-5; Dkt. #52-6,; Dkt. #52-7; Dkt. #52-8.

62.     Griffitts signed the WLL for ZFRE06025 and ZFRE05239 on February 4, 2016. Griffitts signed the WLL for ZFRE02091 on March 24, 2016. Griffitts signed the WLL for ZFRE02009 and ZFRE02010 on May 3, 2016. Dkt. #52-10; Dkt. #52-11; Dkt. #52-12,; Dkt. #52-13; Dkt. #52-14.

21

63.     Griffitts denies that Lee File reviewed the WLL with him.  File only explained to Griffitts that the tractors would be on a three-year lease, that the warranty would last the full three years, and that the arrangement included Agri-Center handling all of the oil changes and routine matters; the only thing Coder and Griffitts had to do was use the tractors.  Griffitts signed the documents he was requested to sign.  Exhibit B, Griffitts Affidavit, ¶¶ 13-14.

64.     Customers are not allowed to negotiate the terms of the WLL.  Exhibit E, Lind Corporate Representative Depo., at 7:6-9, 26:10-27:3.

65.     The leases with AgDirect were listed as joint installment debt on Coder's individual credit profile report indicating an origination date of 05/13/2016 and original balance of $411,331 after the first annual installments had been paid.  Coder's credit profile report notes the "Proportion Of Loan Balances To Loan Amounts Is Too High" and "Too Many Accounts With Balances."  The AgDirect installment balance for these tractors as of the date of this report is, by itself, greater than the combined total of the other account balances listed on this report.  Exhibit A, Coder Affidavit, ¶¶ 15-16; Exhibit A, Coder Affidavit, Ex. 1.  See also Dkt. #50, Pretrial Order, ¶ 2.B., which stipulated to the authenticity of documents produced in discovery.

66.     The leases with AgDirect were listed as installment debt on Griffitts' individual credit profile report indicating an origination date of 05/13/2016 and original balance of $411,331 after the first annual installments had been paid.  Griffitts' credit profile report notes "Too Many Consumer Finance Company

Accounts" and that the "Proportion Of Loan Balances To Loan Amounts Is Too High." The AgDirect installment balance for these tractors as of the date of this report is, by itself, greater than the combined total of the other account balances listed on this report.  Exhibit B, Griffitts Affidavit, ¶¶ 16-17; Exhibit B, Griffitts Affidavit, Ex. 1. See also Dkt. #50, Pretrial Order, ¶ 2.B., which stipulated to the authenticity of documents produced in discovery.

67.    Coder and Griffitts each used the Tractors for business agricultural purposes on behalf of Custom Chopping and Farm Services. Dkt. #52-1, Coder Depo., at 138:13-141:6.

68.    Coder and Griffitts always used each tractor consistent with agricultural and industry standards for which the tractors were designed and intended, and they never observed anyone doing otherwise.  Exhibit A, Coder Affidavit, ¶¶ 25-26; Exhibit B, Griffitts Affidavit, ¶¶ 25-26.

69.    The five tractors each had an integrated GPS system for autoguidance as well as various other amenities including three with a luxury performance cab and two with a deluxe performance cab.  Dkt. #52-9.

70.    The integrated GPS was a significant factor in selecting these tractors for purchase because of the precision work that would be performed with the tractors. Exhibit A, Coder Affidavit, ¶¶ 8, 10; Exhibit B, Griffitts Affidavit, ¶¶ 8, 10.

71.    The cab amenities were a significant factor in selecting these tractors for purchase because they or their employees were going to be using these tractors for long stretches of time and the tractors would have a significant number of hours

of use (the lease terms allowed 1350 hours/tractor/year).  Exhibit A, Coder Affidavit, ¶¶ 8-9; Exhibit B, Griffitts Affidavit, ¶¶ 8-9.

72.    The tractors also needed to have a minimum of 300 horsepower as well as the front three-point PTO so they would be capable of putting triple mowers on the front, although they accepted one tractor without the front three-point PTO.  Exhibit C, Coder Depo., at 104:16-105:21; Dkt. #52-1, Coder Depo. at 38:23-39:3.

73.    Another requirement was the promise of a like-kind Loaner tractor if a leased Tractor would be out of service due to mechanical issues for more than 24 hours.  Dkt. #52-1, Coder Depo., at 107:15-108:10; Exhibit A, Coder Affidavit, ¶ 11; Exhibit B, Griffitts Affidavit, ¶ 11.

74.    Error code AG-265 was the major issue with the GPS, which occurred when using the tractors in the circle pivot pattern.  Dkt. #52-1, Coder Depo. at 163:1-3.

75.    The problems with the GPS were noticed shortly after receiving the first two tractors and was immediately reported to Agri-Center with numerous contacts between March and October 2016.  Exhibit C, Coder Depo., at 161:15-162:11; Exhibit D, Griffitts Depo., at 29:6-10.

76.    Error code AG-265 occurred consistently after 2-3 hours of continual use in a circular pivot pattern, regardless of what agricultural task was being performed.  With manure spreading in a pivot pattern, this happened on nearly every work project because those projects generally took more than 2-3 hours of continual work.  With other agricultural tasks such as swathing, the GPS failure still occurred after

24

the same length of continual work, but it was somewhat less often than with manure spreading simply because some of those projects were completed in less than 2-3 hours and therefore before the GPS failure would occur.  Exhibit A, Coder Affidavit, ¶ 17; Exhibit B, Griffitts Affidavit, ¶ 18; Dkt. #52-1, Coder Depo., at 163:6-164:3.

77.    Up to three tractors were used at a time on any given day on a particular field, particularly when spreading manure.  When the GPS on one would fail, the others would fail like clockwork one after the other like it was on a timer or a domino effect.  Dkt. #52-2, Griffitts Depo., at 42:11-43:20.

78.    When we reported this to Agri-Center, they and New Holland were unable to identify the problem or solution.  We eventually figured out on our own that each time the failure code appeared, the tractor could be shut off and the person using it would have to wait for the GPS to come back on-line.  This would take up to an hour each time it occurred.  Dkt. #52-1, Coder Depo., 69:16-19; Dkt. #52-2, Griffitts Depo., 44:15-25; Exhibit A, Coder Affidavit, ¶ 18; Exhibit B, Griffitts Affidavit, ¶ 19; Exhibit E, Lind Corporate Representative Depo., 79:14-22.

79.    Plaintiffs continued to report problems with the GPS to Agri-Center multiple times during the three-year lease terms of the Tractors, a minimum of once a month and sometimes five or six times a month, and were told that CNH was working on it.  Agri-Center personnel told Coder they were communicating the GPS problems to CNH.  Exhibit A, Coder Affidavit, ¶¶ 19; Exhibit C, Coder Depo. at 166:17-168:12.

80.    By November 2017, Coder insisted that Agri-Center get CNH involved to fix the problem.  Exhibit C, Coder Depo., at 169:5-23.

81.    CNH was aware of the GPS problems in 2016, but because of how the dealer was reporting it to CNH, CNH did not realize the reports all related to the same issue.  Exhibit E, Lind Corporate Representative Depo., at 97:24-98:15.

82.    CNH was aware that the GPS problems were continuing to occur at least as early as December 2017 and made a site visit in January 2018.  Exhibit C, Coder Depo., 171:23-172:12; Dkt. #52-16, Lind Affidavit, ¶ 8.

83.    Carmen Strmsek from CNH told Coder that CNH accepts responsibility for the failure to resolve the GPS issue and that CNH let it fall through the cracks. Exhibit C, Coder Depo., 172:23-173:4.

84.    Paul Hatfield from CNH thinks these tractors had more problems than they like to see which is atypical for the New Holland brand, and he was upset at the timeline it was taking to get resolved.  Exhibit F, Hatfield Depo., at 44:9-45:17.

85.    When weekly calls began in January 2018, Carmen Strmsek and Greg Linka from CNH said they thought they could have it fixed within 60 days.  Exhibit C, Coder Depo., 174:1-12.

86.    Eric Lind admitted that the AG-265 error code was caused by a defect. Exhibit E, Lind Corporate Representative Depo., at 75:6-19.

87.    Mechanical defects beyond the GPS issues plagued all five tractors, impacting workflow to a significant degree.  Often, it could result in a loss of a half

day or full day of work just in switching the tractor and implements.  Exhibit A, Coder Affidavit, ¶ 20; Exhibit B, Griffitts Affidavit, ¶ 20.

88.    Repairs for the mechanical defects sometimes took weeks to fix, with tractors hauled to Agri-Center sometimes for weeks awaiting repairs.  Exhibit A, Coder Affidavit, ¶ 21; Exhibit B, Griffitts Affidavit, ¶ 21.

89.    Several times more than one tractor was inoperable or in the shop due to the mechanical issues.  Exhibit A, Coder Affidavit, ¶ 22; Exhibit B, Griffitts Affidavit, ¶ 22.

90.    Three tractors (ZFRE05239; ZFRE06025; ZFRE02091) required warranty repairs within the first month of delivery. Two (ZGRE02009; ZGRE02010) made it four months before requiring warranty repairs. The following, nonexhaustive list details some of mechanical defects found in the tractors:

Power Take Off (PTO) defects. The PTO is needed to attach implements to the tractor, a function required for Custom Chopping, Griffitts, and Coder to use the tractors. PTO defects occurred in three of the tractors and included:  the front PTO shaft broke (ZFRE05239); the PTO driveshaft failed at the weld out of tube (ZFRE05239); the PTO hub ring gear bolts sheared off (ZFRE05239); the U-joint failed in the front PTO shaft (ZFRE06025 and ZGRE02009); the PTO bolts sheared (ZFRE02091); and the rear PTO had no power (ZFRE05239).

Oil leaks. In one tractor, an oil leak occurred because the lower valve cover gasket was not correctly installed at the factory. (ZFRE05239) Defects also caused oil leaks in other tractors. (ZFRE06025; ZGRE02009; ZGRE02010).

Hose issues. A hose in one tractor had to be rerouted when it was discovered the gas tank could not be filled (ZFRE02091). Later, defective hoses had to be replaced in four of the five tractors (ZFRE02091, ZGRE02009, ZGRE02010).

Alternators. The alternator failed within ten months of delivery (ZFRE05239). On another tractor, the alternator was not charging and the instrument cluster not displaying (ZFRE02091). Another tractor experienced problems with the battery not staying charged caused by an internal electrical failure in the alternator (ZFRE06025).

Improper wiring and power issues. Air conditioner wiring was improperly routed (ZFRE05239). In another tractor, a seat switch did not function because no power had been installed (ZFRE02091). A defective fuse block had to be replaced (ZFRE02091). And pinched wires caused error codes and popping fuses in yet another tractor (ZGRE02010).

Error codes. Check engine error codes occurred within five months of delivery (ZFRE06025). More check engine codes appeared, the high pressure fuel pump and the main pressure switch failed, a defective seal was discovered, and a cylinder scored about eight months after delivery. The following month, the joystick failed when it spring housing broke. The same tractor experienced more check engine codes just four months later and again about one year after delivery. Despite trouble shooting attempts, no diagnosis for the codes on this last occasion was determined.

Other, miscellaneous defective parts or workmanship. In ZFRE05239, the fan module had to be replaced within one month of delivery; the injector failed requiring a new injector be installed within two months of delivery; and the compressor clutch bearing seized; reports of the engine overheating revealed no output signal from temp

sensor; reports of problems with the fuel line lead to discovery of a hairline crack in steel line. In ZFRE06025, bolts were missing from the 3-point life arm within five months of delivery; the fender bracket broke at the axle due to weak material within five months of delivery; smoke occurred under the cab and a harness connection for lighting modules was loose. In ZFRE02091, the high pressure fuel pump failed within 10 months of delivery; the fuel pressure sensor, filter, and a harness had to be replaced approximately one year after delivery; the starter required repair; a draft pin sensor failed in hitch; injectors and seals failed; the high pressure pump failed. In ZGRE02009, a bad clutch switch had to be replaced; another warranty repair addressed a failed electronic pedal, software glitch, and a defective latch; the pump solenoid failed; the fuel injector failed and 5 of 6 injectors failed a leak down test. ZGRE02010 went for warranty repairs on separate occasions to replace the switch for the transmission filter restriction light; repair the front suspension fuse that had blown and a pinched harness; repair or replace a fuel gauge and a defective fuel sender; replace a relief valve; address the TCU failure and internal failure of the front suspension drive; replace sensors because an open circuit in fuel pressure and temp sensors was causing low engine power and fuel error codes.

Exhibit A, Coder Affidavit, ¶ 23.

91.    There were times that two or three tractors were inoperable at the same time due to mechanical issues.  Exhibit C, Coder Depo., at 188:17-189:12; Exhibit F, Hatfield Depo., at 43:2-5.

92.    Loaner tractors did not have the same amenities as the owned tractors. Exhibit A, Coder Affidavit, ¶ 24; Exhibit B, Griffitts Affidavit, ¶ 24.

29

93.    A brand new T8 380 tractor loaned by CNH arrived with mechanical issues as well.  There was with a hydraulic leak and an antifreeze leak even though it was brand new.  Exhibit A, Coder Affidavit, ¶ 24; Exhibit B, Griffitts Affidavit, ¶ 24; Exhibit C, Coder Depo., at 187:5-16.

94.  In their many years of experience, Coder and Griffitts have purchased and used other farm equipment, and they have never experienced problems of this nature with an integrated GPS autoguidance system on any other tractors.  They have never experienced or mechanical problems to the extent that occurred with these five CNH tractors.  Coder said "The mechanical issues were just beyond anything I have ever seen in my entire life."  Exhibit A, Coder Affidavit, ¶27; Exhibit B, Griffitts Affidavit, ¶ 27; Exhibit C, Coder Depo., 189:10-12.

96.    Paul Hatfield agreed that there were more problems with these tractors than he would like to see.  Exhibit F, Hatfield Depo., at 43:2-5, 45:11-17.

97.    There have been mechanical issues as recently as June 2019 with the one remaining tractor, including a hydraulic leak.  Exhibit B, Griffitts Affidavit, ¶ 24.

98.    Defendant's deadline to identify expert witnesses was February 15, 2019, and Defendant has not identified any expert witness. Dkt. #16, p. 3, ¶ (2)(c); see generally Docket.

## ARGUMENTS AND AUTHORITIES

### Summary Judgment Standards

Summary judgment is not appropriate when there are disputed issues of material facts or when the movant is not entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(a). A genuine dispute exists when a rational factfinder could accept either party's allegation concerning a particular fact. *Davilla v. Enable Midstream Partners, L.P.*, 913 F.3d 959, 965 (10th Cir. 2019). Material facts are those that could affect the outcome. *Id.* In considering the evidence, this court must construe all evidence and draw all reasonable inferences "in the light most favorable to the nonmoving party," in this case, in the light most favorable to Plaintiffs. *Tally v. Time, Inc.*, 923 F.3d 878, 893 (10th Cir. 2019).

### A. Griffitts and Coder Were Individually Liable Under the Transaction Documents at Issue in This Case and Thus Are Consumers Entitled to Protection Under the KCPA.

The KCPA must be liberally construed to protect consumers from the deceptive and unconscionable practices of suppliers as well as from unbargained for warranty disclaimers.  K.S.A. 50-623.  To this end, attempts to limit the implied warranties of merchantability and fitness for a particular purpose as well as attempts to limit the remedies for a breach of those implied warranties are unconscionable practices under the KCPA and are prohibited.  K.S.A. 50-627; K.S.A. 50-639(a).

31

The Act applies to consumer transactions, which are defined as "a sale, lease, assignment or other disposition for value of property . . . within this state . . . to a consumer." K.S.A. 50-624(c).  The Act defines a consumer as "an individual, husband and wife, sole proprietor, or family partnership who seeks or acquires property or services for personal, family, household, business or agricultural purposes." K.S.A. 50-624(b).

Custom Chopping does not dispute that it is not asserting a KCPA claim in this case. Custom Chopping, an LLC that is neither a sole proprietorship nor a family partnership, is not entitled to protection under the KCPA.

But Griffitts and Coder are individuals who fall squarely within the protections of the KCPA as consumers.  The only relevant question under the KCPA is whether each was individually liable under the transaction documents. See *Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1364 (D. Kan. 1996), *aff'd*, No. 96-3247, 1998 WL 177857 (10th Cir. 1998).  How they ended up on those transaction documents is a needless distraction from this point.

In *Wayman*, current and former Wichita area service station dealers sued Amoco Oil Co.  Amoco argued the dealers were not individuals within the meaning of the KCPA because certain of the dealers had incorporated their service station businesses. The court looked to the nature of the liability, noting that the dealers assumed individual liability under the contracts. The court pointed to the contracts, which identified the dealers by their own names, providing the example of the contract between Amoco and "George Wayman," rather than "George Wayman, d/b/a

32

Wayman's Amoco, Inc." The court read this language as evidence the parties were Amoco and the individual, not the associated business entity the individual used. The court further commented,

> "If Amoco wanted to enforce these agreements against plaintiffs personally, it no doubt could.  Hence, regardless of whether an associated corporate entity exists, the liability plaintiffs assumed are individual in nature. Their related KCPA claims are individual as well. That is, the claims are brought in plaintiffs' individual rather than corporate capacities."

923 F. Supp. at 1364.

The court rejected Amoco's argument that payments from corporate accounts established the corporation was harmed, not the individual. The court looked beyond the formalities of the name on the bank account that paid Amoco, presumably the same bank account that received deposits of the income the service station generated. See *Wayman*, 923 F. Supp. at 1364.  The court identified the dispositive inquiry is "the nature of the liability undertaken, not 'who picked up the tab'" for purposes of determining whether the KCPA applied to the individual's claims in the case. *Id.*

Here, plaintiffs Griffitts and Coder assumed individual liability under the transaction documents.  It is the nature of that individual liability that places their claims within the KCPA's protections, just as it did for the plaintiff-service station dealers in *Wayman*.  The undisputed evidence in this case established Griffitts and Coder were personally obligated under the transaction documents.  The transactions as structured here involved bills of sale and leases—both transactions to which the KCPA applies when made to a consumer.  See K.S.A. 50-624(c).

33

Some governing principles of Kansas contract law help explain how to read the three types of documents that inform the transaction here. Importantly here, the KUCC explains that when multiple "confirmatory memoranda" are involved, such as in this case, the various memoranda may be considered to establish consistent terms across the agreements unless one of the memoranda clearly states that it is intended as a final expression of the parties' agreement. K.S.A. 84-2-202. And when an agreement uses a printed form containing blank spaces that are completed by handwritten or typewritten language, the addition (be it handwritten or typed) controls over the preprinted form. See *Wood River Pipeline Co. v. Willbros Energy Services Co.*, 241 Kan. 580, 586-87, 738 P2d 866 (1987); *Desbien v. Penoke Farmers Union Co-op Ass'n*, 220 Kan. 358, 363, 552 P.2d 917 (1976) ("where part of a contract is printed and part of a contract is handwritten or typed by filling in blanks in the printed form, handwritten or typed words will control over the printed part"); see also K.S.A. 84-3-114 (concerning negotiable instruments: "If an instrument contains contradictory terms, typewritten terms prevail over printed terms, handwritten terms prevail over both, and words prevail over numbers.").

The transaction here involves the three purchasers or lessees, Custom Chopping, Griffitts, and Coder; the dealer, AgriCenter; the financer, AgDirect; and the manufacturer, CNH. Plaintiffs seek to recover from CNH because they are the party ultimately liable for Plaintiffs damages as the manufacturer of the defective tractors. CNH provided only one document at issue in this case, the WLL. That document clearly reflects that it is part of a transaction; it is not intended to stand

34

alone. (*E.g.*, Dkt.# 52-10 ["The NHAG Warranty is a limited warranty that is provided to the initial retail purchaser in return for consideration paid as part of the purchase price of the product. The selling dealer must review the warranty coverage with the initial retail purchaser and obtain signature on this document."]; see also Dkt.# 52-11; Dkt.# 52-12 to 52-14. Therefore, it is appropriate to look at all the transaction documents under Kansas law and the various entity's own agreements to understand who is obligated under the various agreements here and therefore whether the KCPA applies.

The lease documents identify three persons obligated under each agreement: Custom Chopping, Griffitts, and Coder. Each lease identifies Griffitts and Coder individually as one of the three persons obligated under the lease. Griffitts and Coder each signed the five lease obligations twice—once in his capacity as an officer of Custom Chopping and once in his individual capacity. The label "Lessee" precedes their typed names, and the title "Individual" was typed on the lines where Coder and Griffitts each signed as individuals, and their corporate title was typed on the lines where Coder and Griffitts each signed in their representative capacity. See Plaintiff's Additional Statement of Uncontroverted Facts, ¶ 58; Dkt.#52-4, at 5; Dkt. #52-5, at 5; Dkt. #52-6, at, 5; Dkt. #52-7, at 5; Dkt. #52-8, at 5.

Griffitts and Coder not only signed the lease obligation in their individual capacities as well as their corporate representative capacities; they also acknowledged delivery of the tractors in their individual capacities as well as their corporate representative capacities, again with the label "Lessee" preceding their

35

names and the title "Individual" typed on the form.  See Plaintiff's Additional Statement of Uncontroverted Facts, ¶ 58; Dkt. #52-4, at 5; Dkt. #52-5, at 5; Dkt. #52-6, at, 5; Dkt. #52-7, at 5; Dkt. #52-8, at 5.

The bills of sale also establish that Griffitts and Coder were individual purchasers under these transaction documents. The bills show Custom Chopping as the Buyer with Brad Griffitts and Tim Coder listed on a separate line as Co-buyers. Dkt. #52-9, at 2-3.  The form agreement only provides two signature lines, so Coder signed on the Buyer line and Griffitts signed the Co-Buyer line.  The structure of the form agreement, i.e., only providing lines for two buyers even though three separate persons bought the tractors, should not undermine the effect of the plain language elsewhere in the agreement, particularly in light of the Lease Agreements which clearly were signed in both corporate and individual capacities.

CNH ignores the plain language of the contracts and the obligations Griffitts and Coder each undertook in their individual capacities—individual obligations that are confirmed by their appearance on Griffitts' and Coder's individual credit profile reports.  See Plaintiff's Additional Statement of Uncontroverted Facts, ¶¶ 65-66; Exhibit A, Coder Affidavit, ¶ 15-16; Exhibit B, Griffitts Affidavit, ¶ 16-17.

CNH attempts to distract the court by citing facts such as who did or did not make payments, who took or did not take preferable tax treatment for the tractors, where and how the tractors were used, and the sole signature on behalf of Custom Chopping on the limitation of warranty—a completely separate document that does not supplant any of the other transaction documents entered into in this case nor the

36

obligations imposed on Griffitts and Coder individually under those other documents. These facts CNH highlights are red herrings, extrinsic evidence that is not admissible to contradict, alter, or vary the terms of these clear transaction documents. K.S.A. 84-2-202; *Barbara Oil Co. v. Kansas Gas Supply Corp.*, 250 Kan. 438, 452, 827 P.2d 24, 34-35 (1992) (the Kansas Uniform Commercial Code [KUCC] does not abolish parole evidence prohibition against admitting evidence to contradict, alter, or vary terms of written instrument where contract is not silent or ambiguous). Nor do they matter under the KCPA, which looks at who is obligated, not who paid for the goods. See K.S.A. 50-624(c); see also *Wayman*, 923 F. Supp. at 1364.

Plaintiffs, indeed, did more than merely "sign their names" as co-buyers and co-lessees. The purchase agreements and lease agreements were documents that had the legal effect of obligating Griffitts and Coder individually to payment obligations for the purchase and lease of the tractors. As lessees, Griffitts and Coder were individually responsible to make the lease payments, along with Custom Chopping. AgDirect could seek the lease payments from any or all of the Plaintiffs; AgDirect was not required to exhaust all efforts to collect from Custom Chopping before seeking contribution from Griffitts or Coder. Griffitts and Coder had equal liability for the lease payments and were not merely guarantors (a status which involves no ownership interest and which has no liability unless and until the seller or lessor is unable to collect from the others), notwithstanding Lee File's testimony by affidavit that that is what he personally believed them to be. See Black's Law Dictionary (11th ed. 2019) (defining guarantor); see also Dkt. # 52-3, at ¶ 18.

37

Nowhere in any of the transaction documents is Griffitts or Coder identified as a guarantor or surety. The form document used for the five leases contains the terms "guaranty" and "guarantor," *e.g.* Dkt. #59-8, at 4 ¶ 12, yet Griffitts and Coder are each identified as "Lessee" and "Individual" rather than as "guarantor." These terms have distinct meanings within the law. A guarantor "makes a guaranty or gives security for a debt. While a surety's liability begins with that of the principal, a guarantor's liability does not begin until the principal debtor is in default.—Also termed *guarantor surety*." Black's Law Dictionary (11th ed. 2019) (defining guarantor). But a lessee or a buyer has a right to own or possess the property. See *id.* (defining buyer and lessee). Had these transactions intended to identify Griffitts or Coder as guarantors, the parties demonstrated they had the terminology to do so. They did not use it.

CNH's reliance on *CIT Group/Sales Financing, Inc. v. E-Z Pay Used Cars, Inc.*, 29 Kan. App. 2d 676, 32 P.3d 1197, 1204 (2001), is misplaced because that case involved an individual obligated as a guarantor who sought the protections of the KCPA. A panel of the Kansas Court of Appeals concluded the KCPA did not extend to that factual scenario because, "The KCPA's protection is limited to individuals and sole proprietors who directly contract with suppliers for goods or services, and is not extended to individuals who promise performance of a corporation contracting with a supplier." *CIT Group/Sales Financing*, 29 Kan. App. 2d at 685. As established above, Griffitts and Coder signed as lessees or buyers, not guarantors. Thus, *CIT Group* does not apply.

38

Plaintiffs do not believe the transaction documents are ambiguous in the least. The transaction documents are clear that Griffitts and Coder each were purchasers and lessees in their individual capacities and therefore are consumers protected by the KCPA. But if this court disagrees and looks beyond the clear contract language, then it need look no further than Griffitts' and Coder's credit profile reports, which document the individual obligations imposed on each of them. See Exhibit A, Coder Affidavit, ¶ XXXX; Exhibit B, Griffitts Affidavit, ¶ XXXX.

In short, CNH's attempt to evade application of the KCPA must fail. Griffitts and Coder signed the transaction documents in their individual capacities. This is clearly established in multiple places on the five subject leases and the two bills of sale. However, to the extent the court finds the documents are ambiguous regarding Griffitts' and Coder's individual obligations, then there is a question of material fact that should be resolved by the trier-of-fact. Plaintiffs Griffitts and Coder are "consumers" and therefore entitled to KCPA protection. Defendant is not entitled to judgment as a matter of law on Griffitts' and Coder's KCPA claims.

### B. CNH's Attempt to Disclaim Warranties Fails and Therefore All Remedies Provided by the UCC Are Available.

All remedies under the UCC are available to Griffitts and Coder because CNH did not disclaim, limit, or otherwise exclude any warranty or remedy available to these buyers. Only Custom Chopping signed the WLL. See Dkt.# 52-10 to 52-14. Moreover, any attempt to disclaim warranties with respect to Griffitts and Coder also

fails because the KCPA precludes such disclaimers to consumers, which CNH acknowledges in its memorandum. See K.S.A. 50-639(a)(1) (suppliers prohibited from attempts to limit implied warranties of merchantability and fitness for a particular purpose); K.S.A. 50-637(b)(7) (unconscionable acts or practices include exclusions, modifications, or other attempts to modify or exclude implied warranties or merchantability or fitness for a particular purpose and their remedies); see also *Farrell v. General Motors Corp.*, 249 Kan. 231, Syl. ¶ 3, 239, 815 P.2d 538 (1991); Dkt.# 52, at 19.

CNH next argues the WLL precludes Custom Chopping asserting a claim based on the implied warranty of merchantability. To effectively exclude the implied warranty of merchantability against Custom Chopping, the disclaimer (1) must mention merchantability and (2) be conspicuous. K.S.A. 84-2-316(2); see also *BHC Development, L.C. v. Bally Gaming, Inc.*, 985 F. Supp. 2d 1276, 1291 (D. Kan. 2014). Kansas law defines conspicuous as written so "a reasonable person against whom it is to operate out to have noticed it." KSA 84-1-201(b)(10). Whether a term is conspicuous is a question for court. KSA 84-1-201(b)(10). In determining whether the term is conspicuous, the court looks at the document as the whole consider whether the disclaimer is written in a manner that draws the reader's attention to its terms. *BHC Development, L.C.*., 985 F. Supp. 2d at 1291. Conspicuous terms include:  "(A) A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and (B) language in the body of a record or display in larger type than the surrounding

text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language." KSA 84-1-201(b)(10); see also *BHC Development, L.C..*, 985 F. Supp. 2d at 1291.

First, it is noteworthy that the WLL for each tractor was executed *<u>after</u>* the sales agreement and lease agreement for that tractor:

a.      ZFRE05239:  Bill of Sale was dated January 23, 2016;  Lease Agreement was dated January 28, 2016.  WLL was signed February 4, 2016.

b.      ZFRE06025:  Bill of Sale was dated January 23, 2016;  Lease Agreement was dated January 28, 2016.  WLL was signed February 4, 2016.

c.      ZFRE02091, Bill of Sale was dated March 24, 2016; Lease Agreement was dated March 21, 2016.  WLL was signed March 24, 2016.

d.      ZGRE02009, Bill of Sale was signed January 23, 2016.  Lease Agreement was dated April 29, 2016.  WLL was signed May 3, 2019.

e.      ZGRE02010:  Bill of Sale was dated January 23, 2016; Lease Agreement was dated April 29, 2016.  WLL was signed May 3, 2016.

The warranty disclaimer here is disclosed only *after* the signature lines, on the second page of the Warranty and Limitation of Liability Agreement. The document is signed on page one; no additional signature or even initials are required on the second page to indicate the signers even saw it.  The disclaimer here appears in the same color and is flush with the margins of the remainder of the second page. The disclaimer is admittedly in all caps, offset in a box, and specifically mentions merchantability. But two other disclaimers also appear in all caps and flush with margins of the remainder of the page, one of which is also offset in a box.  Further, immediately above this disclaimer, the document states that "you may also have other rights, which vary, from region to region."  When viewed in the context of the document as a whole, the disclaimer of the implied warranty of merchantability is insufficient to provide reasonable notice to a person against whom the disclaimer is to operate.  *See BHC Development, LLC*, 985 F. Supp. 2d at 1291 (concluding disclaimer headed with all caps and bold was not conspicuous when other paragraphs were on all caps and the key paragraph did not otherwise standout from the remaining pages of the document).  This court should refuse to give it effect here.

## C. All Remedies Available Under the KUCC Are Available Here Because The WLL's Exclusive Remedy Fails of Its Essential Purposes

The KUCC allows sellers to limit their liability. *E.g.,* K.S.A. 84-2-719(1)(a). But when an exclusive remedy fails of its essential purpose, the remedies as provided under the default provisions of the KUCC become available. See K.S.A. 84-2-

719(1)(B).  Whether a remedy failed of its essential purpose is generally a question of fact not amenable to summary judgment.  *Elite Professionals, Inc. v. Carrier Corp.*, 16 Kan. App. 2d 625, 638, 827 P.2d 1195 (1992); see also *Champlain Enterprises, Inc. v. U.S.*, 957 F. Supp. 26, 29-30 (E.D.N.Y. 1997) (applying Kansas enactment of UCC); *Ritchie Sand Inc. v. Eagle Iron Works*, No. 87-1385, 1989 WL 31408, at *5 (D. Kan. 1989).

The commenters to the UCC explained the principles underlying liability limitations and the limits of their reach:

> "[I]t is the very essence of a sales contract that at least minimum adequate remedies by available. . . . [U]nder subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provision of this Article."

U.C.C. 2-719 cmt. 1.

Applying this principle, the Kansas Court of Appeals reversed a grant of summary judgment in *Elite Professionals*.  In that case, a refrigeration unit on a truck failed causing the internal temperatures to rise and hog sides being transported to go bad. 16 Kan.App.2d at 625-26.  Carrier, who made the unit, sought to enforce a contractual limitation on remedies that, like the limitation here, limited the remedy of a defective material or workmanship to repair and replacement of the affected parts at a Carrier facility. 16 Kan. App. 2d at 636.  But Carrier's proffered remedy was only implemented after the unit malfunctioned and caused the meat to spoil.  The

panel found the record devoid of facts that would allow a determination of whether the proffered contractual remedy was meaningfully available to a truck that was in transit carrying cargo that would spoil if not promptly repaired.  The panel further commented,

> "It strikes us that if that time and place availability was such that remedial repair or replace work by Carrier was unavailable to Elite meaningfully prior to the arrival of the loaded reefer trailer at Far West's place of business on the morning of September 17, Carrier's promise was no more than illusory in the context of this case. That consequence reasonably could be found to amount to failure of the essential purpose of the limited remedy."

16 Kan. App. 2d at 636-37.

The panel relied on *Phillips Petroleum v. Bucyrus–Erie Co.*, 131 Wis.2d 21, 388 N.W.2d 584 (1986), a Wisconsin case involving steel used in cranes used in off-shore drilling.  In that case, one of the cranes broke loose and fell off the platform into the North Sea. Norwegian government inspectors ordered Phillips no longer use the remaining cranes until the issue was remedied. *Id.* at 587.  The contract limited Phillips' remedy to replacement of the defective part in Erie, Pennsylvania. *Id.* at 591. The Wisconsin court found this to be a case in which replacing the defective part did not provide an adequate remedy because the limitation resulted in "damages that are, in the circumstances, unconscionably low.  The damage clause is unreasonable." *Id.* at 592. There, the defect resulted in 13 cranes being taken out of commission until all could have the one part replaced.  The court described the impact of this single defect:

44

> "the damage was not limited to the replacement value of a single part even on the 13 cranes. The defect resulted in the total failure of Phillips' ability to use expensive and complex equipment for a protracted period of time. This was damage caused for the 'want of a horseshoe nail.'"

*Id.* at 592.

When a party defends against a claim by asserting it effected repairs as required by a warranty, a dispute about the adequacy of those repairs is a material fact that precludes a court granting summary judgment. *Midwhey Powder Co., Inc. v. Clayton Industries*, 157 Wis.2d 585, 460 N.W.2d 426 (1990). Here, Plaintiffs dispute the adequacy of the repairs. Each of the five tractors suffered from multiple defects that required substantial time out-of-service while the tractors were with an authorized dealer for the warranty repairs. See Plaintiff's Additional Statement of Uncontroverted Facts, ¶¶ 87-89. Even brand new tractors, including loaners to replace out-of-service ones, suffered substantial defects, in one example a hydraulic leak and an antifreeze leak. See Plaintiff's Additional Statement of Uncontroverted Facts, ¶ 93. These are defects that left Plaintiffs with no ability to use a tractor on numerous occasions, sometimes for extended periods of time, and sometimes involved multiple tractors being inoperable at the same time. It is also important to remember that the Plaintiffs had purchased 5 similar tractors so that they could run multiple tractors at the same time, often in the same field. Therefore, when one or more tractors were out of commission, it had a significant impact on the flow of work. Warranty repairs which left the Plaintiffs without the use and benefit of even one of

the five tractors for substantial periods of time, let alone two or three tractors at a time on occasion, necessarily fails of its essential purpose.

In addition, the GPS issue is a particular defect for which the purported remedy of warranty repairs failed entirely.  The GPS issue was first raised shortly after the first two tractors were delivered in February 2016.  It was not fixed until late January 2019, nearly three years after the issue was first raised, and just days before the leases expired on the first two tractors.  Effectively, the defect was *not* repaired despite the WLL promising that defects would be repaired.

CNH asserts that it was unaware that the GPS issues were continuing between October 2016 and December 2017, and therefore it assumed the issue had been solved.  This begs the question, because Agri-Center was certainly aware the problem was ongoing, and Plaintiffs were instructed in the WLL that the equipment must be taken to an authorized dealer for the warranty repairs; in that regard, Agri-Center was CNH's agent and so what Agri-Center knew, CNH is deemed to know. See *Mulholland v. Metropolitan Life Ins. Co.*, 546 F. Supp. 2d 1231, 1235-36 (D. Kan. 2008) (denying summary judgment because existence of agency or apparent agency relationship and whether agent's knowledge can be imputed to the principle are issues of fact).  Moreover, CNH admits that it was aware that this was a "priority" defect that needed to be repaired as of late December, 2017 . . . yet it took over a year after having actual knowledge before the defect was identified, corrected, and installed in the tractors.  Again, by failing to repair the defect for this length of time, the WLL's exclusive remedy fails of its essential purpose.

46

As a result, the WLL's exclusive remedy provision is ineffective and does not preclude Plaintiffs' claims.

### D. Plaintiffs Presented Admissible Evidence of Their Monetary Damages; This Is Not a Case That Requires Expert Testimony To Establish Plaintiffs' Harm.

CNH concedes expert testimony is not required in every case. In fact, they quote, "there is no fixed or general rule that requires expert testimony." *Genesis Health Clubs, Inc. v. Led Solar & Light Co.*, No. 13-1269-JWL, 2014 Wl 1246768, at *6 (quoting *Randolph v. Collectramatic, Inc.*, 59 F.2d 844, 848 [10th Cir. 1979]). Rather, "expert testimony is required only if a lay factfinder lacks the competency and is not equipped by common knowledge and skill to draw proper conclusions concerning the issue at hand." *Id.* (quoting *Voekel v. General Motors Corp.*, 846 F. Supp. 1468, 1477 n.3 [D. Kan. 1994]).

This is not a case requiring expert testimony. Plaintiffs' theory is straightforward. Plaintiffs' position is that they received defective tractors; those defects were numerous, resulting in the loss of use of the tractors for extended periods of time; and the defective GPS as well as many mechanical issues were not repaired in a reasonable period of time. A lay jury is more than capable of evaluating the quantity and type of mechanical issues; no expertise is needed beyond that which most lay jurors have by virtue of owning a home or a vehicle.

In addition, a lay jury is capable of determining the damages here. The purchase and lease amounts are established as the value of the Tractors which were intended to be acquired; the only question for the jury would be the value of the tractors that Plaintiffs actually received. Where, as here, the mechanical and GPS defects are so pervasive, a jury can easily determine that the Tractors were "lemons" and therefore had no value at all.

The contractual remedy, to repair the defective parts and workmanship, was meaningless in this case because no sooner would one issue be resolved than another would occur, and the GPS issue was never resolved until days or weeks before the three-year lease terms ended. The damages are therefore established by lease amounts in this case.

To the extent CNH asserts any damages to the tractors arose from Plaintiffs' misuse or abuse of the tractors[1], then CNH may attempt to submit factual support for that defense at trial. It is not Plaintiffs' burden to put forward evidence rebutting CNH's defense at this summary judgment stage. However, CNH would need expert testimony to establish such a defense. CNH was certainly entitled to designate an expert witness prior to its deadline expiring under this court's orders, but that deadline came and went with no expert designation. Dkt. #16, p. 3, ¶ (2)(c)

---

[1] It is noted that CNH only asserts this point in its Introduction (Doc, 59, page 4), which is not keyed to the record. Indeed, CNH cites absolutely no evidence that any of the mechanical issues were caused by operator abuse, negligence, or misuse. Indeed, such a conclusion would require expert testimony because the *cause* of a mechanical issue is not a matter within the knowledge of the average layperson. CNH's deadline to designate expert witnesses has expired. Dkt. #16, p. 3, ¶ (2)(c); see generally Docket. Therefore, this statement by CNH must be stricken.

CNH cites *Chapman v. Kansas Basement & Found. Repair, Inc.*, No. 100,941, 2009 WL 1911750 (Kan. Ct. App. 2009) (unpublished opinion).  In addition to the fact that this is an unpublished decision and therefore has no precedential value, *Chapman* is distinguishable. There, Lucille Chapman sought damages based on the diminished value of her property for a breach of warranty. The problem for Chapman was that her property had structural issues that predated the attempted repair. Under these circumstances, the panel concluded expert testimony may be required to distinguish those damages attributable to the preexisting condition and those attributable to defendant's attempted repair.  But here, Plaintiffs bought new tractors.  There is no preexisting condition that complicates the calculation.  Further, Eric Lind acknowledged that the GPS defect was a software defect across all of these tractors, and was certainly not caused by misuse or abuse by Plaintiffs.

A jury can also select from multiple methods to calculate damages.  Plaintiffs have asserted one such calculation:  total value of lease payments.  A jury might also reasonably calculate the damages based on the "per hour" rate identified in the leases. A jury may also hear evidence from Plaintiffs as to their opinion on the value of the tractors actually received, compared to the value they paid for the tractors.  There are any number of methodologies and they do not require an expert witness.

### E. Plaintiffs May Pursue Warranty, Contract, and KCPA Claims Based Farm Services Use of the Tractors.

CNH seeks to limit Plaintiffs' recovery by excluding any claims arising from the tractors being used by Farm Services, a Kansas LLC with two members—Griffitts and Coder. Farm Services has not made any claims in this matter.  In any event, the Plaintiffs' use of the tractors for the business of Farm Services does not limit or preclude Plaintiffs' recovery in this case.

CNH first argues that Farm Services lacks contractual privity to CNH, which precludes recovery for any harm based on Farm Services' use of the tractors. Farm Services is not a party to this case. To the extent its use of the tractors are at issue here, it is because Griffitts and Coder, as the individuals who acquired the tractors, used them for business and agricultural purposes when they allowed Farm Services, the limited liability company in which they were the only two members, to use them. See Defendant's Statement of Uncontroverted Facts, SOUF ¶¶ 3, 4, 8.

And as for the KCPA claims, privity is not a requirement; the KCPA provides "no action for breach of warranty with respect to a consumer transaction shall fail because of a lack of privity between the claimant and the party against whom the claim is made." K.S.A. 50-639(b).  And, as this court has concluded, this provision of the KCPA "broadly waives any privity requirement in all breach of warranty claims despite any other provision of law, including the UCC." *Gonzalez v. Pepsico, Inc.*, 489 F. Supp. 2d 1233, 1243 (D. Kan. 2007).

CNH relies on *Limestone Farms, Inc. v. Deere & Co.*, 29 Kan. App. 2d 609, 29 P.3d 457, to support its argument that Griffitts and Coder cannot recover for any damages resulting Farm Services' use of the tractors.  But *Limestone Farms* provides no guidance for this court. That case did not involve a KCPA claim because the purchase of a planter was made by an LLC who then sold the planter to another LLC; no individual was involved in the purchase. 29 Kan. App. At 613.  The *Limestone Farms* court did not have to resolve the issue before this court—whether the presence of a consumer as a contracting party invokes the KCPA and its related prohibitions on exclusions of warranties in consumer contracts. 29 Kan. App. 2d at 614-15.

In any event, this issue is really another red herring.  Farm Services has brought no claim against CNH.  While the mechanical issues and GPS defects did occur during the use by Griffitts' and Coder's business Farm Services, the court cannot look in a vacuum and exclude from consideration the issues and defects that Griffitts and Coder encountered during the Farm Services usage.  Once again, this hinges on the fact that Griffitts and Coder were individual lessees and that they were permitted to use the tractors in their trade or business.  It does not matter what corporate structure that business has.

In addition, the KCPA protections extend to consumers like Griffitts and Coder when they use the acquired property for agricultural purposes. See K.S.A. 50-624(b). K.S.A. 50-624 (c); see also *supra* at section A. The determining factor in whether the KCPA applies is whether the obligation was imposed on a consumer. The fact that Griffitts and Coder were individually obligated under the transaction documents is

what controls the KCPA analysis, regardless of "who" was using the equipment. See *Wayman*, 923 F. Supp. at 1363-64.

**F. CNH Has No Obligations Under, and Is Not Liable to Plaintiffs for, Any Alleged Oral Extended Warranty Agreed to Between Agri-Center and Plaintiffs.**

Plaintiffs do not dispute this point. Plaintiffs are not asserting any claims based on an alleged oral warranty between Agri-Center and Plaintiffs.

DATE:         July 5, 2019                    Respectfully submitted by:

                                             JOSEPH, HOLLANDER & CRAFT, LLC
                                             *Attorneys for the Plaintiffs*

                                             /s/ Anne M. Kindling
                                             Diane L. Bellquist, #20969
                                             Anne M. Kindling, #16140
                                             1508 SW Topeka Blvd.
                                             Topeka, Kansas 66612
                                             Tel: (785) 234-3272
                                             Fax: (785) 234-3610
                                             dbellquist@josephhollander.com
                                             akindling@josephhollander.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of July, 2019, a copy of the foregoing

document was served by email:

> Patrick A. Edwards
> STINSON LEONARD STREET LLP
> 1625 N. Waterfront Pkwy, Suite 300
> Wichita, KS 67206-6620
> Phone: (316) 268-7938
> Fax: (316) 268-9792
> patrick.edwards@stinson.com
> Attorneys for Defendant CNH Industrial

/s/ Anne M. Kindling