# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

GRIFFITTS & CODER CUSTOM
CHOPPING, LLC, et al.,

        Plaintiffs,

v.

CNH INDUSTRIAL AMERICA LLC,

        Defendant.

Case No. 18-2300-DDC

## MEMORANDUM AND ORDER

Plaintiffs Griffitts & Coder Custom Chopping, LLC ("Custom Chopping"), Bradley A. Griffitts ("Griffitts"), and Timothy L. Coder ("Coder," and collectively with Custom Chopping and Griffitts, "plaintiffs") assert breach of express and implied warranties and violations of the Kansas Consumer Protection Act ("KCPA") claims against defendant CNH Industrial America LLC based on alleged GPS and mechanical issues with five New Holland T8 tractors that defendant manufactured and plaintiffs leased. This diversity action arises under Kansas law.[1]

---

[1] As detailed below, the issues in this case revolve around the sale and lease of tractors, which were arranged through a Kansas dealership. The tractors' lessees—plaintiffs—are two Kansas residents and a Kansas limited liability company. Defendant is a Delaware limited liability company. The court previously requested detailed information about the citizenship of each party (Doc. 10). Following defendant's Response to the court's Show Cause Order, the court determined complete diversity exists and the court has subject matter jurisdiction here (Doc. 12).

"[T]he parties believe and agree that the substantive issues in this case are governed by" Kansas law. Doc. 50 at 2. Both parties refer to the KCPA and the Kansas Uniform Commercial Code (the "KUCC") in their briefs. In diversity cases, like this one, the court applies the substantive law of the forum state, including its choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *see also Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1236 n.7 (10th Cir. 2014). The KCPA applies to consumer transactions within Kansas. *See* Kan. Stat. Ann. § 50-624(c). The KUCC "applies to transactions bearing an appropriate relation" to Kansas. *See* Kan. Stat. Ann. § 84-1-301(b).

The court agrees Kansas law governs the court's analysis. "'When the federal courts are called upon to interpret state law, the federal court must look to rulings of the highest state court, and, if no such rulings exist, must endeavor to predict how that high court would rule.'" *Amparan v. Lake Powell Car Rental Cos.*, 882 F.3d 943, 947 (10th Cir. 2018) (quoting *Stickley v. State Farm Mut. Auto. Ins.*, 505 F.3d 1070, 1077 (10th Cir. 2007)). When a

This matter comes before the court on defendant's Motion for Summary Judgment (Doc. 51). Defendant seeks summary judgment against each of plaintiffs' claims. Docs. 51 & 52. Plaintiff has filed a Response (Doc. 56), defendant has submitted a Reply (Doc. 59), and plaintiff has moved for leave to file a surreply (Doc. 62), attaching its Surreply to that motion (Doc. 62-1).[2] The matter thus is fully briefed, and after considering the parties' arguments, the court is prepared to rule. For reasons explained below, the court grants in part and denies in part defendant's Motion for Summary Judgment.[3]

---

federal court must predict how a state's highest court would rule, the federal court starts with decisions from the state's intermediate court of appeals. *Id.* And, in that situation, a federal court should adopt the position of the state intermediate court of appeals "unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940). "To the extent the court cites case law from other states, the court emphasizes that '[b]ecause the UCC is intended to be applied uniformly across the various states, courts routinely turn to decisions from other states when there is no case law on point within the relevant jurisdiction.'" *Lohmann & Rauscher, Inc. v. YKK (U.S.A.), Inc.*, 477 F. Supp. 2d 1147, 1152 n.8 (D. Kan. 2007) (quoting *Nat'l Envtl. Serv. Co. v. Ronan Eng'g Co.*, 256 F.3d 995, 1004 (10th Cir. 2001)).

[2]      Plaintiffs have filed a Motion for Leave to File a Surreply to Defendant's Reply in Support of its Motion for Summary Judgment (Doc. 62). Defendant does not believe a surreply is necessary, but does not oppose the motion. Doc. 62 at 1.

Under D. Kan. Rule 7.1(c), briefing on motions is limited to the motion (with memorandum in support), a response, and a reply. Surreplies typically are not allowed. *Taylor v. Sebelius*, 350 F. Supp. 2d 888, 900 (D. Kan. 2004), *aff'd on other grounds*, 189 F. App'x. 752 (10th Cir. 2006). Instead, surreplies are permitted only with leave of court and under "rare circumstances." *Humphries v. Williams Nat. Gas Co.*, No. 96–4196–SAC, 1998 WL 982903, at *1 (D. Kan. Sept. 23, 1998) (citations and internal quotation marks omitted). For example, when a moving party raises new material for the first time in a reply, the court should give the nonmoving party an opportunity to respond to that new material (which includes both new evidence and new legal arguments) in a surreply. *Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005); *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1139 n.13 (10th Cir. 2003). The rules governing surreplies "are not only fair and reasonable, but they assist the court in defining when briefed matters are finally submitted and in minimizing the battles over which side should have the last word." *Humphries*, 1998 WL 982903, at *1 (citation and internal quotation marks omitted).

Plaintiffs contend their Surreply addresses new issues or arguments raised by defendant's Reply. Doc. 62 at 1. Defendant's Reply arguments address plaintiffs' proposed additional statement of uncontroverted facts and arguments raised by plaintiffs' Response. But, the court agrees that some of defendant's arguments about the KCPA's definitions of "agricultural purposes" and "consumer" first were raised, at least explicitly, in defendant's Reply. The court thus grants plaintiffs' motion and considers the Surreply in its analysis below.

[3]      Plaintiffs also have filed an Unopposed Motion for Oral Argument (Doc. 60) requesting oral argument on their KCPA claims. They request oral argument under D. Kan. Rule 7.2, which provides, "The court may set any motion for oral argument or hearing at the request of a party or on its own initiative." After reviewing the parties' written briefs, the court finds that they explain the parties' positions sufficiently. The court thus concludes oral argument will not assist its work and delaying the case to conduct oral argument would contradict Fed. R. Civ. P. 1. Exercising its discretion, the court denies plaintiffs' motion.

## I.    Undisputed Facts

The following facts are either stipulated by the parties in the Pretrial Order (Doc. 50), uncontroverted, or, where controverted, are stated in the light most favorable to plaintiffs, the party opposing summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### *The Parties*

Custom Chopping is a Kansas limited liability company, with Griffitts and Coder as its only members.  Griffitts and Coder also are the only members of G&C Farm Services LLC, a Kansas limited liability company ("Farm Services").  Farm Services is not a party to this suit. Neither Griffitts nor Coder own or operate a farming operation as an individual, a sole proprietorship, or with family members.  And, they are not related to one another.  Both Griffitts and Coder are Kansas residents.

Custom Chopping owns 335 acres near Muleshoe, Texas where it raises crops to sell. "Custom Chopping performs three primary services:  (a) custom silage harvesting, which involves swathing, chopping, hauling, piling, and packing a particular crop; (b) custom swathing and hauling of straw; and (c) occasional trucking for other custom cutters and farmers."  Doc. 52 at 6.  The custom silage harvesting season for Custom Chopping runs from March to November. Its straw swathing season occupies the middle of summer.

The only service Farm Services provides is manure spreading.  Its season runs from September to April.  Farm Services is in the process of liquidating and closing its business, and last spread manure in December 2018 or January 2019.

Defendant CNH Industrial America LLC is a Delaware limited liability company.  It sells New Holland brand agricultural equipment through authorized dealers throughout the United

States, including through F&W Tractor Co., Inc. d/b/a AgriCenter ("AgriCenter"). AgriCenter is located in South Hutchison, KS.

### The Tractor Leases

Plaintiffs leased five New Holland tractors from Farm Credit Leasing Services Corporation d/b/a Ag Direct ("Farm Credit").[4] The parties entered into the following agreements in connection with those leases:

- A Warranty and Limitation of Liability Agreement for New Holland Agricultural Equipment ("WLL Agreement") for each of the five tractors referenced below. The WLL Agreements are from defendant and signed by Custom Chopping and the authorized dealer, AgriCenter.[5]

- A Commercial Equipment Lease Agreement, dated January 28, 2016, for the 36-month lease of a 2016 New Holland T8.380 Auto Command Tractor, Serial Number ZFRE05239, between Farm Credit as "Lessor" and "Griffitts & Coder Custom Chopping LLC, Timothy L Coder, Bradley Allen Griffitts ('Lessee') a(n) Kansas LLC" as "Lessee."

---

[4] Plaintiffs at times refer to acquiring, purchasing, or owning the tractors, as opposed to leasing them. The parties never specify whether they believe the Leases (defined below) constitute true leases governed by Article 2A of the KUCC or, instead, a secured financing and sale governed by Article 2 of the KUCC. As part of the Leases, Farm Credit assigned to lessees—plaintiffs—for the duration of each Lease all warranties it received, to the extent assignable. And, for the breach of warranty claims at issue here, the applicable KUCC provisions are similar under Article 2 and Article 2A. *Compare* Kan. Stat. Ann. § 84-2a-214(2), (3)(a) *with* Kan. Stat. Ann. § 84-2-316(2), (3)(a); *compare* Kan. Stat. Ann. § 84-2a-503(1)-(3) *with* of Kan. Stat. Ann. § 84-2-719(1)(a)-(b); *compare* Kan. Stat. Ann. § 84-2a-508(4) and Kan. Stat. Ann. § 84-2a-519(4) *with* Kan. Stat. Ann. § 84-2-719(2) and Kan. Stat. Ann. § 84-2-714(2); *compare* Kan. Stat. Ann. § 84-2a-216 *with* Kan. Stat. Ann. § 84-2-318.

In its analysis below, the court refers to Article 2's sale provisions of the KUCC because the parties used them in their arguments and the claims are asserted against the tractors' manufacturer, not the lessor. But, throughout the Order, the court generally refers to plaintiffs having leased the tractors. It is uncontroverted that Custom Chopping intended to return the tractors at the end of the lease terms. Doc. 56 at 8–9. The Leases for four tractors expired in February 2019 or April 2019, and those four tractors were returned to Farm Credit. Doc. 52 at 5; Doc. 50 at 5. The fifth tractor's Lease was set to expire in September 2019 and the tractor still was in plaintiffs' possession at the time of the summary judgment briefing. *Id.* All five Leases provided that title remained with lessor and, at the Leases' expiration, lessee may (i) return the equipment, (ii) purchase it for a specified amount (which appears to be more than a nominal amount, and if no amount was specified the purchase would be at fair market value), or (iii) renew the Lease for an additional term at the then fair market value rental. *See, e.g.*, Doc. 52-6 at 2–3. These facts favor a finding that the Leases were true leases and not sales, even though lessee remained responsible for insurance, taxes and repairs. *See Wight v. Agristor Leasing*, 652 F. Supp. 1000, 1007–09 (D. Kan. 1987); *see also AgriStor Leasing v. Meuli*, 634 F. Supp. 1208, 1214–15 (D. Kan. 1986).

[5] The "Purchaser Name" lists Custom Chopping and the signature block asks for "Purchaser Signature." Griffitts signed on the signature line.

4

- A Commercial Equipment Lease Agreement, dated January 28, 2016, for the 36-month lease of a 2016 Auto Command Tractor, Serial Number ZFRE06025, between Farm Credit as "Lessor" and "Griffitts & Coder Custom Chopping LLC, Timothy L Coder, Bradley Allen Griffitts ('Lessee') a(n) Kansas LLC" as "Lessee."

- A Commercial Equipment Lease Agreement, dated March 21, 2016, for the 42-month lease of a 2015 New Holland T8.435 Auto Command Tractor, Serial Number ZFRE02091, between Farm Credit as "Lessor" and "Griffitts & Coder Custom Chopping LLC, Timothy L Coder, Bradley Allen Griffitts ('Lessee') a(n) Kansas LLC" as "Lessee."

- A Commercial Equipment Lease Agreement, dated April 29, 2016, for the 36-month lease of a 2016 New Holland T8.380 Powershift Tractor, Serial Number ZGRE02009, between Farm Credit as "Lessor" and "Griffitts & Coder Custom Chopping LLC, Timothy L Coder, Bradley Allen Griffitts ('Lessee') a(n) Kansas LLC" as "Lessee."

- A Commercial Equipment Lease Agreement, dated April 29, 2016, for the 36-month lease of a 2016 New Holland T8.380 Powershift Tractor, Serial Number ZGRE02010, between Farm Credit as "Lessor" and "Griffitts & Coder Custom Chopping LLC, Timothy L Coder, Bradley Allen Griffitts ('Lessee') a(n) Kansas LLC" as "Lessee."

Doc. 50 at 3–4. This Order refers to each of these Commercial Equipment Lease Agreements as a "Lease" and, collectively, calls them the "Leases." Each Lease contained four signatures for where "Lessee" manifested that it had accepted and agreed to the Lease. They were signed by "Lessee" Custom Chopping through its representatives Coder (as Vice President) and Griffitts (as President) and by "Lessee" Coder and "Lessee" Griffitts in their individual capacities. Those same parties signed again to confirm delivery of the equipment.

AgriCenter sold the tractors.[6] As part of the lease transactions, AgriCenter created two Bills of Sale and each one identified Custom Chopping as the "Buyer," and Griffitts and Coder

---

[6] The summary judgment record is not clear who purchased the tractors from AgriCenter. Lee File, the General Manager of AgriCenter, testified that the tractors "were sold by AgriCenter pursuant to" the Leases. Doc. 52-3 at 3 (File Aff. ¶ 15). And, he explains the steps he took to arrange the lease financing between Farm Credit, AgriCenter, and plaintiffs. Doc. 52-3 at 3–4 (File Aff. ¶¶ 10-18). In the Pretrial Order, plaintiffs' factual contentions assert both that they purchased the tractors from AgriCenter and that they entered into a leaseback agreement with Farm Credit. They agree, as part of the Leases, Farm Credit held title to the tractors, but passed the

as a "Co-Buyer."  The first Bill of Sale, dated January 23, 2016, covered the four 2016 tractors. The second Bill of Sale, dated March 21, 2016 (signed March 24, 2016), covered the 2015 tractor that was leased in March 2016.  Doc. 52-3 at 4.  Each one contained two signatures from plaintiffs.  On the first Bill of Sale, Coder signed on the "Buyer" signature line, and Griffitts signed on the "Co-Buyer" signature line.  On the second one, Griffitts signed on the "Buyer" signature line, and Coder signed on the "Co-Buyer" signature line.  Only two signature lines appeared on these Bills of Sale—one for buyer and one for co-buyer.

The tractors have been used for three purposes only:  (a) spreading manure for Farm Services, (b) swathing and hauling silage and equipment for Custom Chopping, and (c) mowing and maintaining land used by Custom Chopping as its Texas office, where it stores equipment and provides lodging for employees during the season.  In short, the tractors never have been used for purposes unrelated to the business activities of Farm Services and Custom Chopping.[7] Farm Services never paid Custom Chopping for using the tractors, nor does it have any contracts or other agreements with Custom Chopping.

Though the tractors were used by Farm Services, the above agreements never identify Farm Services as a buyer or lessee because it did not have an established credit rating like

---

right of enforcing the manufacturer's warranties to plaintiffs.  Doc. 50 at 5.  In the summary judgment record, plaintiffs present no evidence that they separately paid consideration to AgriCenter to purchase the tractors.  Indeed, Mr. File testified Custom Chopping sought to finance the lease of the tractors and so, Mr. File secured quotes from three lease financing companies.  Doc. 52-3 at 3 (File Aff. ¶¶ 10–11).  As discussed *supra* note 4, the Leases appear to be true leases, which would mean the tractors were sold to Farm Credit.  The parties did not brief this issue, however, or identify the purchaser of the tractors in the undisputed summary judgment facts.

[7]      Plaintiffs did not controvert that the tractors only have been used for these purposes.  Doc. 56 at 17.  But, as discussed more below, plaintiffs assert for the first time in their Surreply that the tractors also were used for personal and household purposes.  Doc. 62-1 at 3.  This is so, they argue, because they used the tractors to mow land owned by Custom Chopping that employees of Custom Chopping—including Griffitts and Coder—use as lodging while working during the season.  *Id.*  The court addresses this late arriving argument in its analysis below.

Custom Chopping.  When shopping for the tractors and entering into the Leases, plaintiffs never raised the possibility of adding Farm Services as a co-buyer or lessee on the agreements.

By their individual signatures on the documents, Griffitts and Coder believed themselves to be joint owners, co-buyers, and co-lessees of the tractors, along with each other and Custom Chopping.  According to Griffitts and Coder's understanding, they had equal ownership interests in the tractors[8] and they were equally responsible for payments, regardless of who actually made the payments.  The Leases were listed as joint installment debt on Griffitts and Coder's individual credit profile reports.  The "Reasons" section of the credit reports included the following language, among other explanations:  "Proportion of Loan Balances to Loan Amounts is Too High" and "Too Many Accounts with Balances."  And, for each credit report, the installment balance as of the date of the report was greater than the combined total of the other account balances listed in the report.

Custom Chopping made all payments under the Leases.  Also, Custom Chopping paid all non-lease expenses for the tractors.  The lease expenses for the tractors were taken as deductions on Custom Chopping's tax returns, and the individual returns for Griffitts and Coder claimed no amounts derived from the tractors.  Custom Chopping or Farm Services received all payments for work performed using the tractors.  In other words, Griffitts and Coder did not make or receive any payments derived from the tractors' use; nor did they utilize the tractors when they filed their individual tax returns.

---

[8]    Again, the parties do not discuss the nature of the leaseback arrangement with Farm Credit and whether it constitutes a true lease or a disguised financing.  Defendant controverts that plaintiffs ever purchased or owned the tractors because the Leases with Farm Credit were signed before the tractors ever came into plaintiffs' possession. Doc. 59 at 6.

As explained in more detail below, some of plaintiffs' claims arise from Griffitts and Coder's inclusion as signing parties on the Leases and Bills of Sale. Neither Griffitts nor Coder asked to be identified as additional lessees or co-buyers in those documents. Lee File, the General Manager of AgriCenter, testified that he listed Griffitts and Coder as "Co-Buyers" on AgriCenter's Bills of Sale issued in connection with the Leases "because it was [his] understanding that Farm Credit required the individual business owners . . . to be identified on sale documents as co-buyers when the equipment was sold or leased to any entity (in this case, Custom Chopping), such that [Griffitts] and [Coder] acted as personal guarantors in the transaction." Doc. 52–3 at 4. Similarly, any paperwork submitted by Mr. File that referenced Griffitts and Coder as "co-lessees or additional lessees" "did so because it was [his] understanding that Farm Credit requires the individual business owners . . . to be identified as such on lease documents when the equipment is leased to an entity . . . such that [the individual owners] essentially act as personal guarantors in the transaction." *Id.* at 5. Mr. File testified that "Agri Center considered its 'customer' with respect to the sale and lease of the Tractors to be Custom Chopping, not [Griffitts] or [Coder] individually, although Agri Center communicated with [Griffitts] and [Coder] as representatives for Custom Chopping." *Id.* at 4–5.[9]

Whether Mr. File advised the individual plaintiffs why he had listed them as co-buyers or co-lessees is controverted. But, plaintiffs do not dispute that Mr. File emailed the unsigned Leases to them, and the unsigned Leases identified Griffitts and Coder as lessees. Griffitts and Coder then reviewed, signed, and emailed the agreements back to Mr. File without making any revisions.

---

[9] Plaintiffs controvert Mr. File's affidavit to the extent that his thought process or opinions contradict the agreements themselves or express legal conclusions. Specifically, plaintiffs challenge Mr. File's statements that he believed the individual plaintiffs were identified on the agreements essentially to act as guarantors and that AgriCenter considered Custom Chopping to be its customer. Doc. 56 at 10.

### *The Lease Terms and the Warranties*

Paragraph 6 of each Lease provided that the lessees may not sublet the equipment. And, each lessee agreed that "the Equipment will only be used in the Lessee's trade or business for legal business and commercial purposes." Doc. 52 at 7. In Paragraph 9 of each Lease, lessees acknowledged that the lessor—Farm Credit—was not the manufacturer of the equipment. And, each lessee acknowledged that

> LESSEE IS SATISFIED THAT THE EQUIPMENT IS SUITABLE AND FIT FOR ITS PURPOSES; LESSOR HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY EITHER EXPRESS OR IMPLIED AND HAS NOT WARRANTED THE MERCHANTABILITY OF THE EQUIPMENT OR ITS FITNESS FOR ANY PARTICULAR PURPOSE; AND LESSEE LEASES THE EQUIPMENT AND TAKES SUCH "AS IS" AND WITH ALL FAULTS.

Doc. 52 at 8. But, lessor assigned to lessees for the duration of each Lease "all warranties received by Lessor with respect to the Equipment to the extent assignable." *Id.*

The warranties and liability limitations appear in the WLL Agreement signed in connection with each tractor lease. *See* Docs. 52-10, 52-11, 52-12, 52-13, 52-14. Customers could not negotiate the terms of the WLL Agreement. Each WLL Agreement listed Custom Chopping under "Purchaser Name." And Griffitts signed the "Purchaser Signature" line. Neither Griffitts nor Coder signed any WLL Agreement in his individual capacity. For the Leases dated January 28, 2016, the WLL Agreements were signed February 5, 2016.[10] These Leases indicate that the equipment was delivered on February 3, 2016. Doc. 52-4 at 5; Doc. 52-5 at 5. For the Lease dated March 21, 2016, the WLL Agreement was signed March 24, 2016. This Lease indicates that the equipment was delivered on March 22, 2016. Doc. 52-6 at 5. For

---

[10]     Defendant claims these WLL Agreements were signed on February 5, 2016, which plaintiffs do not controvert. Doc. 56 at 12–13. Plaintiffs purport they were signed on February 4, 2016, which defendant does not controvert. Doc. 59 at 6. It is difficult to discern the actual date shown on the exhibits provided as part of the summary judgment record. But, whether they were signed on February 4 or February 5 is not a fact that matters to the issues decided by this Order.

the Leases dated April 29, 2016, the WLL Agreements were signed May 3, 2016. These Leases indicate that the equipment also was delivered on May 3, 2016. Doc. 52-7 at 5; Doc. 52-8 at 5.

Each WLL Agreement provided that it is "a limited warranty provided to the initial retail purchaser in return for consideration paid as part of the purchase price of the product." *See, e.g.*, Doc. 52-14 at 2. The warranty period lasted 24 months or 2,000 hours. *Id.* And, a "**What's Covered**" provision in each WLL Agreement provided, "If a defect in material or workmanship is found . . . and reported during the Warranty Period" defendant agrees to "pay parts and labor costs to repair the defect if the services are performed by an authorized . . . dealer at the dealer's location." *Id.* at 3.

The WLL Agreements also provided that defendant's warranty "is limited to the written terms" in the WLL Agreement and that no "person dealer, or agent" is authorized to change or extend the terms of the warranty. *Id.* In bold and all capital letters, in a box set apart from the rest of the text, each WLL Agreement provided:

> **EXCLUSIVE REMEDY**
> **THE REMEDY OF REPAIRING A DEFECT IN MATERIALS OR WORKMANSHIP AT A NHAG DEALERSHIP UNDER THE TERMS OF THIS WARRANTY IS THE PURCHASER'S EXCLUSIVE REMEDY AND IS IN LIEU OF ANY OTHER REMEDY OTHERWISE AVAILABLE.**

*Id.* Below this provision, under "**Limitation and Exclusions,**" each WLL Agreement provided that it gives "specific legal rights and you may also have other rights, which vary, from region to region." *Id.* This is followed by another box with bold capital letters stating:

> **THIS DOCUMENT CONTAINS THE ENTIRE NHAG WARRANTY, NHAG MAKES NO OTHER REPRESENTATIONS OR WARRANTIES, EXPRESSED OR IMPLIED, AND SPECIFICALLY EXCLUDES THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR PARTICULAR PURPOSE.\* NHAG WILL NOT BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES RESULTING FROM A BREACH OF THE WRITTEN WARRANTY OR ANY IMPLIED WARRANTY IMPOSED BY LAW.\***

*Id.* The boxed provisions above appear on page two of the WLL Agreements. The signature blocks appear on page one.

The WLL Agreements go on to list "**What's Not Covered**." This list includes, among other things, repairs arising from failing to maintain the equipment or improper use and

"economic loss including lost profits, crop loss, equipment rental, or other expense." Doc. 52-14 at 3.

Plaintiffs allege that Mr. File agreed to provide an extended warranty to plaintiffs to match a warranty provided by one of defendant's competitors "as part of the agreement to lease the Tractors through a sale from Agri-Center." Doc. 56 at 11. Plaintiffs assert that this warranty "was for the life of each lease" and included an agreement by AgriCenter to (1) perform all fluid and filter changes on the tractors, (2) perform all mechanical repairs needed on the tractors, and (3) provide plaintiffs a loaner tractor if a repair was needed and could not be made within 24 hours. *Id.* The Bills of Sale reference the fluid changes next to an extended warranty term.[11] But all the other extended warranties were verbal agreements. Plaintiffs never discussed this alleged extended warranty with defendant or entered into any written agreement with defendant about the purported extended warranty. Plaintiffs do not know if Farm Credit ever was advised of the alleged extended warranty.

Each WLL Agreement required the dealer to "review the warranty coverage with the initial retail purchaser and obtain signature on this document." *See, e.g.*, Doc. 52-14 at 2. It is controverted whether this review took place here. Mr. File testified that he reviewed the WLL Agreement with Griffitts in February 2016 before the first two WLL Agreements were signed, but Griffitts denies a review occured.[12] Doc. 52-3 at 5; Doc. 56-2 at 4.

---

[11]    The first Bill of Sale references "Extended Warranty to 4 yrs 4000 hrs." Doc. 52-9 at 2. The second Bill of Sale references "Extended Warranty to 5 yrs 6000 hrs." *Id.* at 3.

[12]    The two WLL Agreements dated May 3, 2016 contain boxes, both checked "yes," next to the question: "The selling dealer explained the warranty terms and coverage to me." Docs. 15-12 & 15-13. And, no evidence in the summary judgment record suggests that plaintiffs did not read the WLL Agreement or were unaware of its terms.

*The Use of the Tractors and Alleged GPS and Mechanical Issues*

Each tractor had an integrated GPS system for autoguidance and various other amenities. Three tractors had a luxury performance cab and two had a deluxe performance cab. The integrated GPS system, cab amenities, and minimum 300 horsepower were significant reasons why plaintiffs selected these tractors. Plaintiffs needed the GPS capability because the tractors would be used for precision work. The cab amenities were important because the tractors would be used for long stretches of time. The lease terms allowed 1,350 hours of use per tractor per year.

As summarized below, plaintiffs claim the tractors sustained a number of GPS and mechanical issues, which defendant mostly does not controvert for purposes of summary judgment. Specifically, when a tractor was used to spread manure in a circular center pivot pattern, the GPS would crash after about two to three hours of use. When a tractor was used for swathing in a circular center pivot pattern, the GPS still crashed, but more sporadically and less frequently than during manure spreading. When swathing, the GPS sometimes crashed two or three times a day, and some days not at all. Plaintiffs attribute this difference to the fact that manure spreading projects often take more than two to three hours, while swathing jobs sometimes were completed in less than two to three hours. Thus, plaintiffs assert, the GPS issue "occurred consistently after 2-3 hours of continual use. . . regardless of what agricultural task was being performed." Doc. 56 at 24–25. Defendant controverts this assertion, arguing that Coder testified that the GPS error occurred sporadically when performing swathing and, on some days, not at all. The GPS issue that occurred when using the tractors in a circular center pivot pattern was reflected by error code AG-265.

Up to three tractors were used at a time, depending on the activity. When the GPS on one tractor failed, the others also would fail like they were "on a timer or a domino effect." Doc. 56 at 25. Plaintiffs eventually figured out that when the error code appeared, the operator could shut off the tractor, then wait for it to come back online. Turning off the tractor, then turning it back on to allow the GPS receiver to reconnect could take up to an hour each time the GPS crashed.

Plaintiffs encountered the GPS problems shortly after receiving the first two tractors and they reported the problems to AgriCenter. Plaintiffs continued to report problems with the GPS to AgriCenter over the life of the Leases—at least once a month and sometimes five or six times a month. AgriCenter told plaintiffs that it was communicating with defendant about the problem and defendant was working on it. But, because of the way AgriCenter reported each issue during the lease term to defendant as separate cases, rather than an ongoing case with continual issues, defendant did not realize that all of the reports related to the same problem. Defendant was aware of the GPS problems in 2016. Between March and October 2016, AgriCenter and defendant communicated many times about the issue. Doc. 56-3 at 7 (Coder Depo. 162:4–11). By November 2017, after continuously reporting issues to AgriCenter, Coder insisted that AgriCenter get defendant involved to fix the problem. As early as December 2017, defendant knew that the GPS problems had continued and made a site visit in January 2018.

Paul Hatfield, an employee of defendant, testified that the tractors "had more problems than [he] would like to see," the amount of issues was atypical for New Holland's brand, and that he was upset about the time it took to get the issue resolved. Doc. 56-6 at 5–6 (Hatfield Depo. 44:9–24, 45:1–17). In January 2018, defendant's employees told Coder they thought defendant could have the issue fixed within 60 days.

AgriCenter and defendant initially were unable to identify the problem or a solution. At some point, defendant discovered the AG-265 error code was caused by a defect. Sometime between January 29, 2019 and February 2, 2019, a permanent software fix was installed on the tractors. After this fix, Custom Chopping encountered no more GPS issues with any of the tractors.

In addition to the GPS issues, Custom Chopping also reported various other mechanical issues with the tractors. *See* Doc. 56 at 27–29. Mechanical issues occurred on all five tractors and "impacted workflow to a significant degree." Doc. 56 at 26–27. Three tractors required warranty repairs within the first month of delivery. The other two tractors required a repair after four months. Some repairs of these mechanical defects took weeks to fix, after being hauled to AgriCenter for repair. Several times, more than one tractor was inoperable or in the shop because of mechanical issues. At times, three tractors were inoperable at the same time. At times, plaintiffs used loaner tractors from AgriCenter or defendant, but these did not have the same amenities as the leased tractors. A new loaner tractor from defendant had a hydraulic leak and antifreeze leak.

An authorized dealer repaired all mechanical issues with the leased tractors. Plaintiffs do not allege that defendant failed to pay for parts or labor costs for defects in the tractors that authorized dealers repaired.

### *Procedural History*

In May 2018, plaintiffs filed suit against defendant. They assert four claims: (1) breach of express warranty by failing to repair defects in materials and workmanship, (2) breach of implied warranty of merchantability because the tractors were defective and not fit for the ordinary purposes for which they are used, (3) violation of the KCPA by engaging in

unconscionable acts and practices of a one-sided transaction in which plaintiffs Griffitts and Coder were unable to receive a material benefit, and (4) violation of the KCPA by engaging in deceptive acts and practices by knowingly representing that the tractors were of a particular standard or quality and had certain uses, benefits, or characteristics when in reality the tractors were not of such standard or quality and did not have the uses, benefits, or characteristics represented.  Doc. 1-1.  All three plaintiffs assert breach of express warranty and breach of implied warranty of merchantability claims.  Griffitts and Coder individually assert the two KCPA claims, claiming unconscionable and deceptive acts and practices.

Plaintiffs request the following damages:  (1) recovery of the total of all lease payments made for the tractors, $791,140.27; (2) civil penalties under the KCPA in the amount of $100,000 ($10,000 per tractor per each individual plaintiff); and (3) attorneys' fees under the KCPA.

As explained in more detail below, defendant argues the court should grant summary judgment in its favor against all claims.  Defendant contends that "no genuine issues of material fact" exist and that it "is entitled to judgment as a matter of law on each of [p]laintiffs' claims in this lawsuit."  Doc. 51 at 1.

## II.     Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also In re Aluminum Phosphide Antitrust Litig.*, 905 F. Supp. 1457, 1460 (D. Kan. 1995).  When it applies this standard, the court "view[s] the evidence and make[s] inferences in the light most favorable to the non-movant."  *Nahno-Lopez v. Houser*, 625 F.3d

1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1150 (D. Kan. 2012) (explaining that "[a]n issue of fact is 'genuine' if 'the evidence allows a reasonable jury to resolve the issue either way.'" (quoting *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Nahno-Lopez*, 625 F.3d at 1283 (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)); *see also In re Urethane Antitrust Litig.*, 913 F. Supp. 2d at 1150 (explaining that "a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim." (citation omitted)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'" *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)).

Finally, summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

### III.    Analysis

Defendant seeks summary judgment against all four of plaintiffs' claims. It relies on five arguments. First, defendant argues plaintiffs' KCPA claims fail because no plaintiff is a "consumer" entitled to protection under the KCPA. Doc. 52 at 17. Second, defendant asserts plaintiffs' breach of implied warranty of merchantability claims fail because defendant disclaimed all implied warranties in the WLL Agreements. Doc. 52 at 19. Third, defendant contends, plaintiffs' breach of express warranty claims fail because the WLL Agreements provide an exclusive remedy that defendant already has provided and thus plaintiffs are not entitled to the money damages they seek. Doc. 52 at 20. Fourth, defendant argues that plaintiffs "are precluded from asserting claims or seeking damages" based on problems encountered while Farm Services used of the tractors because there is no privity of contract and Farm Services is not a party to this suit. Doc. 52 at 22–24. Last, defendant seeks a summary judgment ruling that

it is not liable for any alleged oral extended warranty between AgriCenter and plaintiffs. Doc. 52 at 25. The court addresses each argument in turn, below.

### A. Kansas Consumer Protection Act Claims[13]

The KCPA is designed to protect consumers from (i) "suppliers who commit deceptive and unconscionable practices" and (ii) "unbargained for warranty disclaimers." Kan. Stat. Ann. § 50-623(b)-(c). The KCPA requires the court to construe the act liberally to promote these policies. *Id.*; *see also Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1363 (D. Kan. 1996).

Plaintiffs Griffitts and Coder assert two claims against defendant for violations of the KCPA. They assert defendant has engaged in both deceptive acts and practices[14] and unconscionable acts and practices[15] in violation of the KCPA. Section 50-626 of the KCPA prohibits a supplier from "engag[ing] in any deceptive act or practice in connection with a *consumer transaction*." Kan. Stat. Ann. § 50-626(a) (emphasis added). Whether a supplier has engaged in a deceptive act or practice is a question for the jury. *Wayman*, 923 F. Supp. at 1372. Section § 50-627 of the KCPA prohibits a supplier from "engag[ing] in any unconscionable act or practice in connection with a *consumer transaction*." Kan. Stat. Ann. § 50-627(a) (emphasis added). And, suppliers generally are not permitted to "[e]xclude, modify or otherwise attempt to

---

[13] Plaintiffs requested oral argument on this summary judgment issue. As discussed above, *supra* note 3, the written briefs on the KCPA issues suffice and the court thus denies plaintiffs' request.

[14] Plaintiffs contend that defendant "engaged in deceptive acts and practices by" representing the tractors to have certain capabilities while "knowingly, or with reason to know, that the tractors did not have the characteristics, uses or benefits as purported." Doc. 50 at 12. And, plaintiffs argue, defendant "engaged in deceptive acts and practices" when transacting with Griffitts and Coder "by knowingly, or with reason to know, that the tractors differed materially from the represented particular standard, quality, grade, style or model." Doc. 50 at 12 (internal quotation marks omitted). Because of these alleged deceptive acts and practices, plaintiffs contend they were unable to get the tractors that they bargained for and instead received tractors with "persistent and pervasive mechanical and software defects." Doc. 50 at 6–7.

[15] Specifically, plaintiffs contend that defendant's "transaction with Griffitts and Coder was unconscionable because the consumers were unable to receive a material benefit from the transaction" and the warranty provisions were "excessively one-sided in favor of the supplier." Doc. 50 at 12 (internal quotation marks omitted). Further, they believe the transaction "was unconscionable under the totality of the circumstances." *Id.*

limit the implied warranties of merchantability . . . and fitness for a particular purpose" or remedies for a breach of those warranties "with respect to property which is the subject of . . . a *consumer transaction*." Kan. Stat. Ann. § 50-639(a) (emphasis added); *see also* Kan. Stat. Ann. § 50-627(b)(7). "The unconscionability of an act or practice is a question for the court." *Id.* § 50-627(b); *see also Wayman*, 923 F. Supp. at 1372.

For Griffitts and Coder to assert KCPA claims under the particular KCPA provisions they invoke, the tractor Leases must qualify as "consumer transactions" and Griffitts and Coder must qualify as "consumers." The KCPA defines a "consumer transaction" as "a sale, lease, assignment or other disposition for value of property . . . to a *consumer* . . . ." Kan. Stat. Ann. § 50-624(c) (emphasis added). And, the act defines a "consumer" as "an *individual*, husband and wife, sole proprietor, or family partnership who seeks or acquires property or services for personal, family, household, *business or agricultural purposes*." Kan. Stat. Ann. § 50-624(b) (emphasis added). The KCPA defines "agricultural purpose" as "a purpose related to the production, harvest, exhibition, marketing, transportation, processing or manufacture of agricultural products *by a consumer who cultivates, plants, propagates or nurtures the agricultural products*." Kan. Stat. Ann. § 50-624(a) (emphasis added). The KCPA does not define the term "business purpose." *See* Kan. Stat. Ann. § 50-624 (definitions); *see also Wayman*, 923 F. Supp. at 1364.

Here, the KCPA claims necessarily are brought by Griffitts and Coder—and not Custom Chopping. This is so because the KCPA does not apply to transactions between a supplier and a limited liability company, corporation, or other similar entity. *See* Kan. Stat. Ann. § 50-624(b) (defining "consumer" to include only "an individual, husband and wife, sole proprietor, or family partnership"); *see also Midland Pizza, LLC v. Sw. Bell Tel. Co.*, No. 10-2219-CM-GLR, 2010

WL 4622191, at *3 (D. Kan. Nov. 5, 2010) (explaining that limited liability companies are not "consumers" under the KCPA); *Wayman*, 923 F. Supp. at 1364 (explaining that the KCPA "clearly limits 'consumers' to 'individuals' and 'sole proprietors'" so "a corporation or similar entity that has suffered an injury as a result of a 'deceptive' or 'unconscionable' act or practice cannot assert a claim under the KCPA" (internal citations omitted)).

Griffitts and Coder contend that because the Leases and Bills of Sales identify them as "Lessees" or "Co-Buyers," the lease transactions qualify as a "consumer transactions" and they qualify as "consumers" under the KCPA. They argue the transactions qualify as consumer transactions because both Griffitts and Coder are "individuals," they are parties to the Leases, and they leased the tractors for their "business agricultural purposes." Doc. 56 at 23. Plaintiffs assert in their Surreply that the tractors also were used for personal and household purposes. Doc. 62-1 at 3. This is true, they argue, because they used the tractors to mow land owned by Custom Chopping that employees of Custom Chopping—including Griffitts and Coder—use as lodging while working during the season. *Id.*

Defendant argues plaintiffs' KCPA claims "fail as a matter of law because no [p]laintiff[] [is] a 'consumer' and the sales and leases of the [t]ractors are not 'consumer transactions' under the KCPA." Doc 51 at 1. Defendant contends that this is so because Griffitts and Coder leased the tractors jointly with each other and Custom Chopping. So, this was not a "consumer transaction" where property was leased to "*an* individual" or "*a* consumer" by a supplier. *See* Kan. Stat. Ann. § 50-624(b), (c) (definitions of consumer and consumer transaction). Defendant also argues Griffitts and Coder are not "consumers" because the tractors were leased for the business and agricultural purposes of two distinct legal entities—*i.e.*, Griffitts and Coder did not seek and lease the tractors for any individual business or agricultural purpose. Instead, the

Leases covered tractors used only for the business and agricultural purposes of two limited liability companies, who are not "consumers" under the KCPA.

Defendant notes the undisputed fact that the tractors have been used solely for services performed by Custom Chopping and Farm Services and the undisputed fact that the individual plaintiffs—as individuals—never made or received any payments in connection with the tractor Leases. Finally, defendant notes, only Custom Chopping was listed under "Purchaser Name" on the WLL Agreements. These facts, defendant reasons, eclipse plaintiffs' claims that Griffitts and Coder were joint lessees, and establish that Griffitts and Coder are not "consumers" for KCPA purposes.

The court first addresses the parties' arguments about Griffitts and Coder's liability under the Leases, and whether Griffitts, Coder, and Custom Chopping jointly signing the Leases precludes the KCPA claims. Next, because the court finds joint liability alone does not preclude a KCPA claim, the court addresses whether Griffitts and Coder are consumers, *i.e.*, individuals who sought or acquired the tractors for personal, household, business, or agricultural purposes. For reasons explained below, the court is persuaded by defendant's consumer purposes argument and grants summary judgment to defendant on Griffitts and Coder's KCPA claims.

### 1. Griffitts and Coder's Joint Liability under the Leases

Plaintiffs argue that the "[t]he only relevant question under the KCPA is whether each [individual] was individually liable under the transaction documents." Doc. 56 at 32 (citing *Wayman*, 923 F. Supp. at 1364). If so, plaintiffs assert, the KCPA applies and their KCPA claims survive summary judgment.

Defendant responds with two arguments of its own. *First,* defendant argues that Griffitts and Coder aren't true lessees; instead, defendant contends, the two individuals really are

guarantors who are liable only if Custom Chopping failed to make a payment. The Kansas Court of Appeals has held that "[t]he KCPA's protection is limited to individuals and sole proprietors who directly contract with suppliers for goods and services, and is not extended to individuals who promise performance of a corporation contracting with a supplier." *CIT Group/Sales Fin., Inc. v. E-Z Pay Used Cars, Inc.*, 32 P.3d 1197, 1204 (Kan. Ct. App. 2001). So, an individual who signs as a guarantor of a transaction between a supplier and a corporate entity cannot invoke the KCPA. *Id.*

Defendant points to Mr. File's explanation why he included the individuals on the Leases and Bills of Sale—*i.e.*, he believed Farm Credit required owners to be added to the lease documents to function as guarantors of a transaction with a corporate lessee. And, defendant argues, the undisputed facts that Griffitts and Coder did not request to be included on the Leases as lessees, make any payments on the Leases, use the tractors for an individual purpose, or sign any WLL Agreement as a purchaser establish as a matter of law that Griffitts and Coder were guarantors, not individually liable under the Leases.

Yet, it is also undisputed that the individual plaintiffs appeared directly on the Leases, which identified the individuals as lessees. And, under the terms of each Lease, Griffitts and Coder were jointly and severally liable with each other and Custom Chopping. *See, e.g.*, Doc. 15-6 at 4 (explaining in Section 16 of the Lease that "[i]n the event there is more than one Lessee named in this Lease, the obligations of each shall be joint and several"). Thus, the plain language of the Leases will not support a summary judgment holding that Griffitts and Coder merely were guarantors. The Leases plainly identify Griffitts and Coder as lessees, regardless why Mr. File decided to include them as lessees. That Griffitts and Coder didn't ask to be included as lessees is immaterial. Farm Credit could hold them directly liable on the debt owed

under the Leases.  This debt also appears as joint installment debt on their individual credit profiles.  Defendant's first argument is unpersuasive, as the court concludes that the summary judgment facts establish that Griffitts and Coder are directly liable on the Leases and not merely guarantors.  *See AMCO Ins. v. Beck*, 929 P.2d 162, 165 (Kan. 1996) ("The interpretation and construction of a contract is a question of law." (internal citations omitted))

*Second*, defendant contends that plaintiffs' joint liability means the individual plaintiffs' KCPA claims must fail.  Plaintiffs, citing the *Wayman* decision from our court, contend that Griffitts and Coder's individual liability under the Leases enables them to bring the KCPA claims.  Defendant also cites *Wayman*, arguing that Griffitts and Coder, even if lessees, are not "consumers" because they purchased the tractors jointly with each other and Custom Chopping and not as "*an* individual."

"The interpretation of a statute is a question of law, and it is the function of the court to interpret a statute to give it the effect intended by the legislature."  *Finstad v. Washburn Univ.*, 845 P.2d 685, 690 (Kan. 1993).  The court thus must interpret the KCPA and determine whether the Kansas Legislature intended it to apply to the lease transactions jointly signed by Griffitts, Coder, and Custom Chopping under the undisputed facts summary judgment facts.  "[T]he guiding principle to be applied in interpreting the KCPA is that the act is to be liberally construed in favor of the consumer."  *State ex. rel Stephan v. Brotherhood Bank & Tr. Co.*, 649 P.2d 419, 422 (Kan. Ct. App. 1982).

Judge Belot's decision in *Wayman* significantly informs the analysis.  The plaintiffs in that case were individual service station franchisees who marketed and sold Amoco Oil Company branded products and leased Amoco-owned service stations.  *Wayman*, 923 F. Supp. at 1329, 1331.  These individuals asserted various claims against Amoco, including claims under

the KCPA. *Id.* at 1329. Amoco argued that certain plaintiff franchisees were not "consumers" for KCPA purposes because they had incorporated their franchises. *Id.* at 1363. And, the corporations had made the payments owed to Amoco, not the individuals. *Id.* at 1364.

*Wayman* considered whether the individuals who had incorporated their businesses could qualify as "consumers" under the KCPA. Judge Belot first considered Amoco's argument that the franchisees who had incorporated their businesses were not "individuals" within the meaning of Kan. Stat. Ann. § 50-624(b). *Wayman*, 923 F. Supp. at 1363. He held that corporate entities who suffer injury as a result of deceptive or unconscionable acts or practices are not entitled to KCPA's protections. *Id.* But, individuals or sole proprietors who suffer injury can assert KCPA claims. *Id.* All the franchise and lease agreements were between only Amoco and the individual franchisee. *Id.* at 1363–64. So, *Wayman* held, "even those individuals who incorporated their service station dealerships arguably suffered injury as *individuals*" because "even the most updated" agreements with Amoco "mention nothing about any of the plaintiffs doing business as corporations." *Id.* The court determined "if Amoco wanted to enforce these agreements against plaintiffs personally, it no doubt could." *Id.* at 1364. The court also rejected Amoco's argument that "because the corporations, not plaintiffs themselves, made payments to Amoco . . . any alleged injury was borne solely by the plaintiffs' corporations, not by plaintiffs individually." *Id.* "In the court's view, the nature of the liability undertaken, not who 'picked up the tab,' should determine the nature of plaintiffs' KCPA claims." *Id.* The court held that, though the corporations had made the payments, the plaintiffs—individuals—were individually liable and the KCPA claims thus belonged to the individual not the corporation. *Id.*

Here, as noted above, Griffitts and Coder are directly liable on the Leases. They are, in this important respect, like the individual franchisees in *Wayman*. And, if Farm Credit had

wanted to enforce the Leases against Griffitts or Coder, it could. But, this conclusion doesn't make this case just like *Wayman*. Custom Chopping is included as a party to the Leases as well. So, unlike *Wayman*, the Leases "mention" doing business as a corporate entity and are not solely between an individual and a supplier. *See Wayman*, 923 F. Supp. at 1363–64. And, while Farm Credit could hold Griffitts or Coder individually liable, they undertook the liability jointly with each other and Custom Chopping—and not solely as individuals.

Defendant argues that this joint liability—by itself—means that Griffitts and Coder cannot assert viable KCPA claims. But, defendant has directed the court to no case law deciding whether joint liability precludes an individual who is jointly liable from prevailing on a KCPA claim. And, the court's research has identified no case deciding the question.

Construing the KCPA liberally, as it must, *Brotherhood Bank & Tr. Co.*, 649 P.2d at 422, the court predicts the Kansas Supreme Court would hold that undertaking joint liability with a corporate entity alone does not strip an individual of his right to assert KCPA claims. *Cf. Hayes v. Find Track Locate, Inc.*, 60 F. Supp. 3d 1144, 1151–52 (D. Kan. 2014) (holding mother and son were not "consumers" and lacked standing under the KCPA because the husband was the only party to the contract to acquire a vehicle and "[t]he KCPA's protection is limited to individuals who directly contract with suppliers for goods and services," regardless of who contributed money for the purchase); *Kestrel Holdings I, L.L.C. v. Learjet, Inc.*, 316 F. Supp. 2d 1071, 1076–77 (D. Kan. 2004) (distinguishing *Wayman* and dismissing KCPA claims brought by limited liability company, even though two individuals alleged to have assumed liability for the aircraft);[16] *Wayman*, 923 F. Supp. at 1363–64 (holding plaintiffs were "individuals" within the

---

[16]     *Kestrel Holdings* distinguished its facts from those in *Wayman* because (i) no allegations existed in the complaint indicating that the individuals had signed the purchase agreement in their individual capacity or assumed any individual liability, (ii) the individuals were not plaintiffs in the case but instead were attempting to raise KCPA claims through a corporate entity and corporate entities are not consumers with standing to sue under the KCPA, and

meaning of the KCPA because they individually signed the agreements and assumed liabilities that were individual in nature). The court thus holds that Griffitts and Coder's joint liability under the Leases with a limited liability company does not preclude their KCPA claims.

Still, the KCPA does not apply to every individual who undertakes to perform obligations under a property lease. It applies only to "consumers," a term defined to mean "an individual, husband and wife, sole proprietor, or family partnership who seeks or acquires property or services *for personal, family, household, business or agricultural purposes*." Kan. Stat. Ann. § 50-624(b) (emphasis added). So, to assert KCPA claims, Griffitts and Coder must qualify as "consumers," as the act defines that term. If they do so qualify, then the Leases would qualify as "consumer transactions" as they involved a lease of property within Kansas. *See* Kan. Stat. Ann. § 50-624(c) (definition of "consumer transaction"). And, if the Leases are "consumer transactions," the individual plaintiffs then must establish they have suffered injury to bring a KCPA claim. *Wayman*, 923 F. Supp. at 1363 ("An individual or sole proprietor must have suffered injury and must make the claim." (internal quotations and citation omitted)); *see also Midland Pizza, LLC*, 2010 WL 4622191, at *3 ("To bring a private cause of action under [the KCPA], . . . the aggrieved party must be a 'consumer' as defined by the act."); *Finstad v. Washburn Univ.*, 845 P.2d 685, 471–72 (Kan. 1993) (to recover under the KCPA, plaintiffs must show they are "aggrieved by" a violation of the KCPA, not just that they are consumers under the KCPA).[17] The next section addresses whether Griffitts and Coder are "consumers."

(iii) even if the individuals wrote checks from their individual bank accounts they were not a party to the purchase agreement.

[17]     To recover damages under the KCPA provisions plaintiffs cite in the Pretrial Order—Kan. Stat. Ann. §§ 50-634(b) and 50-636(a)—the act makes clear the consumer must be aggrieved. *See* Kan. Stat. Ann. §§ 50-364(b) & 50-636(a); *see also Queen's Park Oval Asset Holding Tr. v. Belveal*, Nos. 114,849, 115,246, 2017 WL 2001609, at *4 (Kan. Ct. App. May 12, 2017) (explaining that "[t]he requirement that the party be aggrieved is mandatory" and to be aggrieved a plaintiff must show "a causal connection between the KCPA violation and the plaintiff's alleged damage" (internal quotations and citation omitted)); *Schneider v. Liberty Asset Mgmt.*, 251 P.3d 666, 671

## 2. Definition of "Consumer"

Defendant argues Griffitts and Coder do not satisfy the KCPA's definition of "consumer" because the tractors were not acquired for *individual* business or agricultural purposes. Doc. 59 at 13–14. Plaintiffs respond, arguing that Griffitts and Coder used the tractors for "business agricultural purposes on behalf of Custom Chopping and Farm Services." Doc. 56 at 23; *see also id.* at 50 (tractors used for "business and agricultural purposes when they allowed Farm Services . . . to use them"). Griffitts and Coder believe acquiring tractors for use by limited liability companies that they own and who perform agricultural services constitutes acquiring property for business and agricultural purposes under the KCPA. For the first time in their Surreply, plaintiffs also assert that the tractors also were used for personal and household purposes. Doc. 62-1 at 3.

The court must interpret the definition of consumer "to give it the effect intended by the legislature." *Finstad*, 845 P.2d at 690. Kansas law directs that the "court should give words in common usage their natural and ordinary meaning." *Id.* (internal quotations and citation omitted). "In determining legislative intent, [the court] is not limited to consideration of the language used in the statute, but may look to the purpose to be accomplished and the effect the

---

(Kan. Ct. App. 2011) ("Generally, a consumer may not bring a private action under the KCPA unless the consumer can prove that the seller has aggrieved the consumer. To be aggrieved . . . the consumer must prove that the seller's act has adversely affected the consumer's legal rights. Additionally, the consumer must show that there was a causal connection between the deceptive act and the claimed injury." (internal citations omitted)). A party is "aggrieved" if his "legal right is invaded by an act complained of or [his] pecuniary interest is directly affected by the order. This term refers to a substantial grievance, a denial of some personal or property right, or the imposition upon a party of some burden or obligation." *Finstad*, 845 P.2d at 691 (internal quotations and citations omitted). A person is not aggrieved if they "happen to entertain desires on the subject;" only those "who have rights which may be enforced at law and whose pecuniary interest may be affected" can be aggrieved. *Id.* (internal citations and quotations omitted).

Defendant's summary judgment papers never contest whether Griffitts and Coder have suffered injury, *i.e.*, are "aggrieved" under the KCPA. Instead, defendant focuses its arguments on whether Griffitts and Coder qualify as "consumers." The court thus limits its consideration here to whether plaintiffs' claims fail based on the KCPA's definition of "consumer."

statute may have under the various constructions suggested." *Id.*; *see also State ex. rel Stephan*, 649 P.2d at 421 ("[T]he purpose and intent of the legislature governs when that intent can be ascertained from the statute. In determining legislative intent, courts are not limited to a mere consideration of the language used, but look to the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished and the effect the statute may have under the various constructions suggested." (internal citations omitted)).

The court's analysis below is threefold. First, the court considers whether any evidence has been presented showing Griffitts and Coder leased the tractors for personal or household purposes. Second, the court considers whether Griffitts and Coder leased the tractors for agricultural purposes. Third, the court considers whether Griffitts and Coder leased the tractors for business purposes. For reasons explained below, the court concludes the Kansas Legislature did not intend the KCPA to apply to transactions where property is sought or acquired by individuals for agricultural or business purposes of separate legal entities who do not qualify for the KCPA's protections.

### i.    Personal and Household Purposes

*First*, plaintiffs argue because they used the tractors to mow land that is at times used as lodging by employees of Custom Chopping and Farm Services—including Griffitts and Coder— the tractors were used for personal and household purposes. Doc. 62-1 at 3 (arguing individual plaintiffs used the tractors for personal and household purposes because they were used to maintain "properties where they and employees reside while working jobs in Texas"). But, the two parcels of land the tractors were used to mow are owned or leased by Custom Chopping— not Griffitts and Coder. Employees lodge at these locations during the working seasons of

Custom Chopping and Farm Services. And, the land also is used as an office and to store equipment. *See* Doc. 56 at 16–17.

Plaintiffs have not presented any facts to support a finding that the tractors were used for personal or household purposes of Griffitts or Coder, within the ordinary meaning of those terms. No facts show use of the tractors unrelated to their employment. Rather, the undisputed facts show the tractors were used to maintain land owned or leased by Custom Chopping and used by Custom Chopping, Farm Services, and their employees for business purposes. As explained in the following sections, use of a tractor by an individual on behalf of a business entity does not constitute personal use. The court thus concludes the summary judgment facts, even when viewed in plaintiffs' favor, do not support a finding that Griffitts and Coder acquired the tractors for personal or household purposes.

### ii. Agricultural Purposes

*Second*, defendant contends, plaintiffs cannot have acquired the tractors for an "agricultural purpose" because "agricultural purpose" is defined to include only the "production, harvest, exhibition, marketing, transportation, processing or manufacture of agricultural products *by a consumer who cultivates, plants, propagates or nurtures the agricultural products*." Kan. Stat. Ann. § 50-624(a) (emphasis added). It is undisputed. Neither Griffitts nor Coder individually operate a farming operation, and the tractors at issue here were used only by Custom Chopping and Farm Services. Thus, defendant argues, because neither Griffitts nor Coder individually cultivated, planted, propagated or nurtured any agricultural products, those individuals cannot assert KCPA claims. In short, defendant reasons, Griffitts and Coder did not acquire the tractors for agricultural purposes "*by a consumer*"—*i.e.*, by an individual, husband

and wife, sole proprietor, or family partnership. Instead, defendant reasons, the tractors were acquired for Custom Chopping and Farm Services' agricultural purposes.

The court agrees with defendant. The plain language of the KCPA requires the *consumer*—who plaintiffs assert to be the two individual plaintiffs—to undertake actions for an agricultural purpose. But, plaintiffs have failed to adduce any admissible evidence that Griffitts or Coder, as individuals, have done so. Actions by Griffitts or Coder on behalf of Custom Chopping and Farm Services are agricultural purposes undertaken by those business entities— and not by Griffitts or Coder as consumers. Plaintiffs chose to create separate legal entities with limited liability to operate their businesses. That was their right. But, by organizing their businesses, those separate legal entities—through their employees, including Griffitts and Coder—cultivated, planted, propagated or nurtured agricultural products. Griffitts and Coder relinquished their right to sue as consumers under the KCPA when they organized their limited liability companies to undertake the agricultural purposes.

The Official Comments to the KCPA support this conclusion. They provide:

> Though the definition of "agricultural products" is broad, the operative definition is "agricultural purpose" and this is narrowed by the requirement that the person dealing with the agricultural products be the one who cultivates, plants, propagates, or nurtures the agricultural products.

Kansas Comment, 1973 (Subsection (a)). And, before the 1991 amendments to the KCPA, agricultural purpose required "a natural person" to undertake the actions amounting to the agricultural purpose. *See* 1991 Kan. Sess. Laws, ch. 159 § 1 (amending "natural person" to "consumer"). As discussed below, 1991 was the same year that the Kansas Legislature expanded the definition of "consumer" to include an "individual or sole proprietor." *Id.* This expanded definition of "consumer" falls within the definition of "agricultural purpose," and, together with the accompanying Official Comments, show that the Kansas Legislature intended to narrow

agricultural purposes to actions undertaken by individuals, sole proprietors, husbands and wives, or family partnerships, acting in those capacities.[18] This history manifests an intention to exclude agricultural activities undertaken by a limited liability company.

Attempting to implicate individual use, plaintiffs often couch their arguments and additional statements of purportedly uncontroverted facts in terms of Griffitts and Coder using the tractors, as opposed to Custom Chopping or Farm Services. For example, plaintiffs purport that "Coder and Griffitts each used the Tractors for business agricultural purposes on behalf of Custom Chopping and Farm Services." Doc. 56 at 23; *see also* Doc. 56 at 50 (arguing "Griffitts and Coder, as the individuals who acquired the tractors, used them for business and agricultural purposes when they allowed Farm Services, the limited liability company in which they were the only two members, to use them"). Defendant controverts these proposed facts, arguing that "[t]he undisputed facts prove that the tractors have only been used or operated by Custom Chopping and Farm Services," and not by Coder or Griffitts for individual purposes "as neither Mr. Coder nor Mr. Griffitts even own or operate a farming operation" in their capacity as individuals, sole proprietors, or with other family members. Doc. 59 at 7.

The court again agrees with defendant. It is uncontroverted that the tractors were used only in Custom Chopping and Farm Services' activities. Equally undisputed is the fact that neither Griffitts nor Coder operate a farming operation as an individual, sole proprietor, or family partnership. Doc. 56 at 3, 16–17 (Pls.' Resp. ¶¶ 6, 42). Using an asset "on behalf of" a business entity constitutes use by the company—not by Griffitts and Coder. Likewise, any injury resulting from such use belongs to the companies. *Cf. Hartleib v. Weiser Law Firm, P.C.*, No.

---

[18]     In 1991, the Kansas Legislature added sole proprietor to the "consumer" definition. 1991 Kan. Sess. Laws, ch. 159 § 1. In 2001, the Legislature added husband and wife and family partnership. 2001 Kan. Sess. Laws, ch. 49 § 1.

19-02099-CM-JPO, 2019 WL 3943064, at *4 (D. Kan. Aug. 21, 2019) (applying Kansas law and concluding, "[w]hen a corporation is injured, the claims arising out of that injury belong to the corporation"); *Lightner v. Lightner*, 266 P.3d 539, 545 (Kan. Ct. App. 2011) (explaining that "[s]hareholders do not have standing to sue for harms to the corporation or even for the derivative harm to themselves that might arise from a . . . wrong to the corporation" unless the shareholders can demonstrate that they have "suffered an injury that is not dependent on an injury to the corporation" and that the court should determine "[w]ho suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy").

On this question, plaintiffs cannot have it both ways. They chose to organize and operate their business affairs through a business entity with limited liability. Having made that choice, they cannot later claim that they—as individuals—"used" the tractors as individual consumers in limited liability company endeavors. Various courts—including this one—have rejected similar efforts to realign the facts to support a claim. *See Terry v. Yancey*, 344 F.2d 789, 790 (4th Cir. 1965) ("A corporation is, of course, an entity separate and apart from its officers and stockholders, and where an individual creates a corporation as a means of carrying out his business purposes he may not ignore the existence of the corporation in order to avoid its disadvantages."); *Greenberg v. Cure*, No. 12-2107-EFM, 2013 WL 1767792, at *1, 3–4 (D. Kan. Apr. 24, 2013) (rejecting individual plaintiff's request for damages based on limited liability company's lost profits after plaintiff was injured in collision and asked the court to disregard the distinction between plaintiff and his single member limited liability company, reasoning that "the corporate veil of his LLC [ ] protects [plaintiff] from personal liability [and it] also prevents him from personally recovering losses sustained by the LLC"); *Meyer v. Christie*, No. 07-2230-CM,

2011 WL 2847463, at *2–3 (D. Kan. July 15, 2011) (holding individual plaintiffs, the two member-owners of an LLC, were not entitled to any lost contracting profits of LLC as damages because "[t]he LLC should not be available as a shield from liability at times but treated as immaterial when it is profitable to an individual managing member").

All that matters, the current plaintiffs argue, is whether they individually were obligated under the Leases, "regardless of 'who' was using the equipment" for the agricultural purposes. Doc. 56 at 51–52. But, the definition of "agricultural purpose" and Official Comments simply won't abide this argument. Instead, they make it clear: a consumer must be the one "*who* cultivates, plants, propagates or nurtures the agricultural products"—*i.e.*, the one who uses the tractors for the agricultural purpose. Kan. Stat. Ann. § 50-624(a) (emphasis added). Griffitts and Coder may be directly liable to Farm Credit for the lease of the tractors. But, they have adduced no evidence that they acquired the tractors for agricultural purposes they undertook as consumers. Instead, the summary judgment facts establish that the limited liability companies— entities not permitted to bring KCPA claims—were the ones who used the tractors for agricultural purposes. In sum, the summary judgment facts, even when viewed in plaintiffs' favor, establish that Griffitts and Coder are not "individual[s] . . . who seek or acquire property . . . for . . . agricultural purposes" under Kan. Stat. Ann. § 50-624(b).

### iii.    Business Purposes

*Third*, defendant argues that Griffitts and Coder cannot claim they have acquired the tractors for "business purposes" under the KCPA. Instead, defendant argues, the tractors were acquired for someone else's business purposes—*i.e.*, Custom Chopping and Farm Services' business purposes. The court agrees.

"Business purpose" is not defined by the KCPA. *See* Kan. Stat. Ann. § 50-624 (definitions); *see also Wayman*, 923 F. Supp. at 1364. And, the parties have not directed the court to any case law directly deciding this issue. But, the court predicts that the Kansas Supreme Court would hold that property is acquired for "business purposes" contemplated by the KCPA only if the property is used by "an individual, husband and wife, sole proprietor, or family partnership" conducting business in that capacity. This interpretation largely tracks the court's interpretation of "agricultural purposes," above. In short, the consumer must conduct the "business purposes" in his capacity as a consumer—*i.e.*, as an individual, husband and wife, sole proprietor, or family partnership—before the business purpose can fall within the scope of the KCPA. When an asset is acquired to be used solely by a limited liability company, the "business purposes" are those of that entity, and not those of a consumer. *See* discussion *supra* Part III.A.2.ii. (holding that when a corporate entity is created, it operates as an entity separate from its owners and thus actions conducted on behalf the corporate entity are taken for the corporate entity's purposes). As discussed next, the legislative history of the KCPA supports this interpretation as consistent with the Kansas Legislature's intent.

The analysis in *Wayman* discussing the "consumer" definition is helpful. *Wayman* held that if an individual signs an agreement and assumes liabilities that are individual in nature, they are an "individual" within the KCPA's definition of "consumer," regardless of who actually made the payments. *Wayman*, 923 F. Supp. at 1363–64.[19] *Wayman* next considered whether the plaintiffs—without distinguishing between the plaintiffs who had incorporated their businesses and those who operated as sole proprietors—had acquired the goods for the "'business purposes'

---

[19] As discussed above, *supra* Part III.A.1., the court concludes Griffitts and Coder each are an "individual" under the KCPA. This is so even though they signed the Leases jointly, *i.e.*, with each other and Custom Chopping.

contemplated by" the KCPA. *Id.* at 1364. Amoco argued that "business purposes" did not include goods that were purchased for resale, but only goods that were purchased to be used in (or consumed in) the business. *Id.* at 1364–65. Judge Belot, after considering the KCPA's legislative history, agreed. *Id.* at 1364–65. He ultimately granted summary judgment for Amoco against all KCPA claims. *Id.* at 1372–73.[20]

To interpret the definition of "consumer," *Wayman* looked at the Official Comments to the KCPA, which provided:

> This definition of "consumer" is intentionally broad. It covers not only individuals who seek or acquire goods, services or real estate for personal, family or household purposes, but also sole proprietors such as farmers and business people.

*Id.* at 1364 (quoting Kansas Comment, 1973 (Subsection (b)). Despite the intentionally broad definition, the court determined that acquiring goods for resale was not a consumer transaction. *Id.* at 1364–65. It reached this conclusion, in part, because plaintiffs did "not themselves 'consume' the gasoline that they purchased from Amoco." *Id.* at 1364.

*Wayman* also considered the KCPA's legislative history. 923 F. Supp. at 1365. When enacted in 1973, a "consumer" was a "person other than an organization who seeks or acquires: (1) Goods or services used or provided in his business, or (2) goods, services, money or credit for personal, family, household or agricultural purposes." *Id.* (internal citations omitted). In 1976, the Legislature proposed striking subsection (1) entirely, "eliminating all coverage for business consumers." *Id.* But, "[t]he Attorney General's office opposed removing the small business person under the Act." *Id.* (internal citations and quotations omitted). So, instead, the Legislature "simply added the term 'business' to the list of 'purposes' for which a 'consumer' seeks or acquires property." *Id.*

---

[20]  *Wayman* did not consider whether goods purchased by an individual for use in an incorporated business fell within the "business purposes" contemplated by the Kansas Legislature in enacting the KCPA.

This change was reflected in the revised definition of "consumer." *Wayman*, 923 F. Supp. at 1365. That year, 1976, the definition of "consumer" was amended to read: "an individual who seeks or acquires property or services for personal, family, household, *business*, or agricultural purposes." *Id.* (internal quotations and citations omitted). With this amendment, the Legislature did not intend to "'change the scope' of the KCPA, but merely clarify it." *Id.* (quoting Minutes of the Senate Committee on Judiciary, March 10, 1976). So, *Wayman* concluded, the scope of the KCPA still was limited to goods "used in" the business—as the original consumer definition provided—and thus did not include goods purchased for resale. *Id.*

Here, like the plaintiffs who acquired goods for resale in *Wayman*, Griffitts and Coder did not themselves "consume" the tractors. Rather, Custom Chopping and Farm Services consumed the tractors that were purchased, as discussed above in the court's analysis of agricultural purposes. And, the Official Comments to the KCPA show that the Legislature intended the KCPA to apply broadly to "individuals who seek or acquire goods, services or real estate for personal, family or household purposes" and "also [to] *sole proprietors such as farmers and business people*." Kansas Comment, 1973 (Subsection (b)) (emphasis added). But, this legislative history does not suggest that the KCPA was intended to apply to *individuals* who acquire goods for business purposes that they conduct through a separate entity—and not as a sole proprietor. The Kansas Legislature explained when amending the definition of consumer to include "business purposes" that the scope remained the same. And that scope covers *sole proprietors* who acquire goods used in their businesses. The Legislature since has expanded the scope to cover family partnerships as well.[21]

---

[21]    *See supra* note 18.

Though the court must construe the KCPA liberally in favor of the consumer, the historical background of the KCPA shows that Griffitts and Coder's acquisition of the tractors for business purposes conducted through separate limited liability companies is not the type of "business purpose" the KCPA was intended to cover. *Cf. In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 355 F. Supp. 3d 145, 161 (E.D.N.Y. 2018) (dismissing claims brought by health and welfare funds under Vermont Consumer Fraud Act, where "consumer" was defined as any person purchasing goods "not for resale in the ordinary course of his or her business but for his or her use or benefit," because health and welfare funds did not purchase the drug for their own benefit or use, but for their members, and thus were not a "consumer" of the product (internal quotations and citations omitted)); *Whittenburg v. L.J. Holding Co.*, 830 F. Supp. 557, 561, 566 (D. Kan. 1993) (granting summary judgment for defendant against KCPA claim where jet was paid for with two individuals' personal funds and the individuals claimed to each own a half interest in the jet, but the jet was purchased by the individuals "on behalf of" a corporate entity, the purchase agreement was with the corporate entity alone, and the jet was titled in name of the corporation, because claim belonged to the corporation and corporations are not consumers under the KCPA). If the facts were different, *i.e.*, the tractors were used by Griffitts or Coder in their capacity as individuals, or as husband and wife, sole proprietor, or family partnership, the result might change. But, Griffitts and Coder have adduced no evidence that they acquired the tractors for the "business purposes" essential to a KCPA claim. Instead, the summary judgment facts establish that the tractors were acquired solely for Custom Chopping and Farm Services' business purposes. The court concludes that the summary judgment facts, even when viewed in plaintiffs' favor, establish that Griffitts and

Coder are not "individual[s] . . . who seek or acquire property . . . for . . . business . . . purposes" under Kan. Stat. Ann. § 50-624(b).

In sum, while Griffitts and Coder may be "individuals" under the KCPA by the nature of their direct contractual obligations and joint liability, the court concludes they have not presented any summary judgment evidence to satisfy the remaining requirements to establish themselves as "consumers"—*i.e.*, that they acquired the tractors for the personal, household, business, or agricultural purposes intended by the Kansas Legislature to fall within the scope of the KCPA. Griffitts and Coder thus are not "consumers" under the undisputed facts before the court, nor were the tractor Leases "consumer transactions."  The court therefore grants summary judgment against Griffitts and Coder's KCPA claims.

### B.  Breach of Implied Warranty of Merchantability

Defendant argues plaintiffs' breach of implied warranty of merchantability claims fail as a matter of law because defendant expressly disclaimed all implied warranties in the WLL Agreements as part of its express warranties given for the tractors.  Doc. 51 at 2.  Each WLL Agreement states that it contains the entire warranty provided by defendant and that defendant "specifically excludes the implied warranties of merchantability and fitness for particular purpose."  *See, e.g.*, Doc. 52-14 at 3.

The KUCC provides that "*[u]nless excluded or modified . . .* a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  Kan. Stat. Ann. § 84-2-314(1) (emphasis added).[22]  For goods to be

---

[22]     On summary judgment the parties never address whether privity exists between defendant and plaintiffs permitting plaintiffs to bring the implied warranty of merchantability claims asserted here.  *See City of Winfield, Kan. v. Key Equip. & Supply Co.*, No. 11-1358-CM-KGS, 2012 WL 1207256, at *3–4 (D. Kan. Apr. 11, 2012) (dismissing implied warranty claims where plaintiff failed to allege direct privity of contract between plaintiff and remote seller defendant, but explaining that express warranty claim may survive if evidence exists that independent express warranty from manufacturer was provided); *Kice Indus., Inc. v. AWC Coatings, Inc.*, 255 F. Supp. 2d 1255, 1258 (D. Kan. 2003) ("Implied warranties of fitness or merchantability, for products not inherently dangerous, are

merchantable, they must "pass without objection in the trade under the contract description," be

"fit for the ordinary purposes for which such goods are used," and "conform to the promises or

affirmations of fact made on the container or label if any." *Id.* § 84-2-314(2)(a),(c),(f). Under

Kan. Stat. Ann. § 84-2-316(2), a seller may exclude or modify the implied warranty of

merchantability if the language "mention[s] merchantability" and, if in writing, it is

"conspicuous." "[A]ll implied warranties are excluded by expressions like 'as is,' 'with all

---

not extended from a manufacturer of a product to a remote purchaser for economic losses, where the parties are not in privity."); *Owens-Corning Fiberglas Corp. v. Sonic Dev. Corp.*, 546 F. Supp. 533, 541 (D. Kan. 1982) (holding "privity of contract is a requirement in Kansas for a claim based on breach of implied warranty" except where the circumstances under Kan. Stat. Ann. § 84-2-318 apply—*i.e.* "lack of privity is not a bar to recovery by a natural person who is personally injured by a breach"); *Koss Constr. v. Caterpillar, Inc.*, 960 P.2d 255, 260–61 (Kan. Ct. App. 1998) (holding that Kansas law requires privity between buyer and manufacturer to maintain an action for breach of implied warranty of merchantability against the manufacturer where purchaser has incurred "only economic loss, as opposed to personal injury or property damage" (internal quotations and citation omitted)); *see also* Kan. Stat. Ann. § 84-2-318 (explaining express and implied warranties extend to third party beneficiaries if they are a "natural person who may reasonably be expected to use, consume or be affected by the goods" and are "injured in person by breach of the warranty").

The court questions whether privity exists here. In their summary judgment Response, plaintiffs assert that they have sued defendant CNH because they believe it is "the party ultimately liable for Plaintiffs damages as the manufacturer of the defective tractors." Doc. 56 at 34. But, it is uncontroverted that AgriCenter sold the tractors. And—as plaintiffs aptly point out—defendant "provided only one document at issue in this case, the WLL" Agreements. *Id.* In the Pretrial Order, plaintiffs "seek damages equal to the total amount of lease payments paid for use of the tractors in the total combined amount of $791,140.27." Doc. 50 at 15. These are purely economic losses. *See AgriStor Leasing v. Meuli*, 634 F. Supp. 1208, 1217–18 (D. Kan. 1986) (explaining that the failure of a product purchased to perform as expected is an economic loss, not a loss to person or property, because it relates to a loss of the benefit of the bargain); *see also Prof'l Lens Plan, Inc. v. Polaris Leasing Corp.*, 675 P.2d 887, 891–99 (Kan. 1984) (holding where damages are sought only for economic loss, the product is not inherently dangerous, and no personal injuries or property damage are involved, there is no public policy reason to extend implied warranties to non-privity manufacturers). But, the issue is not before the court on summary judgment.

Also, the parties never argue whether the individual plaintiffs have sustained an injury. *See Dieker v. Case Corp.*, 73 P.3d 133, 146–47 (Kan. 2003) ("To demonstrate a breach of the implied warranty of merchantability, plaintiff must show that the goods were defective, that the defect was present when the goods left the manufacturer's control, and that the defect caused the injury sustained by plaintiff."). In the summary judgment record, it is uncontroverted that only Custom Chopping made lease payments. And, only Custom Chopping and Farm Services—through their employees—used the tractors. It is unclear how Griffitts and Coder individually could claim they sustained an injury, and certainly they never identify such an injury. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 & n.1 (1992) (explaining that a plaintiff must have suffered an "injury in fact" to have standing to raise a claim, which requires an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, and that a particularized injury is an injury that "affect[s] the plaintiff in a personal and individual way"); *see also Hartleib v. Weiser Law Firm, P.C.*, No. 19-02099-CM-JPO, 2019 WL 3943064, at *4 (D. Kan. Aug. 21, 2019) ("When a corporation is injured, the claims arising out of that injury belong to the corporation."). But, defendant did not move for summary judgment on this basis.

faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty." *Id.* § 84-2-316(3).

Plaintiffs assert three arguments why the court shouldn't grant summary judgment against their breach of implied warranty claims.[23] Plaintiffs first argue that all KUCC remedies are available to Griffitts and Coder because only Custom Chopping signed the WLL Agreements. Next, plaintiffs argue that the warranty disclaimer was not conspicuous, and so, defendant did not effectively exclude the implied warranty of merchantability. Finally, plaintiffs argue that Custom Chopping did not execute the WLL Agreements until after plaintiffs had signed the Leases and Bills of Sale, so the disclaimer must be ineffective. The court addresses each argument, in turn, below.[24]

### 1. The Reach of the WLL Agreements

*First*, plaintiffs argue all KUCC remedies are available to Griffitts and Coder because only Custom Chopping signed the WLL Agreements. Doc. 56 at 39. So, plaintiffs contend,

---

[23] Plaintiffs also argue that the KCPA prohibits defendant from excluding the implied warranty of merchantability for Griffitts and Coder, so any disclaimer is ineffective for these plaintiffs. Doc. 50 at 11; Doc. 56 at 39–40. As discussed above, *supra* Part III.A., the court concludes the KCPA does not apply to the transactions at issue here.

[24] In the Pretrial Order, plaintiffs also claim that the "implied warranty of merchantability applies to Plaintiffs because the [WLL Agreements] failed of [their] essential purpose." Doc. 50 at 11. In the summary judgment briefing plaintiffs correctly limit this argument to asserting other *remedies* may be available when an exclusive remedy fails of its essential purpose, rather than asserting disclaimed warranties are revived. Doc. 56 at 42. Where an "exclusive or limited remedy [ ] fail[s] of its essential purpose" other "*remed[ies]* may be had" under the KUCC. Kan. Stat. Ann. § 84-2-719(2) (emphasis added). But, warranties that are disclaimed are not revived because an exclusive remedy failed of its essential purpose. *See Ritchie Enter. v. Honeywell Bull, Inc.*, 730 F. Supp. 1041, 1047–48 (D. Kan. 1990) (applying the Massachusetts Uniform Commercial Code and explaining "[w]hen a limited remedy fails of its essential purpose, 2-719(2) abrogates only the remedy limitation and not the warranty disclaimers[;] . . . [c]onsequently, disclaimers valid under 2-316 are also valid under 2-719 [and] [d]espite any argument that the limited remedy failed of its essential purpose, plaintiff is bound by the written exclusion of the express and implied warranties and its only warranty claim is based on the express warranty in the [agreement] against defects in material and workmanship" (internal citations omitted)); *see also R.J. Meyers Co. v. Reinke Mfg. Co.*, 885 N.W. 2d 429, 438–39 (Iowa Ct. App. 2016) (collecting cases from a variety of jurisdictions that have adopted the Uniform Commercial Code and explaining that "[t]he disclaimer of the implied warranties is not overcome by showing the limited remedy for breach of the express warranty failed of its essential purpose[;] [t]he concepts are separate and distinct"). The KUCC and case law make it clear—only other *remedies* are available, not other warranty causes of action.

defendant "did not disclaim, limit, or otherwise exclude any warranty or remedy available to these buyers" in their capacity as individuals. *Id.*

In response, defendant argues that the WLL Agreements were "provided to the initial retail purchaser in return for consideration paid as part of the purchase price of the product." *See, e.g.*, Doc. 52-14 at 2. And, defendant asserts, the record does not include any indication that "Custom Chopping ever mentioned to Agri-Center or [defendant] that it believes other purchasers or lessees exist who also should sign the WLL, which demonstrates that Custom Chopping believed that the WLL covered the entire transaction." Doc. 59 at 15. Defendant also argues that the WLL Agreements must apply to Griffitts and Coder since they assert breach of express warranty claims. Defendant stresses if Griffitts and Coder "legitimately believed the WLL [Agreements] did not apply to them, then they would not have asserted a breach of express warranty claim." Doc. 59 at 15. Defendant thus contends that the WLL Agreements effectively disclaim the implied warranty of merchantability claims for all three plaintiffs. Doc. 52 at 19.

Plaintiffs' arguments—in the summary judgment record before the court—are somewhat contradictory. Griffitts and Coder simultaneously argue the WLL Agreements do not apply to them and yet they assert KCPA and breach of express warranty arguments that are based, at least in part, on the WLL Agreements.[25] Notably, in their Complaint, plaintiffs even alleged that

---

[25] *See, e.g.*, Doc. 1-1 at 3 (Compl. ¶ 20) (asserting express warranty claims by all three plaintiffs and explaining "[p]ursuant to the [WLL Agreements, defendant] expressly warranted the materials and workmanship of the T8 tractors purchased by the Plaintiffs"); Doc. 50 (Pretrial Order) at 5 (plaintiffs' factual contentions asserting that as "part of the purchase agreements"—the rest of which plaintiffs purport are among all three plaintiffs—"each of the tractors were expressly warrantied as detailed in" the WLL Agreements "between [defendant] and Custom Chopping"), 11 (asserting breach of implied warranty of merchantability claim is available to *plaintiffs* because the WLL Agreements' limited, exclusive express warranties fail of their essential purpose—without asserting in the Pretrial Order that this warranty claim is available to Griffitts or Coder because they are not signors), 11 (arguing the KCPA prohibits excluding the implied warranty of merchantability for consumers so the disclaimers in the WLL Agreements are ineffective for Griffitts and Coder), 12 (noting in KCPA claim section that plaintiffs don't believe contractual privity exists between Farm Credit and AgriCenter to pass the manufacture warranties to Griffitts and Coder, but supporting their claim that defendant committed unconscionable acts under the KCPA in part because the WLL Agreements are excessively one sided in favor of the supplier); Doc. 56 (Response) at 19 (uncontroverted that all three plaintiffs assert breach of express and implied warranty claims), 34–37 (arguing, in response to defendant's

"[o]n fulfillment of each purchase, a representative of Agri Center *and a representative of the Plaintiffs* signed each [WLL Agreement]."[26]  Doc. 1-1 at 2 (Compl. ¶ 12) (emphasis added).  And, defendant's Answer admitted that "Plaintiffs . . . signed a WLL Agreement for each of the Tractors."  Doc. 7 at 2–3 (Answer ¶ 12).

The parties have not addressed the Complaint's allegation in their summary judgment briefing.  The court considered whether it amounts to a judicial admission, precluding any dispute whether the WLL Agreements apply to all three plaintiffs.[27]  But, the "pretrial order

motion, that the court should consider the transaction documents collectively to decide if the KCPA claims survive summary judgment because, even though Griffitts and Coder did not sign the WLL Agreements, defendant "provided only one document at issue in this case"—the WLL Agreements—and "[t]hat document clearly reflects it is part of a transaction; it is not intended to stand alone"), 31 (KCPA arguments referencing that it is unconscionable to limit the implied warranty of merchantability).

[26]     The WLL Agreements were signed by Griffitts under "Purchaser Signature" with Custom Chopping listed under "Purchaser Name."  The Complaint also was verified by Tim Coder.  Doc. 1-1 at 8 (declaring under the penalty of perjury that the "statements and allegations contained [in the Complaint] are true and correct according to [his] knowledge, information and belief").  Plaintiffs have not presented any evidence indicating that Griffitts and Coder were unaware of the WLL Agreements or their terms.

        This allegation in the Complaint is comparable to plaintiffs' arguments in response to defendant's summary judgment motion that the court should consider all parties to be co-buyers despite the Bills of Sale containing only two signatures—one from "Buyer" Custom Chopping (signed by Coder or Griffitts) and one from "Co-Buyer" (signed by the other of Griffitts or Coder).  *See* Doc. 56 at 36.  Plaintiffs argue that the form Bill of Sale only provided two signature lines "even though three separate persons bought the tractors" and asserted the court should consider the Bills of Sale together with the Leases (where the signors clearly signed both individually and in their capacities as representatives of the company).  *Id.*  The WLL Agreements too provided only one line for "Purchaser Name" and one spot for "Purchaser Signature."  Yet, plaintiffs now argue the WLL Agreements do not apply to Griffitts and Coder.  Plaintiffs point out that the WLL Agreements, unlike the Bills of Sale, do not mention Griffitts and Coder individually anywhere.  The Bills of Sale on the other hand listed Griffitts and Coder as "Co-Buyers" on the first page, and contained signatures for more than simply Custom Chopping.  So, plaintiffs contend, WLL Agreements do not apply to the individual plaintiffs and do not disclaim the individual plaintiffs' breach of implied warranty claims.

[27]     "Judicial admissions are formal admissions . . . which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Grynberg v. Bar S Servs., Inc.*, 527 F. App'x 736, 739 (10th Cir. 2013) (internal quotations and citation omitted) (holding that plaintiff could not dispute the validity of a contract at summary judgment by arguing the other party did not sign it, when earlier judicial admissions established the plaintiff believed a valid contract existed).  "[A]dmissions in the pleadings . . . are in the nature of judicial admissions binding upon the parties, unless withdrawn or amended." *Id.* (internal quotations and citation omitted).  So, a litigant's "attempt to disavow his earlier judicial admissions" in a complaint or answer "with seemingly contrary evidence at summary judgment does not create a disputed issue of fact." *Id.*  But, if the party making a judicial admission "explains the error in a subsequent pleading or by amendment, the trial court must accord the explanation due weight." *Smith v. Argent Mortg. Co.*, 331 F. App'x 549, 556 (10th Cir. 2009) (internal quotations and citation omitted).

supersedes all pleadings and controls the subsequent course of this case." Doc. 50 at 1; *see Delano v. Kitch*, 663 F.2d 990, 1002 (10th Cir. 1981) (holding pretrial order supersedes the pleadings, so where defendant admitted the allegations in his answer but they were not referenced in the pretrial order—and the pretrial order included provisions giving plaintiffs notice the allegations were disputed—the admissions could be read to the jury as evidence but were not controlling judicial admissions); *Smith v. Potter*, No. 05-2149-JWL, 2006 WL 3050814, at *9 (D. Kan. Oct. 25, 2006) (rejecting argument that plaintiff's assertion in his complaint "warrants summary judgment in favor of defendant" because "assertions made in a superseded pleading (the complaint in this case ha[d] been superseded by the pretrial order) are not binding judicial admissions but are treated instead as ordinary evidentiary admissions . . . admissible against plaintiff at trial and plaintiff would be entitled to explain to the jury any inconsistency between his complaint and his subsequent pleadings").

In the Pretrial Order here, plaintiffs carefully refer to the "exclusive and/or limited remedies *for Custom Chopping*" under the WLL Agreements. Doc. 50 at 11 (emphasis added); *see also id.* at 5 ("The purported exclusive remedy for Custom Chopping is repair of defect in materials or workmanship."). Plaintiffs also note that they "do not believe that [Farm Credit] has contractual privity with AgriCenter and/or [defendant] to pass the manufacture warranties to [Griffitts] and [Coder]." Doc. 50 at 12. So, plaintiffs arguably have amended the assertion they initially made in their Complaint and given defendant notice that the issue now is disputed. *Delano*, 663 F.2d at 1002; *see also MNM Invs., LLC v. HDM, Inc.*, No. 18-1267-EFM-KGG, 2019 WL 3801672, at *7 & n.24 (D. Kan. Aug. 13, 2019) (explaining statements or assertions in complaints and pretrial orders may serve as judicial admissions binding on such party if "no subsequent pleading or amendment" amends those statements). Recognizing that this first

argument against summary judgment directly conflicts with the breach of express warranty claims they have asserted, plaintiffs contend they should be allowed to assert alternative theories of recovery and "[t]he pleading of an alternative theory should not be read as a concession that another theory fails." Doc. 62-1 at 5.

In short, regardless of their other arguments and the allegations in their Complaint, Griffitts and Coder now purport to have viable breach of implied warranty claims because they were not parties to the WLL Agreements. But, defendant argues the WLL Agreements must apply to Griffitts and Coder because they assert breach of express warranty claims and never raised the existence of any other purchasers who should have signed the WLL Agreements.

The parties' arguments on this important subject are brief, and mostly conclusory. Neither party directs the court to any law controlling whether the WLL Agreements—and the express warranties and the implied warranty disclaimers within them—should apply to Griffitts and Coder under the circumstances presented here—*i.e.*, where the other transaction documents include all three plaintiffs but the signed warranty agreements include only one plaintiff, Custom Chopping. For reasons explained below, the court concludes Griffitts and Coder are not bound by the disclaimers in the WLL Agreements.

Under Kansas law, "to form a binding contract, there must be a meeting of the minds on all the essential elements." *Unified Sch. Dist. No. 446, Independence, Kan. v. Sandoval*, 286 P.3d 542, 546 (Kan. 2012). "The question whether a binding contract was entered into depends on the intention of the parties and is a question of fact." *Reimer v. Waldinger Corp.*, 959 P.2d 914, 916 (Kan. 1998). And, "[a]n unconditional and positive acceptance is required to form a contact." *Nungesser v. Bryant*, 153 P.3d 1277, 1288 (Kan. 2007).

Here, the parties never dispute whether a contract existed—the WLL Agreements are in writing, Custom Chopping manifested its acceptance by signing them, and consideration (payment for the tractors) supports them. But, the faces of the WLL Agreements—which are the only contracts from defendant before the court—do not establish that Griffitts and Coder have accepted the warranties and disclaimers within them. And, "[t]he legal effect of a written instrument is a question of law." *Osterhaus v. Toth*, 249 P.3d 888, 896 (Kan. 2011). Applying Kansas law to interpret and construe the contracts, the court interprets the WLL Agreements to bind only to Custom Chopping and defendant.

The court's goal when "interpreting written contracts is to ascertain the parties' intent." *Id.*; *see also Waste Connections of Kan., Inc. v. Ritchie Corp.*, 298 P.3d 250, 264–65 (Kan. 2013). The court must not isolate provisions, but should consider the contract as a whole. *Waste Connections*, 298 P.3d at 264–65. "If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction." *Osterhaus*, 249 P.3d at 896; *see also Waste Connections*, 298 P.3d at 264. But, if the written contract is ambiguous, the court may consider extrinsic or parol evidence to construe it. *Waste Connections*, 298 P.3d at 264; *see also Brown v. Lang*, 675 P.2d 842, 846 (Kan. 1984) ("When the intent of the parties to a contract is clearly ascertainable by construing the document from its four corners it is not considered ambiguous; although some terms may be conflicting, extrinsic evidence is inadmissible and rules of construction applicable to ambiguous contracts do not apply."). For example, the court may consider "the interpretation placed upon the contract by the parties themselves . . . on an ambiguous term of the contract . . . if it is not blatantly inconsistent with the language of the contract." *Wallis v. Dog Day, Inc.*, No. 107,896, 2014 WL 278704, at

*5 (Kan. Ct. App. Jan. 24, 2014) (citing *First Nat'l Bank of Olathe v. Clark*, 602 P.2d 1299,

1304 (Kan. 1979)).

Though some conflicting evidence exists whether the parties intended the WLL

Agreements apply to Griffitts and Coder, that evidence is extrinsic to the WLL Agreements and

those agreements themselves are unambiguous. They never identify Griffitts or Coder as parties

to them. They are provided to the "initial retail purchaser." And, from the four corners of the

WLL Agreements, the "purchaser" clearly is identified at the bottom of the first page as Custom

Chopping. No other purchaser is referenced within the WLL Agreements. The WLL

Agreements never mention the individual plaintiffs, and the court finds no language in the WLL

Agreements indicating the parties intended them to apply to any party other than defendant and

Custom Chopping. Finally, only Custom Chopping signed the WLL Agreements.

The court recognizes the WLL Agreements were provided as part of a larger group of

lease transactions, in which all three plaintiffs—as they argue—were identified in other

agreements as co-buyers and lessees. But, the only agreements issued by defendant are the WLL

Agreements. And, these written agreements conferred the express warranties and disclaimed all

other warranties. The WLL Agreements are clear on their face that the express warranties are

provided to Custom Chopping alone. *See Bank of Okla., N.A. v. Fidelity State Bank & Tr. Co.,*

*Dodge City, Kan.*, 623 F. Supp. 479, 486 (D. Kan. 1985) (explaining that where the provisions of

a contract are "clear and unambiguous" the intent of the parties "must be determined from the

four corners of the instrument itself" and "the facts and circumstances surrounding its execution

become competent only in the event the instrument is ambiguous on its face and requires aid to

clarify its intent" (internal quotations and citations omitted)). Completely omitting any other

person from the only agreements involving defendant—even where Griffitts and Coder signed

agreements with Farm Credit and AgriCenter concerning the same tractors—does not create an ambiguity as a matter of law. *See id.* ("Ambiguity does not arise . . . from a total omission . . . [and] even where a contract is ambiguous, evidence of the facts and circumstances existing prior to and contemporaneous with its execution are competent only to *clarify* the intent and purpose of the contract, not to vary or nullify the clear and positive provisions of the contract.").

The law also requires the court to construe disclaimers liberally in favor of the buyer. *J & W Equip., Inc. v. Weingartner*, 618 P.2d 862, 865 (Kan. Ct. App. 1980) ("As a general policy . . . the law of commercial transactions permits disclaimers but construes them liberally in favor of the buyer."). Where the disclaimer is made in a written contract issued by defendant and the two individual plaintiffs never signed in their capacity as individuals, the court declines to make the disclaimers apply to those individuals.

The court's conclusion as a matter of law that plaintiffs Griffitts and Coder are not parties to the WLL Agreements has two primary consequences: one favors those two plaintiffs and the other favors defendant. First, since plaintiffs Griffitts and Coder did not agree to be bound by the WLL Agreements, defendant cannot use the disclaimers in those agreements to nullify implied warranties that otherwise extend to Griffitts and Coder. Second, because the WLL Agreements are the only alleged source of an express warranty by defendant and because plaintiffs Griffitts and Coder are not parties to those agreements, they cannot rely on them to assert a legally viable claim for breach of express warranty.

In sum, defendant has failed to carry its summary judgment burden on the implied warranty claims asserted by plaintiffs Griffitts and Coder. The court thus denies that portion of defendant's motion. Conversely, defendant has carried its summary judgment burden on Griffitts and Coder's claim for breach of an express warranty. As a matter of law, Griffitts and

Coder are not parties to the WLL Agreements. And those agreements are the only evidence in the summary judgment record capable of supporting a claim that defendant gave an express warranty. So, plaintiffs Griffitts and Coder cannot survive summary judgment on their express warranty claims.

These rulings simplify the analysis in the rest of this Order. The court need not consider plaintiffs' other implied warranty arguments as they apply to Griffitts and Coder. The next two subsections only consider plaintiffs' implied warranty arguments as they apply to plaintiff Custom Chopping.

## 2. The Conspicuousness of the Warranty Disclaimers

*Second*, plaintiff Custom Chopping argues that the warranty disclaimer in the WLL Agreement was not conspicuous, and so defendant did not effectively exclude the implied warranty of merchantability. Doc. 56 at 40–42. Under Kan. Stat. Ann. § 84-2-316(2), a seller may exclude or modify the implied warranty of merchantability in writing if the language "mention[s] merchantability" and is "conspicuous." Kan. Stat. Ann. § 84-2-316(2); *see also BHC Dev., L.C. v. Bally Gaming, Inc.*, 985 F. Supp. 2d 1276, 1292 (D. Kan. 2013) ("[U]nder Kansas law the implied warranty of merchantability may be disclaimed by contract only if the language specifically mentions merchantability and is 'conspicuous.'" (quoting Kan. Stat. Ann. § 84-2-316(2))).

The KUCC defines "conspicuous" as "written, displayed or presented [so] that a reasonable person against which [the provision] is to operate ought to have noticed it." Kan. Stat. Ann. § 84-1-201(10). Conspicuous terms may include:

> (A)    A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and

(B)  language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

Kan. Stat. Ann. § 84-1-201(b)(10).  Whether a provision is conspicuous is a question for the court.  *Id.*; *see also Geo. C. Christopher & Son, Inc. v. Kan. Paint & Color Co., Inc.*, 523 P.2d 709, 718 (Kan. 1974) (holding that warranty disclaimer on invoices included with each delivery of paint was not conspicuous and thus ineffective to disclaim implied warranties where the disclaimer appeared in smaller type than other information in the invoice, in the same black color font, with "nothing on the invoice that directs attention to the clause").

Custom Chopping asserts that the disclaimer here was not presented so a reasonable person would have noticed it.  Plaintiffs point out that the disclaimer was included on the second page of the WLL Agreements and came after the signature lines, with no additional signature or initials required on the second page to "to indicate the signers even saw it."[28]  Doc. 56 at 42.  Plus, plaintiffs argue, the disclaimer is not conspicuous because it "appears in the same color and is flush with the margins of the remainder of the second page."  *Id.*  But, Custom Chopping concedes that the disclaimer is "in all caps, offset in a box, and specifically mentions merchantability."  *Id.*  Still, Custom Chopping argues two other disclaimers appear all in capital letters on the same page, "one of which is also offset in a box."  *Id.*  And, they note that language above the disclaimer states "you may also have other rights which vary, from region to region."  *Id.*

---

[28]  It is unclear from the summary judgment record whether Custom Chopping claims it was unaware of the disclaimer.  *See Ray Martin Painting, Inc. v. Ameron, Inc.*, 638 F. Supp. 768, 775 (D. Kan. 1986) (explaining a "buyer's *awareness* of the disclaimer causes it to be effective" even if inconspicuous).

The court rejects Custom Chopping's challenge to conspicuousness. "In deciding whether a disclaimer is conspicuous, the [c]ourt considers the entire document." *Orica New Zealand Ltd. v. Searles Valley Minerals Operations Inc.*, No. 04-2310-KHV, 2005 WL 387659, at *1 (D. Kan. Feb. 17, 2005) (citing *J & W Equip.*, 618 P.2d at 864). "Contrasting type, ink color and type size are relevant factors, but they are not determinative." *Id.* (citing *Kelley Metal Trading Co. v. Al-Jon/United, Inc.*, 812 F. Supp. 185, 189 (D. Kan. 1993)). The key question is whether the disclaimer was written in a way that draws the reader's attention to it. *Id.* (citing *J & W Equip.*, 618 P.2d at 866).

Here, the WLL Agreements are just two pages. The first page sets out the length of the warranty and covered parts. The second page describes what the warranty actually includes: "If a defect in material or workmanship is found . . . NHAG will pay parts and labor costs to repair the defect if the services are performed by an authorized NHAG dealer . . . ." *See, e.g.*, Doc. 52-14 at 3. The warranty disclaimer on the second page is provided inside a box, in bold type, and entirely in capital letters. Most of the document is in lower case type. Viewing the document as a whole, the disclaimer is written in a way that draws the reader's attention to it. *See Orica New Zealand*, 2005 WL 387659, at *2 (concluding warranty disclaimer in ten page distribution agreement was conspicuous where bulk of agreement was lowercase, but warranty provisions were in all capital letters and "quickly jump to the reader's eye"); *J & W Equip.*, 618 P.2d at 863–66 (holding warranty disclaimer in "lengthy" contract was conspicuous where it appeared in all capital letters in separate unnumbered paragraph, and "while there are other boldface and noticeable sections of the document, the disclaimer is in distinctive type that draws the reader's attention to it"); *cf. Bally Gaming, Inc.*, 985 F. Supp. 2d at 1291–92 (holding warranty disclaimer in 25 page agreement was not conspicuous where two other provisions of agreement were in all

capital letters but warranty disclaimer was not and thus it did not "stand out from the rest of the text"). The court concludes it is written so that "a reasonable person . . . ought to have noticed it." Kan. Stat. Ann. § 84-1-201(10).

As a matter of law, the disclaimer here was conspicuous. The court thus grants summary judgment against plaintiff Custom Chopping on its conspicuousness challenge to the agreement's implied warranty disclaimer.

### 3. The Timing of the WLL Agreements

*Last*, Custom Chopping argues that "it is noteworthy that the WLL for each tractor was executed *after* the sales agreement and lease agreement for that tractor." Doc. 56 at 41. But, plaintiff neither cites authority nor provides any analysis why this fact is noteworthy. Defendant responds—also citing no legal authority—that the WLL Agreements were signed the day of or within a few days after the delivery of each tractor. Doc. 59 at 15.

For *express* warranties, the KUCC Comments to § 84-2-313 provide:

> The precise time when words of description or affirmation are made or samples are shown is not material. The sole question is whether the language or samples or models are fairly to be regarded as a part of the contract. If language is used after the closing of the deal (as when the buyer when taking delivery asks and receives an additional assurance), the warranty becomes a modification, and need not be supported by consideration if it is otherwise reasonable and in order.

Comment 7 to Kan. Stat. Ann. § 84-2-313. So, a seller may create express warranties before or after the initial closing under the KUCC. As Comment 4 to this section explains, "the parties, if they consciously desire, [can] make their own bargain as they wish."

The KUCC is silent about when disclaimers of the implied warranty of merchantability must be made. Comment 1 to Kan. Stat. Ann. § 84-2-316—the section permitting disclaimers of warranties—explains that the purpose of this provision is to "protect a buyer from unexpected

and unbargained language of disclaimer by . . . permitting the exclusion of implied warranties only by conspicuous language or other circumstances which protect the buyer from surprise."

The Kansas Supreme Court has held that a seller's post-sale disclaimers are ineffective where they were imposed as part of invoices provided "long after" the contract was made and amounted to "a unilateral attempt" of the seller to limit its obligations. *Geo. C. Christopher & Son, Inc.*, 523 P.2d at 716 (concluding that disclaimers expressed in invoices delivered to plaintiff after each paint order made under an larger bid by the supplier could not affect an implied warranty because they were made "long after the date of the contract" and "[a]n attempted limitation at the time of delivery long after a contract of purchase is signed" does not bring the limitation "to the attention of the buyer at the time the contract is made" and is "a unilateral attempt of a party to limit its obligations" (internal quotations and citations omitted));[29] *see also Bowdoin v. Showell Growers, Inc.*, 817 F.2d 1543, 1545–48 (11th Cir. 1987) (holding disclaimer of implied warranty in instruction manual provided at time of delivery of spray rig was ineffective because it was not part of the basis of the bargain); *Mack Trucks of Ark., Inc. v. Jet Asphalt & Rock Co.*, 437 S.W.2d 459, 463 (Ark. 1969) (holding disclaimer of implied

---

[29]    *Geo. C. Christopher* rejected defendant's argument that each order of paint was a separate sale and the invoices a part of each sale.  Instead, the court found the contract was made when defendant's bid was accepted and the disclaimer was not made a part of that contract.  *See Geo. C. Christopher & Son, Inc.*, 523 P.2d at 716–17.  And, "[t]here was no evidence of any kind that the parties negotiated a new agreement on each delivery of paint."  *Id.*  Here, as explained in more detail below, there is evidence of an agreement on the disclaimer—the WLL Agreements are signed contracts in which defendant agrees to provide express warranties subject to the terms and disclaimers within them.  So, the WLL Agreements are not merely a "fulfilment of defendant's obligations" under some previous agreement.  *See id.* at 717; *see also Wayman*, 923 F. Supp. at 1340 (explaining subsequent agreements or modifications to a contract "must be manifested by a writing signed by the parties").  Indeed, this is the *only* agreement directly with defendant.

Also, *Geo. C. Christopher* explained that the rule requiring seller disclaimers to be made at or before the time of the contract does not apply "where the seller was attempting to use the disclaimers subsequently made known to the buyer to create a defense of course of performance." *Geo. C. Christopher & Son, Inc.*, 523 P.2d at 716 (internal quotations and citation omitted).  But, the court didn't address defendant's arguments that the invoices created a course of performance which modified the contract because, even if the invoices were delivered to plaintiff with each paint delivery, the disclaimers were not conspicuous as required by Kan. Stat. Ann. § 84-2-316(2).  *Id.* at 717.

warranty attempted when goods were delivered "long after a contract of purchase" is ineffective because it must be brought to the buyer's attention "at the time the contract is made").

But, "a disclaimer made after the closing of the sale can be made a binding part of the contract if the parties agree to the modification." *Gold Kist, Inc. v. Citizens & S. Nat'l Bank of South Carolina*, 333 S.E.2d 67, 71 (S.C. Ct. App. 1985) (agreeing "post-contract, unbargained-for unilateral attempt[s]" to disclaim warranties on invoices or other documents given to the buyer upon delivery are ineffective, but post-sale disclaimers made a part of the contract by agreement as permitted by § 2-209 of the South Carolina UCC are permitted).[30] Here, AgriCenter's Bills of Sale referenced a manufacturer's warranty as part of the lease transactions, but provided minimal detail about warranty terms. The warranty specifics were agreed to in the separate WLL Agreements signed by Custom Chopping. Custom Chopping entered into the WLL Agreements with defendant after signing the Leases and Bills of Sale and after the tractor's delivery. Under these agreements defendant agreed to provide certain limited express warranties to Custom Chopping in connection with the tractor sales, but subject to the disclaimer of the implied warranty of merchantability and with the requirement that the exclusive remedies be ones provided in the WLL Agreements. Above, the court concluded the disclaimers in the warranty agreements mentioned merchantability and were conspicuous as required by the KUCC to be effective. In a situation where the disclaimer is made by written contract, as opposed to a unilateral attempt post-sale to limit one party's obligations, the disclaimer remains effective.

Analogous case law from Kansas reviewing limitations of remedies, as well as case law from other jurisdictions considering post-sale implied warranty disclaimers supports this conclusion. In *Olathe Manufacturing, Inc. v. Browning Manufacturing*, the Kansas Supreme

---

[30]     The KUCC similarly allows agreements modifying a contract, and such agreements "need no consideration to be binding." *See* Kan. Stat. Ann. § 84-2-209.

Court upheld the trial court's finding that a limited remedy provision in a defendant's catalog providing it applied to *any* products defendant manufactured did not apply to the plaintiff's purchase. 915 P.2d 86, 92–95 (Kan. 1996). The plaintiff had received copies of the defendant's catalog from one of defendant's distributors before the sale. *Id.* But, plaintiff purchased a new product that was not yet included in the catalog and thus "had no knowledge of and had not assented to the remedy limitation" in connection with this particular purchase. *Id.* The trial court determined the catalog language was not binding on plaintiff "absent any contractual writings" between the remote manufacturer and plaintiff or other evidence "from which the Court could infer some type of agreement between the two of them that the sale would be based on that limitation" or that would "show or manifest assent between [buyer and manufacturer] that they are buying subject to a limitation of remedies . . . ." *Id.* at 92. Because the distributor did not incorporate the manufacturer's "limitation from the catalog into its invoicing" or other paperwork documenting the sale and "there [was] no contract between the parties containing that limitation of remedies," the trial court found as a matter of law the limitations were not binding on the plaintiff. *Id.* The Kansas Supreme Court upheld the trial court's ruling, concluding the remedy limitation did not apply as a matter of law because plaintiff "did not know and had no reason to know [the manufacturer] had limited the remedies available." *Id.* at 95.

Limitations on remedies and disclaimers of warranties are different. *See id.* at 89–90. But, courts have applied a similar test to that applied by the *Olathe Manufacturing* trial court to determine whether implied warranty disclaimers are effective—*i.e.*, was the buyer aware of the disclaimer before the sale or has the buyer assented to the disclaimer. *See Pfizer Genetics v. Williams Mgmt. Co.*, 281 N.W.2d 536, 538–39 (Neb. 1979) ("The statute is silent as to when the disclaimer must be made. . . . Although this court has not specifically addressed the question,

other jurisdictions have generally held that disclaimers or warranty made on or after delivery of the goods by means of an invoice, receipt, or similar note are ineffectual unless the buyer assents or is charged with knowledge as to the transaction."); *Pennington Grain & Seed, Inc. v. Tuten*, 422 So.2d 948, 951 (Fla. Dist. Ct. App. 1982) (explaining that a disclaimer of implied warranties is ineffective if made post-contract in an unbargained for and unilateral attempt to limit a seller's obligations, but the court would "nevertheless recognize the disclaimer of other warranties as effective had the farmers assented to it . . . or if the farmers knew of such non-warranty at the time the sale was made, with proof of knowledge being either direct or indirect through evidence of trade custom or course of dealing"); *Hartwig Farms, Inc.v. Pacific Gamble Robinson Co.*, 625 P.2d 171, 173–74 (Wash. Ct. App. 1981) (holding disclaimers on invoices provided after oral contracts for sale were made were ineffective unless accepted by buyer and incorporated into the contract; generally a "disclaimer which is made after a sale is completed cannot be effective because it was not part of the basis of the bargain between the parties" and, because disclaimers are not favored in the law, the court refused to create "the negotiated agreement required for an effective disclaimer . . . [m]erely because [buyer] had notice of the disclaimer's language," instead, the court held the parties must supply the necessary agreement); *Klein v. Asgrow Seed Co.*, 54 Cal. Rptr. 609, 616 (Cal. Dist. Ct. App. 1966) ("Attempts to escape liability for warranties . . . made upon or after delivery of the goods, by means of language on an invoice, receipt or similar notice, are ineffectual unless the buyer assents or he is charged with knowledge of nonwarranty as to the transactions." (internal quotations and citations omitted)).

Here, it is controverted whether Mr. File reviewed the WLL Agreements with Custom Chopping's representatives Griffitts and Coder. Doc. 56 at 15. And, it is not clear from the record whether Custom Chopping received a copy of the WLL Agreements when it signed the

Leases and Bills of Sale. The record shows the warranties were contemplated as part of the leasing of the tractors. *See* Doc. 52-3 at 3 (File Aff. ¶ 10). And, the Bills of Sale referenced the manufacturer's warranties. But, the WLL Agreements themselves were not signed until the day of or within a few days after each tractor's delivery. Regardless, Custom Chopping manifested its acceptance of the WLL Agreements by signing them. This assent establishes that the WLL Agreements were not an unbargained for or unilateral attempt to limit defendant's obligations post-sale. Instead, defendant contractually agreed to provide express warranties to Custom Chopping and, in exchange, Custom Chopping agreed that any other warranties were excluded. No reasonable juror could conclude the implied warranties were not disclaimed where the signed WLL Agreements were the only agreements between defendant and Custom Chopping and Custom Chopping assented the disclaimers by signing the agreements containing the conspicuous disclaimers. *See Albers v. Nelson*, 809 P.2d 1194, 1197 (Kan. 1991) ("It is a well-established rule of law that contracting parties have a duty to learn the contents of a written contract before signing it, and such duty includes reading the contract and obtaining an explanation of its terms."). The court holds that the implied warranty of merchantability effectively was disclaimed and thus grants summary judgment against Custom Chopping's implied warranty of merchantability claim.

In conclusion, the court grants summary judgment in defendant's favor against Custom Chopping's breach of implied warranty of merchantability claim and Griffitts and Coder's breach of express warranty claims. The court denies, however, the motion for summary judgment against Griffitts and Coder's implied warranty of merchantability claims.

### C. Breach of Express Warranty

Next, defendant argues that Custom Chopping's breach of express warranty claim fails as a matter of law because plaintiffs seek a remedy different than the exclusive remedy agreed to in the WLL Agreements. Doc. 51 at 2; Doc. 52 at 20–22. Defendant argues that the WLL Agreements provided for "the exclusive remedy of paying for parts and labor costs for the repair, by an authorized dealer, of any defect in material or workmanship that is found and reported during the warranty period." Doc. 52 at 2. And, defendant points out, Custom Chopping waived any right to incidental or consequential damages under the WLL Agreements. Doc. 52 at 20. Plaintiffs nonetheless seek reimbursement of their lease payments as damages. Doc. 50 at 15; Doc. 56 at 19. Because plaintiffs seek a different remedy than the WLL Agreements allow and plaintiffs never allege that defendant "failed to pay, or that Plaintiffs were required to pay for parts or labor costs by an authorized dealer for the repair of an alleged defect in the tractors," defendant contends, Custom Chopping's breach of express warranty claim must fail. Doc. 52 at 2.

In response, Custom Chopping argues that the exclusive remedy under the WLL Agreements failed of its essential purpose. Doc. 56 at 42–47. Custom Chopping says this is so because of the "number and type of mechanical failures, combined with the software defect in the precision farming and guidance system." Doc. 50 at 11. Custom Chopping argues that repairs are an inadequate remedy because the defects "left Plaintiffs with no ability to use a tractor on numerous occasions, sometimes for extended periods of time, and sometimes involved multiple tractors being inoperable at the same time." Doc. 56 at 45. And, Custom Chopping asserts, the GPS issue took years to fix and their repair shortly before the Leases expired essentially amounted to no repair at all. *Id.* at 46. So, Custom Chopping argues, under the

KUCC other remedies are available beyond the limited remedies provided for by contract.  Doc. 56 at 42.

Defendant asserts that summary judgment is appropriate for a second reason.  Defendant argues that "[e]xpert testimony is required to establish the difference in value damages" under the KUCC and, "[b]ecause Plaintiffs [have] failed to identify or disclose any expert witness," they "have no admissible evidence of damages."  Doc. 52 at 21.

The court addresses defendant's two summary judgment arguments below.

### 1. Exclusive Remedy under the WLL Agreements

Under Kan. Stat. Ann. § 84-2-313, affirmations of fact or promises "made by the seller to the buyer which relate[] to the goods" or "any description of the goods" which are, in each case, "part of the basis of the bargain" create an express warranty that the goods will conform to the affirmation, promise, or description.  Under the KUCC, parties may agree to remedies for a breach of warranty "in addition to or in substitution for" those provided by the KUCC and "may limit or alter the measure of damages recoverable."  Kan. Stat. Ann. § 84-2-719(1)(a); *see also Bally Gaming, Inc.*, 985 F. Supp. 2d at 1293 ("Limitations on liability and remedies are enforceable under Kansas law.").  Generally, when a "remedy is expressly agreed to be exclusive," it is "the sole remedy."  Kan. Stat. Ann. § 84-2-719(1)(b).  But, if "circumstances cause an exclusive or limited remedy to fail of its essential purpose," remedies under the KUCC are available despite the exclusive remedy agreement.  *Id.* § 84-2-719(2).  Comment 1 to Kan. Stat. Ann. § 84-2-719 explains, "it is of the very essence of a sales contract that at least minimum adequate remedies be available."  So, if an otherwise fair and reasonable exclusive remedy provision "because of circumstances fails in its purpose or operates to deprive either party of the

substantial value of the bargain, it must give way to the general remedy provisions" of Article 2 of the KUCC.  Comment 1 Kan. Stat. Ann. § 84-2-719.

Here, it is undisputed that the WLL Agreements provided an exclusive remedy— defendant agreed to pay parts and labor costs to repair a defect in materials or workmanship reported during the warranty period, so long as an authorized dealer had performed the repairs. And, the WLL Agreements explicitly provided that this was the buyer's exclusive remedy.  So, the question is whether this exclusive remedy failed of its essential purpose.  Custom Chopping argues this is a disputed question of fact for the jury.  Doc. 56 at 43.  As explained below, the court agrees.

The Kansas Court of Appeals has held that the question whether a failure of essential purpose under Kan. Stat. Ann. § 84-2-719(2) has occurred is a question of fact.  *Elite Prof'ls, Inc. v. Carrier Corp.*, 827 P.2d 1195, 1204–05 (Kan. Ct. App. 1992).  In that case, the trucking company plaintiff appealed from a summary judgment ruling in favor of defendant, the manufacturer of a refrigeration unit that malfunctioned.  *Id.* at 1197.  Plaintiff was transporting meat across the country when it realized the temperature in the unit had started to rise above the zero degree temperature required to keep the product from spoiling.  *Id.* at 1198.  Plaintiff's employee reported the issue and plaintiff tried to arrange for a repair or truck switch, but ultimately the meat spoiled.  *Id.*  Defendant had warranted the refrigeration unit, agreeing to repair or replace defective parts at one of its dealer facilities during normal working hours.  *Id.* This warranty was given in lieu of all other warranties and defendant disclaimed any liability for all other damages, providing that the repair or replacement of parts was the exclusive remedy. *Id.*  Defendant repaired the refrigeration unit at no charge to plaintiff, but after the meat already had spoiled.  *Id.*  Plaintiff sued to recover damages for the loss of the meat.  *Id.* at 1197.

The trial court granted summary judgment to defendant, holding the warranty disclaimers prevented plaintiff from recovering damages for the spoiled meat. *Elite Prof'ls, Inc.*, 827 P.2d at 1199. But, the court of appeals reversed. *Id.* at 1204. The court of appeals held that the summary judgment record did not establish as a matter of law whether the limited "repair or replace" remedy was meaningfully available to plaintiff or failed of its essential purpose. *Id.* The warranty provided for repair or replacement during normal working hours, but the record did not contain sufficient information to determine if an open facility was available to plaintiff. *Id.* If the repair or replace remedy failed of its essential purpose, under the KUCC other remedies would be available despite the exclusive remedy provision. *Id.* So, the court of appeals remanded to the trial court, explaining that "[w]hether the remedy failed in this case is a question of fact and should not have been decided on summary judgment." *Id.* at 1204–05.

Other courts, including this court, agree. *See Delhomme Indus., Inc. v. Hous. Beechcraft, Inc.*, 669 F.2d 1049, 1062–63 (5th Cir. 1982) (applying the KUCC and explaining that if manufacturer's limited remedy of repair or replacement of parts failed of essential purpose, buyer could "go beyond it and recover damages;" the test to determine if "a limited warranty failed of its essential purpose is whether the buyer is given, within a reasonable time, goods that conform to the contract;" and "the question whether the circumstances . . . justify a § 84-2-719(2) action . . . is a question of fact"); *Champlain Enter., Inc. v. United States*, 957 F. Supp. 26, 29–31 (N.D.N.Y. 1997) (applying the KUCC and explaining that Kansas law generally permits parties to agree to their own remedies by contract, but not "every contractual limitation will automatically be given full effect," and if a limited remedy fails of its essential purpose—a question of fact for the jury—and leaves a party with an unconscionably inadequate remedy, depriving plaintiff of the substantial value of its bargain, other remedies may be available);

*Ritchie Enter. v. Honeywell Bull, Inc.*, 730 F. Supp. 1041, 1048–49 (D. Kan. 1990) (applying Massachusetts law and explaining "[w]hether circumstances show the limited remedy to have failed of its essential purpose is generally considered to be a question of fact," so "courts have usually assumed at the summary judgment level that the remedy of repair or replacement has failed"); *Ritchie Sand, Inc. v. Eagle Iron Works*, No. 87-1385-C, 1989 WL 31408, at *5–6 (D. Kan. 1989) (noting § 84-2-719(2) "requires an analysis of the agreed limited remedy to determine its essential purpose and whether it has failed in that purpose" and "from the buyer's standpoint, this limited remedy [of repair or replacement] is to provide him with conforming goods within a reasonable time after discovery of the defect," and concluding that—though whether the circumstances cause a failure of essential purpose generally is a question of fact—on the record before the court no "reasonable person could find that . . . [the] limited warranty failed in its essential purpose").[31]

Plaintiffs here have presented evidence of the tractors' GPS and mechanical issues throughout the lease terms. And, plaintiffs have presented evidence that these issues affected Custom Chopping's workflow. Plaintiffs also have identified evidence in the record showing that, at times, multiple tractors were inoperable or in the shop and that sometimes defects took weeks to fix, or effectively, never were fixed during the lease terms. But, evidence also exists that Custom Chopping continued to use the tractors and that defendant was unaware the problems had continued. And, there is evidence that defendant repaired both the mechanical issues and the GPS issues, and plaintiff was provided loaner tractors at times. On this summary

---

[31]     In *Ritchie Sand*, defendant's limited warranty period already had expired. 1989 WL 31408, at *6. And, though the warranty was conditioned upon written notice of the defect given immediately after the defect's discovery, plaintiff did not notify defendant in writing until at least 10 months after the problems began, and a year after the warranty had expired. *Id.* at *4. But, defendant still sent an engineer to examine the product within two weeks of receiving notice of the problem and corrected it, bringing the "goods into conformance in little more than two months." *Id.* at *3, 6.

judgment record, a reasonable jury could return a verdict for plaintiff, the non-moving party, on this issue. *See Nahno-Lopez*, 625 F.3d at 1283; *Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1129–31 (10th Cir. 2002) (reviewing jury's damage award which implicitly found that the exclusive remedy failed of its essential purpose and explaining that, under Michigan law, facts showing a seller had not completed repairs or provided replacements promised by the warranty within a reasonable time or repeated problems requiring repair, some of which never were repaired, are sufficient to support a finding that the express warranty failed in its essential purpose); *Ritchie Enter.*, 730 F. Supp. at 1048 (explaining that courts have found a limited remedy of repair and replacement to have failed of its essential purpose "where the defects were latent and undiscoverable after a reasonable inspection, or where repairs were unreasonably delayed or never effectively made" (internal citations omitted)).

The WLL Agreements provided Custom Chopping with an exclusive remedy. But a jury must determine whether the evidence, as a whole, shows that this exclusive remedy failed of its essential purpose. Genuine disputes about material facts remain, and the court thus can't award defendant judgment as a matter of law on Custom Chopping's breach of express warranty claim.

### 2. Damages for Breach and the Need for Expert Testimony

As explained above, if the exclusive remedy is found to have failed of its essential purpose, remedies "may be had as provided" by the KUCC. *See* Kan. Stat. Ann. § 84-2-719(2). Under Kan. Stat. Ann. § 84-2-714(2), "[t]he measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." *See also Delhomme Indus., Inc. v. Hous. Beechcraft, Inc.*, 735 F.2d at 184–85 (5th Cir. 1984) (applying the KUCC and explaining the proper measure

of damages should be determined by comparing "the value of the aircraft 'with defects' at the time of acceptance and the value of the aircraft had it been 'as warranted'"); *Ricklefs v. Clemens*, 531 P.2d 94, 99–100 (Kan. 1975) (explaining normally the measure of damages is the difference between the value of the goods accepted and the value if they had been as warranted—*i.e.*, "the loss directly and naturally resulting from the breach of warranty"— but where the car at issue was stolen, special circumstances existed and the damages for breach of warranty was the value of the car at the time of dispossession). "Proof of damages is an essential element in an action for breach of express warranty." *Limestone Farms, Inc. v. Deere & Co.*, 29 P.3d 457, 460 (Kan. Ct. App. 2001).

Defendant argues—even if a jury must resolve fact questions whether the exclusive remedy under the WLL Agreements failed of its essential purpose—that Custom Chopping's breach of express warranty claim still fails as a matter of law because Custom Chopping has disclosed no expert to establish damages. Defendant contends that "[e]xpert testimony is required to establish the difference in value damages caused by an alleged breach." Doc. 52 at 21. This is so, defendant argues, because the facts here are complex and a lay factfinder, without the aid of expert testimony, "does not know anything about the market for or value of tractors (whether purchased or leased), much less the value of tractors with certain alleged GPS and mechanical defects." *Id.* at 21–22. And so, defendant asserts, by "fail[ing] to identify or disclose any expert witness in this case, Plaintiffs[] have no admissible evidence of damages." *Id.* at 21; *see also* Doc. 51 at 2 ("Plaintiffs have offered no admissible evidence (*i.e.*, expert testimony) to establish damages available under the UCC for breach of warranty.").

Custom Chopping disagrees. Custom Chopping contends that "a lay jury is more than capable of evaluating the quantity and type of mechanical issues; no expertise is needed beyond

that which most lay jurors have by virtue of owning a home or a vehicle." Doc. 56 at 47. And, Custom Chopping asserts, "[t]he purchase and lease amounts are established as the value of the Tractors which were intended to be acquired; the only question for the jury would be the value of the tractors that Plaintiffs actually received." *Id.* at 48. In Custom Chopping's view, "the mechanical and GPS defects [were] so pervasive" that a jury "can easily determine that the Tractors were 'lemons' and therefore had no value at all." *Id.* Custom Chopping argues that the tractors' repeated issues, coupled with the GPS issue not being resolved until near the end of the Leases, shows the damages are established by the lease payments. *Id.*

'"There is no fixed or general rule that requires expert testimony."' *Genesis Health Clubs, Inc. v. Led Solar & Light Co.*, No. 13-1269-JWL, 2014 WL 1246768, at *6 (D. Kan. 2014) (quoting *Randolph v. Collectramatic, Inc.*, 590 F.2d 844, 848 (10th Cir. 1979)). But, if a subject "requires special experience, only the testimony of a person of that special experience will be received." *Randolph*, 590 F.2d at 848. And, "expert testimony is required only if a lay factfinder lacks the competency and is not equipped by common knowledge and skill to draw proper conclusions concerning the issue at hand." *Genesis Health Clubs*, 2014 WL 1246768, at *6 (citing *Voelkel v. Gen. Motors Corp.*, 846 F. Supp. 1468, 1477 n.3 (D. Kan. 1994)).

As Judge Lungstrum concluded in *Genesis Health Clubs*, the court here concludes that "it cannot say at this stage that expert testimony is required for consideration of this issue." *See Genesis Health Clubs*, 2014 WL 1246768, at *6. Defendant bears the burden on summary judgment to show that expert testimony is required to establish damages. And, as explained below, the court concludes defendant has not carried its burden on this question on summary judgment.

Defendant has not identified anything in the record or case law supporting a conclusion that only expert testimony could establish the difference in value between the tractors as received and the tractors as they were warranted. Sometimes, expert testimony may be required. *See Chapman v. Kan. Basement & Found. Repair, Inc.*, No. 100,941, 210 P.3d 137, 2009 WL 1911750, at *3–5 (Kan. Ct. App. July 2, 2009) (upholding directed verdict for defendant where trial court "determined that expert witness testimony was required to substantiate" plaintiff's claim that defendant's breach had diminished the house's value because the house had preexisting structural issues separate from any issues caused by defendant's piering repairs and expert testimony was required to distinguish between damages caused by defendant and those caused by the preexisting condition and, without such evidence plaintiff had not established the necessary causal nexus between breach and diminution in value);[32] *see also Robison Farms, Inc. v. ADM All. Nutrition, Inc.*, No. 05-4089-KGS, 2007 WL 2875132, at *19 (D. Kan. Sept. 29, 2007) (explaining plaintiff must prove that the defect in the product caused plaintiff's injury and although "the court does not believe every claim for a breach of express warranty in a product liability case requires an expert to testify as to causation," facts of this particular case—in which plaintiff used a preservative product on its crop that it alleged caused the damage to its hay— involved "such technical complexities" that "the average layman" would not be able to understand them "without the aid of expert testimony" (internal quotations and citations omitted)). But here, defendant marshaled no evidence, *e.g.*, expert testimony of its own or case law examining cases like this one, to support its argument that the typical jury could not

---

[32] The Kansas Court of Appeals noted in *Chapman* that plaintiff's "sole approach to her damages was diminution in value, apparently to the exclusion of other acceptable measures of damages such as cost of repair." *Chapman*, 2009 WL 1911750, at *4. The court of appeals also explained that in breach of warranty actions, plaintiff must prove that the breach caused the damages claimed, and "the measure of damages for breach of warranty is the loss directly and naturally resulting from the breach." *Id.* (internal citations and quotation omitted).

determine the value of the tractors with and without the alleged defects. *Cf. Massey-Ferguson Credit Corp. v. Webber*, 841 F.2d 1245, 1250–51 (4th Cir. 1988) (holding testimony of mechanic employed by selling dealer that the combine "would not perform properly and was worth nothing," and testimony of neighboring farmer "that the machine had only a salvage value" was sufficient to support jury's award of fair market value of the combine (less its salvage value) as damages, and overruling trial court's decision to set aside jury verdict on the grounds that it was contrary to common sense that the new combine could have no value);[33] *Ricklefs*, 531 P.2d at 100–102 (examining cases considering the proper measure of damages and noting that the "value" under Kan. Stat. Ann. § 84-2-714 is not the same as "purchase price," but, depending on circumstances, the purchase price may be "some evidence of its value for the purpose of assessing damages"); *Perry v. Schoonover Motors, Inc.*, 371 P.2d 152, 155–56 (Kan. 1962) (measure of damages where car was represented as new, but actually was used, was the difference in value between the car as represented and the car actually received, and "the price paid may properly be submitted to the jury as a fact to aid" their assessment of damages); *Rose v. Mercedes-Benz U.S.A., LLC*, 882 N.2d 112, 113–14, 117–21 (Ill. Ct. App. 2007) (concluding plaintiff failed to lay adequate foundation for her testimony about value of her defective vehicle, offered as lay opinion testimony, because while foundation was presented for an opinion on the value of a car in good condition, no basis was given "for personal knowledge of the value of the car in its defective condition"). The current record, as adduced and submitted by defendant, does not sustain its burden to show that Custom Chopping must admit expert testimony to establish

---

[33]    The combine in the *Massey-Ferguson Credit Corp.* case was used in three harvests, but damaged 20% of the crops it harvested. 841 F.2d at 1247, 1250 ("A machine manufactured and purchased solely for use in commercial farming has little more than scrap value if it cannot be operated economically.")

damages. The court thus denies summary judgment against Custom Chopping's breach of express warranty claim for this reason.

Defendant's Reply also argued that "no reasonable jury could conclude that the Tractors, even with the purported GPS and mechanical issues alleged by Plaintiffs, had no value at all. Doc. 59 at 16–17. Defendant directs the court to plaintiffs' interrogatory answers, which show 9,235 hours of usage on the tractors as of January 10, 2019."[34] *Id.* at 17. And, defendant's Reply takes issue with plaintiffs' arguments in their Response that, even if the total value of lease payments is not the proper method to calculate damages, other methods exist. *Id.* More specifically, plaintiffs asserted that "[a] jury might also reasonably calculate the damages based on the 'per hour' rate identified in the leases" or calculate damages after "hear[ing] evidence from Plaintiffs as to their opinion on the value of the tractors actually received, compared to the value they paid for the tractors." Doc. 56 at 49. The parties again disagree whether an expert is

---

[34] Though this issue is not properly before the court, the court has meaningful doubt whether plaintiffs' aggressive damage claim aligns with the measure of damages permitted as a remedy under the KUCC. Namely, plaintiffs assert in the Pretrial Order that they "seek damages equal to the total amount of lease payments paid for use of the tractors in the total combined amount of $791,140.27." Doc. 50 at 15. The court struggles to see how any reasonable juror could find the lease payments equal the difference in value of the tractors—the KUCC's measure of damages under Kan. Stat. Ann. § 84-2-714(2). Not only does the evidence show the tractors were used by Custom Chopping and Farm Services throughout the terms of the Leases, although often they may have been out of service for repairs or caused delays due to GPS failures, the tractors also were financed and leased through Farm Credit.

The lease payments undoubtedly include amounts owed to Farm Credit unrelated to the "value of the goods accepted and the value they would have had if they had been as warranted." *See* Kan. Stat. Ann. § 84-2-714(2). For example, the court doubts the "value" of the tractors accepted includes the financing costs incurred by plaintiffs to lease the tractors rather than buying them at their listed purchase price. And, it is unlikely such amounts could be recovered as incidental or consequential damages. *See Delhomme Indus., Inc.*, 735 F.2d at 185–86 (rejecting plaintiff's contention that it should be entitled to recover as incidental or consequential damages "the amounts it expended on insurance and finance charges" because incidental damages include only those "incident to the delay or other breach" and consequential damages "must proximately result from the breach," and explaining that "Kansas law requires that such damages must be the reasonably-contemplated probable result of the breach, or arise from the breach itself" (internal quotations and citations omitted)); *cf. Perry v. Schoonover Motors, Inc.*, 371 P.2d 152, 155 (Kan. 1962) (explaining evidence of financing document properly was admitted solely for the purpose of showing the car purchased was represented to be new, and jury properly was instructed the measure of damages was based on the value of the car—*i.e.*, the instructions did not include damages based on financing arrangement with third party). *But see Schatz Distrib. Co. v. Olivetti Corp. of Am.*, 647 P.2d 820, 825–26 (Kan. Ct. App. 1982) (measure of damages where plaintiff purchased computer that failed to work could include interest on lease purchase contract as consequential damages where purchaser presented evidence that the seller knew the buyer needed to finance the purchase).

required to establish these damages. Defendant argues plaintiffs had to disclose these proposed

damage theories in the Pretrial Order, and by not doing so, plaintiffs cannot pursue them as

damages at trial.[35] Doc. 59 at 18. Defendant did not move for summary judgment on these

issues, however, and first raised them in its Reply. And, the court declines to consider issues not

properly before it.

In sum, at trial—if Custom Chopping prevails on its argument that the exclusive remedy

failed of its essential purpose—it then must establish damages for its breach of express warranty

claim as permitted by the KUCC—*i.e.*, the difference between the value of the goods delivered

and the value of the goods if as warranted, unless special circumstances show damages of a

different amount. *See* Kan. Stat. Ann. § 84-2-714(2). At this stage, the court cannot determine

whether expert testimony is required to establish damages and the court declines to grant

summary judgment against Custom Chopping's breach of express warranty claim.

---

[35] Plaintiffs did not cite Kan. Stat. Ann. § 84-2-714(2) in the Pretrial Order. But, the Pretrial Order does state plaintiffs' breach of warranty claims are governed by the KUCC and applicable Kansas case law. Doc. 50 at 2. Plaintiffs also assert in the Pretrial Order that they "are availing themselves of the remedies in the KUCC." *Id.* at 11; *cf. Genesis Health Clubs*, 2014 WL 1246768, at *8 (holding that because plaintiff did not assert in the pretrial order a claim for damages under § 84-2-714 for the difference between the value of the goods delivered and the value of the goods if as warranted—plaintiff sought the purchase price as damages in the pretrial order—and had not "provided any evidence of such difference in value" plaintiff was "barred from asserting any such claim for the difference in value," where defendant moved for summary judgment specifically on the issue of damages). And, plaintiffs contend in their Response that the value of the lease payments is the difference in value under the KUCC because the tractors were "lemons." Doc. 56 at 48 (arguing the "purchase and lease amounts are established as the value of the tractors which were intended to be acquired" and the tractors were "lemons" with no value at all).

The court can't determine from the current record the potential value of a tractor that is defective during the first three to four years of its useful life compared to the value of the tractor if as warranted. And, though the court is skeptical that this difference in value could equal the lease payments, *supra* note 34, defendant did not move for summary judgment based on the amount of damages claimed in the Pretrial Order. While not properly before the court, the court reminds plaintiff that "[a] damages theory omitted from the pretrial order is waived." *Genesis Health Clubs, Inc. v. LED Solar & Light Co.*, 639 F. App'x 550, 557 (10th Cir. 2016) (upholding district court's determination that plaintiff could not pursue a new measure of damages based on difference in value after claiming damages in the amount of the purchase price in the pretrial order, and finding no abuse of discretion in district court's determination that—even if the amount of damages would decrease under the alternative method—defendant "'was entitled to know in discovery'" how plaintiff "'intended to measure and prove its damages, as well as the amount of those damages'").

### D. Farm Services' Use of the Tractors

Defendant's fourth summary judgment argument asserts that plaintiffs "are precluded from asserting claims or seeking damages related to alleged problems encountered by" Farm Services during that limited liability company's use of the tractors. Doc. 51 at 2. Defendant contends Farm Services has no privity with defendant because it was not a party to the Leases or WLL Agreements, had no agreement with Custom Chopping, made no payments to Custom Chopping for using the tractors, and was not allowed to operate the tractors under the terms of the Leases. *Id.* Defendant notes that the GPS issues occurred more frequently when the tractors were used for manure spreading, an activity performed by Farm Services only. Doc. 52 at 22. And, defendant argues, the Leases restrict use of the tractors "the Lessee's trade or business for legal business and commercial purposes." *See, e.g.*, Doc. 52-6 at 3. Because Farm Services is not a Lessee under any Lease, defendant contends, Farm Services' use of the tractors violated the Leases. Doc. 52 at 24. Importantly, defendant argues that Farm Services is not a party to this lawsuit, and thus claims stemming from an injury sustained by Farm Services are not properly before the court. Doc. 52 at 23. Defendant seeks a summary judgment ruling that plaintiffs "may not assert claims or seek damages" based on Farm Services' use of the tractors. *Id.* at 22. The court agrees.

Plaintiffs argue in response that Griffitts and Coder are the two members of Farm Services and so, even though Farm Services itself has asserted no claims in this case, the two individuals "used [the tractors] for business and agricultural purposes when they allowed Farm Services . . . to use them." Doc. 56 at 50. Many of plaintiffs' arguments are tied to the arguments asserted in support of their KCPA claims, which the court determined above fail as a matter of law. *See id.* at 50–52. Plaintiffs argue that "[w]hile the mechanical issues and defects

did occur during the use by . . . Farm Services, the court cannot look in a vacuum and exclude from consideration the issues and defects that Griffitts and Coder encountered during [] Farm Services['] usage." *Id.* at 51. And, plaintiffs contend, "[i]t does not matter what corporate structure that business has." *Id.*

The court already has rejected this argument. *See supra* Part III.A.2. The court need not consider whether Farm Services' use of the tractors was permitted under the terms of the Leases or if Farm Services has privity with defendant. Plaintiffs created a separate legal entity with limited liability to operate their business. Any claims arising from an injury to Farm Services from its use of the tractors belong to Farm Services, and that entity has not asserted any claims here. *See Hartleib v. Weiser Law Firm, P.C.*, No. 19-02099-CM-JPO, 2019 WL 3943064, at *4 (D. Kan. Aug. 21, 2019) (applying Kansas law and concluding, "[w]hen a corporation is injured, the claims arising out of that injury belong to the corporation"). Farm Services is not a party to this suit. It cannot assert claims by proxy. The court thus concludes that plaintiffs may not assert claims or seek damages stemming from problems encountered by Farm Services.

### E.  Extended Warranty with AgriCenter

Finally, defendant argues plaintiffs' claims—to the extent that they assert defendant is liable to plaintiffs for "any purported oral extended warranty allegedly agreed to by Agri-Center related to the tractors"—fail as a matter of law because defendant "was not a party to that alleged agreement and [defendant's] express warranty disclaims it." Doc. 51 at 2. So, defendant seeks a summary judgment ruling that it is not liable for any extended warranty that AgriCenter allegedly provided to plaintiffs. Doc. 52 at 25. "Plaintiffs do not dispute this point." Doc. 56 at 52. Plaintiffs maintain they "are not asserting any claims based on an alleged oral warranty

between Agri-Center and [p]laintiffs." So, no claims based on the extended warranty allegedly provided by AgriCenter can survive summary judgment here.

## IV. Conclusion

For reasons explained above, the court grants in part and denies in part defendant's Motion for Summary Judgment (Doc. 51). Specifically:

- the court grants summary judgment for defendant against Griffitts and Coder's KCPA claims;

- the court denies summary judgment against Griffitts and Coder's breach of implied warranty of merchantability claims;

- the court grants summary judgment for defendant against Custom Chopping's breach of implied warranty of merchantability claim;

- the court grants summary judgment for defendant against Griffitts and Coder's breach of express warranty claims; and

- the court denies summary judgment against Custom Chopping's breach of express warranty claim.

The court also grants plaintiffs' Motion for Leave to File a Surreply (Doc. 62). The court exercises its discretion and denies plaintiffs' Unopposed Motion for Oral Argument (Doc. 60).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant CNH Industrial America LLC's Motion for Summary Judgment (Doc. 51) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** plaintiffs Griffitts & Coder Custom Chopping, LLC, Bradley A. Griffitts, and Timothy L. Coder's Unopposed Motion for Oral Argument (Doc. 60) is denied.

**IT IS FURTHER ORDERED THAT** plaintiffs' Motion for Leave to File a Surreply to Defendant's Reply in Support of its Motion for Summary Judgment (Doc. 62) is granted.

**IT IS SO ORDERED.**

**Dated this 6th day of February, 2020, at Kansas City, Kansas**

                                       **s/ Daniel D. Crabtree**
                                       **Daniel D. Crabtree**
                                       **United States District Judge**